1  Pavel I. Pogodin, Ph.D., Esq. (SBN 206441)
2  CONSENSUS LAW
   5245 Av. Isla Verde
3  Suite 302
   Carolina, PR 00979
4  United States of America
   Telephone: (650) 469-3750
5  Facsimile: (650) 472-8961
   Email: pp@consensuslaw.io
6
7  Attorneys for Plaintiff Dmitry Dolgov

8              **UNITED STATES DISTRICT COURT**

9          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10                **SAN FRANCISCO DIVISION**

11

12  Dmitry Dolgov,                    Case No.  3:20-cv-7140

13                                    **COMPLAINT FOR CONSPIRACY TO**
                     Plaintiff,       **CONDUCT AND CONDUCTING**
14                                    **ENTERPRISE'S AFFAIRS THROUGH**
                                      **A PATTERN OF RACKETEERING**
15                                    **ACTIVITY IN VIOLATION OF 18**
                                      **U.S.C. §§ 1962(d) AND (c) (RICO),**
16                   v.               **CRYPTOCURRENCY MARKET**
                                      **MANIPULATION IN VIOLATION OF 7**
17                                    **U.S.C. § 9(1) (USE OF DECEPTIVE OR**
                                      **MANIPULATIVE DEVICE), 7 U.S.C. §§**
18  HDR Global Trading Limited (A.K.A. **9(3) AND 13(a)(2) (PRICE**
    BitMEX), ABS Global Trading Limited, **MANIPULATION), PRINCIPAL**
19  Grape Park LLC, Mark Sweep LLC,   **AGENT LIABILITY, AIDING AND**
    Unknown Exchange, Arthur Hayes, Ben Delo, **ABETTING PRICE MANIPULATION**
20  Samuel Reed, Agata Maria Reed (A.K.A. **IN VIOLATION OF 7 U.S.C. § 25(a)(1),**
    Agata Maria Kasza), Barbara A. Reed and **NEGLIGENCE, FRAUD, CIVIL**
21  Trace L. Reed,                    **CONSPIRACY, UNFAIR BUSINESS**
                                      **PRACTICES IN VIOLATION OF CAL.**
22                                    **BUS. & PROF. CODE §§ 17200 ET SEQ,**
                     Defendants.      **UNJUST ENRICHMENT**
23                                    **(RESTITUTION), CONSTRUCTIVE**
                                      **TRUST, ACCOUNTING AND**
24                                    **CONVERSION**
25                                    **DEMAND FOR JURY TRIAL**
26

27

28

## **COMPLAINT**

Plaintiff Dmitry Dolgov ("Dolgov") ("Plaintiff"), by and through his undersigned attorneys, for his Complaint against Defendant HDR Global Trading Limited ("HDR"), Defendant ABS Global Trading Limited ("ABS"), Defendant Grape Park LLC ("Grape Park"), Defendant Mark Sweep LLC ("Mark Sweep"), Defendant Unknown Exchange ("Unknown Exchange"), Defendant Arthur Hayes ("Hayes"), Defendant Ben Delo ("Delo"), Defendant Samuel Reed ("Reed"), Defendant Agata Maria Reed (A.K.A. Agata Maria Kasza) ("Agata Reed"), Defendant Barbara A. Reed ("Barbara Reed") and Defendant Trace L. Reed ("Trace Reed") (collectively "Defendants") alleges as follows:

## **INTRODUCTION**

*"It just costs more to bribe them."  Defendant Arthur Hayes (about U.S. authorities).*

1.     Plaintiff Dolgov is informed and believes and thereon alleges that popular cryptocurrency derivatives exchange platform called Bitcoin Mercantile Exchange or BitMEX ("BitMEX" or "BitMEX platform") owned and operated from within this District by Defendants ABS, HDR, Hayes, Delo and Reed, and each of them, in a brazenly lawless manner, was deliberately designed from ground up with the purpose to engage in, facilitate, aid, abet, counsel, induce and/or procure a myriad of illegal activities including, without limitation, racketeering in violation of 18 U.S.C. §§ 1962(d) and (c) (RICO), wire fraud in violation of 18 U.S.C. § 1343; money laundering in violation of 18 U.S.C. § 1956(a); engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957(a); conducting, controlling, managing, supervising, directing, or owning all or part of an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), interstate transportation of stolen property in violation of 18 U.S.C. § 2314 and cryptocurrency market manipulation in violation of the Commodity Exchange Act (the "CEA"), 7 U.S.C. §§ 1 et seq. (2012) and Commodity Futures Trading Commission ("CFTC") Regulations ("Regulations") promulgated thereunder, 17 C.F.R. §§ 1 et seq. (2018).  Defendants, and each of them, specifically designed BitMEX to financially benefit from the alleged racketeering activity and other unlawful conduct, earning Defendants

billions of dollars in illicit profits, Ex. 1, 2, 3.

2.      On October 1, 2020, Defendants Hayes, Delo and Reed were indicted by United States Department of Justice on felony charges of violating the Bank Secrecy Act and conspiring to violate the Bank Secrecy Act, by willfully failing to establish, implement, and maintain an adequate anti-money laundering ("AML") program at BitMEX.  In announcing the indictment, Ex. 4, FBI Assistant Director William F. Sweeney Jr. said:  "As we allege here today, the four defendants, through their company's BitMEX crypto-currency trading platform, willfully violated the Bank Secrecy Act by evading U.S. anti-money laundering requirements.  One defendant went as far as to brag the company incorporated in a jurisdiction outside the U.S. because bribing regulators in that jurisdiction cost just 'a coconut.'  Thanks to the diligent work of our agents, analysts, and partners with the CFTC, they will soon learn the price of their alleged crimes will not be paid with tropical fruit, but rather could result in fines, restitution, and federal prison time." Defendant Reed was apprehended by the FBI in Boston, Massachusetts.  Defendants Hayes and Delo remain at large and are currently fugitives wanted by the U.S. Government.

3.      On the same day, the CFTC announced the filing of a civil enforcement action in the U.S. District Court for the Southern District of New York charging Defendants HDR, ABS, Hayes, Delo and Reed with operating an unregistered trading platform and violating multiple CFTC Regulations, including failing to implement required anti-money laundering procedures. The CFTC complaint is attached hereto as Ex. 5 and all allegations therein are made part hereof.

4.      Among those charged were company owners Defendants Hayes, Delo, and Reed, who operate BitMEX's platform through a maze of corporate entities, including Defendants HDR and ABS.   BitMEX's platform has received more than $11 billion in bitcoin deposits and made more than $1 billion in fees, while conducting significant aspects of its business from the U.S. and accepting orders and funds from U.S. customers.

5.      The key facts of the racketeering scheme run by Defendants are rather simple and easy to understand.  In 2014, Defendants launched the bitcoin derivatives trading platform BitMEX, which enables traders to place bets on direction of cryptocurrency prices.  In designing

their platform, Defendants decided to sidestep any financial controls mandated by the traditional banking system by transacting only in bitcoin and refused to implement any know your customer (KYC) or anti-money laundering (AML) checks what so ever, Ex. 1.   In other words, Defendants would open account and accept unlimited funds from anyone, without a single question asked.

6.     In fact, one can open an account, deposit unlimited funds and start trading without furnishing a single document, all is required is a user name and email address, which are not verified by BitMEX in any way.  The entire account registration and funding process takes about 10 minutes and no documents are even looked at.  Understandably, because of total lack of controls of any kind, hackers, tax evaders, money launderers, smugglers, drug dealers all flocked to BitMEX flooding the platform with hot money, Ex. 1.  A recent and very telling example is the infamous Twitter hacker, who turned out to be a BitMEX trader, Ex. 6.

7.     Having a large pool of hot money at their disposal, Defendants designed the internal workings of their trading platform to enable, encourage and benefit from money laundering and market manipulation.  It all has to do with anonymity, lack of trading limits, high leverage and how the index price for bitcoin derivatives is calculated.   Defendants deliberately designed this index price to be based on bitcoin spot price on two or three illiquid bitcoin spot exchanges.  Illiquid in this context means that, to precipitously move bitcoin price on those exchanges, relatively small market orders will suffice.  Therefore, a relatively small market order on a spot exchange results in a relatively large bitcoin index price move on the very liquid BitMEX.

8.     A money launderer (Defendants) would open two exchange accounts – a helper account on one or more exchanges used by BitMEX to calculate its index price (Coinbase Pro, Kraken and BitStamp) and a winner account on BitMEX.  The money launderer (Defendants) would then enter into a large leveraged derivatives position on BitMEX and immediately execute market orders from the helper account with maximum slippage to move the index price in a favorable direction, Ex. 2, 3, 7.  Due to disparity in liquidity between BitMEX and the spot exchanges, the aforesaid deliberate design of the index price by Defendants, and the cascading

liquidations of leveraged trader positions on BitMEX, the amount spent from the helper account

is multiplied greatly and translates into outsized profit in the winner account on BitMEX, Ex. 2,

3, 7.  Because BitMEX accounts are by design anonymous, the laundered money cannot be traced

from the helper account to the winner account.  Thus, the money laundering proceeds in the

winner account on BitMEX appear as legitimate trading gains and the money laundering scheme

achieves its purpose.  The described money laundering and other nefarious acts are well



documented and take place on BitMEX almost daily, Ex. 2, 3, 7.  Moreover, to exacerbate the

described price manipulations, BitMEX intentionally locks users out of their accounts during

manipulation times, falsely telling the users that their "system is overloaded".

9.      Defendants' own Leaderboard, which lists the most profitable trading accounts on

BitMEX, is replete with evidence of market manipulation and money laundering.  For example,

BitMEX's Leaderboard account under assumed name Quick-Grove-Mind shows multimillion-

Consensus Law
CryptoCurrency
Attorneys

Compl. for Violation of RICO (Demand for Jury Trial)   - 5 -   Dolgov v. HDR et al.   Case No. 3:20-cv-7140

dollar profit spikes, which exactly match known market manipulation events, while entirely



avoiding any and all trading losses.  Notably, Defendants' own data shows that this market

manipulator generated over $30,000,000 in profit during three market manipulation events that

took place on September 24, 2019, November 18-19, 2019 and March 11-12, 2020, at the expense

of retail traders, including Plaintiff.  In view of the fact that to generate $30,000,000 in profit, the

trader would need to open at least $100,000,000 leveraged position on the BitMEX platform,

Plaintiff Dolgov is informed and believes and thereon alleges that the Leaderboard account under

the assumed name Quick-Grove-Mind was a market manipulation winner account used by one of

the individual Defendants Hayes, Delo or Reed.

10.     BitMEX directly participates in and financially benefits from the market

manipulation and money laundering through its internal trading desk and indirectly, by collecting increased trading fees and also by liquidating users' accounts.  Specifically, BitMEX knowingly collects high trading fees for the above money laundering transactions, which constitute "proceeds" of money laundering under 18 U.S.C. §§ 1956 and 1957 and which are deposited into its general account (bitcoin wallet), from which it pays all its employees and even its attorneys (after currency conversion).  Thus, the salaries of all BitMEX employees as well as legal fees paid to its lawyers are tainted with the proceeds of money laundering in violation of 18 U.S.C. §§ 1956 and 1957.

| Manipulation Component | Manipulative Conduct Involved | Place of Manipulative Conduct |
|---|---|---|
| Helper Component | Defendants deliberately moved BitMEX's .BXBT index price by placing large market orders with maximum slippage from helper accounts on three illiquid exchanges that are used by BitMEX to calculate .BXBT index | BitStamp, Coinbase Pro and Kraken, all located in the United States |
| The deliberate BitMEX's .BXBT index price move by Defendants directly and proximately caused liquidation cascades on Kraken and BitMEX that resulted in Plaintiff's swap positions on those exchanges to be liquidated, resulting in monetary damages as alleged herein. | | BitMEX, having the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations in this District and Kraken, also located in this District. |
| Winner Component | Defendants capturing multiplied (due to disparity in liquidity) manipulation profits caused by the deliberate .BXBT index price move using winner account(s) on BitMEX. | BitMEX, having the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations in this District. |
| Facilitation Component | Defendants freezing BitMEX servers and accepting orders on only one side of the market to exacerbate the price moves during manipulation times | This District, where all three site reliability engineers Jerry Aldrich, Scott H. and Armando Cerna of BitMEX, who are responsible for the trading platform uptime and server freezes, are located and who personally perpetrated the BitMEX server freezes. |

11.     In the described money laundering scheme, the market manipulation gains realized

by the launderer (Defendants) in the winner account and the funds confiscated by BitMEX as the result of liquidations induced by the launderer are generated at the expense of Plaintiff and other cryptocurrency traders like Plaintiff.  Notably, BitMEX deposits proceeds from the user account liquidations into its so called "Insurance Fund," which has steadily grown over the years and now amounts to over $427,000,000 dollars, all misappropriated from traders, including Plaintiff.

12.     Moreover, BitMEX has been recently caught red-handed doing at least $70,000,000 of business in New York and California without obtaining a money transmitting license in those states and without complying with FinCEN regulations, in violation of 18 U.S.C. § 1960(a), see Paragraph 106, Ex. 8.  This violation has been conclusively proven using BitMEX's own Leaderboard, see Paragraph 106.  Even Defendants themselves acknowledged this fact by hastily instituting a "User Verification Programme" less than 48 hours after being caught doing unlicensed business in the United States, Ex. 9.  In total, BitMEX has 65 individual and 14 institutional United States traders that Plaintiff are aware of, without having any benefit of discovery, see Paragraphs 91, 92 and 97.  The amount of $70,000,000 of unlicensed United States business exceeds any possible threshold for the obligation to obtain the money transmitting license under 18 U.S.C. § 1960(a).  Specifically, in *United States v. Faiella*, 39 F. Supp. 3d 544 (S.D.N.Y. 2014), the threshold for triggering 18 U.S.C. § 1960(a) liability was $1,000,000 in unlicensed bitcoin transmissions.  In *United States v. Klein*, 6:17-cr-03056 (W.D.Mo. 2017), the threshold for 18 U.S.C. § 1960(a) liability was less than $30,000 in unlicensed bitcoin transmissions.  Based on these cases, Defendants have exceeded the legal threshold for triggering 18 U.S.C. § 1960(a) liability by a factor of 2,333x (two thousand three hundred thirty three times).  Consequently, all the funds that BitMEX collected from its trading operations and deposited into its general account (bitcoin wallet) are proceeds of unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a) (in addition to being proceeds of money laundering in violation of 18 U.S.C. §§ 1956 and 1957, as explained above).

13.     Awash with large amounts of tainted cash and encouraged by perceived lack of any accountability, Defendants grew so brazen that they do not even hesitate to publicly admit to

bribery and bank fraud, Ex. 10, 11.  Despite the fact that the vast majority of  personnel and managers are located in this District, to avoid being subject to United States laws, regulations and taxes, Defendants established 12 false shell companies, including Defendant ABS, with intent to create an appearance that Defendant HDR has no presence, operations or investors in regulated jurisdictions such as the United States.

14.     The sheer magnitude of Defendants' unlawful activity is truly staggering.   In addition to being recently caught red-handed doing at least $70,000,000 of business in New York and California without obtaining a money transmitting license, see Paragraphs 106 and 107 below, which by itself conclusively establishes the violation of 18 U.S.C. § 1960(a) by Defendant HDR[1], "[s]everal sources close to the company" have disclosed to media sources that nearly 15 percent of the BitMEX's 2019 trading volume—or about $138 billion worth—is attributable to traders located in the United States.  Moreover, Defendant HDR's high volume business with numerous residents of the United States and this District as alleged in detail below is vast and pervasive.  Accordingly, Defendants were unquestionably on notice of the need to obtain a money transmission license in the United States, which Defendants willfully and deliberately failed to do.  Therefore, according to Defendants' own data, Defendant HDR's unlicensed money transmitting business admittedly processed, on average, $3 billion of illegal and unlicensed money transfers each day, all in violation of United States federal statute 18 U.S.C. § 1960(a), which is the record volume for such unlawful activity in the entire history of the monetary regulation in the United States.

15.     A combination of providing traders with extremely high trading leverage (up to 100x), using .BXBT index price for highly liquid perpetual swap contracts calculated based on prices of two or three illiquid spot exchanges, enabling manipulators and money launderers to avoid detection by providing them with the ability to open unlimited number of anonymous

---

[1] In *United States v. Faiella*, 39 F. Supp. 3d 544 (S.D.N.Y. 2014), the threshold for triggering 18 U.S.C. § 1960(a) liability was $1,000,000 in unlicensed bitcoin transmissions.  In *United States v. Klein*, 6:17-cr-03056 (W.D.Mo. 2017), the threshold for 18 U.S.C. § 1960(a) liability was less than $30,000 in unlicensed bitcoin transmissions.  Based on these cases, Defendants exceeded the legal threshold for triggering 18 U.S.C. § 1960(a) liability by a factor of 2,333x.

document check-free trading accounts without any trading and withdrawal limits, weaponizing deliberate server freezes, using fraudulent "system overload" events to accept some trading orders and reject others during large market moves to exacerbate price fluctuations and cause the most liquidations all make BitMEX an exquisite "designer" tool for unsavory actors to launder funds and manipulate cryptocurrency markets.  Because of the very high derivatives trading volume on BitMEX, the artificial prices caused by the BitMEX manipulations spread, like forest fires, from BitMEX to other exchanges wreaking havoc on the entire cryptocurrency ecosystem, costing traders and investors billions of dollars in losses and resulting in a domestic injury in the United States ("Domestic Injury").

16.     Moreover, on April 30, 2018, after repeated denials, Defendants finally admitted that BitMEX operates its own for-profit trading desk operated by an employee of Defendant HDR, a Ukrainian national Nick Andrianov ("Andrianov"), who, at all times relevant herein, was an agent and employee of Defendant HDR and who acted within the scope of his agency and employment with Defendant HDR. This desk trades against BitMEX's own customers on their own exchange, using BitMEX's inside information about its customers' existing trading positions, stop loss orders, liquidation prices and open orders and enjoys many other unfair advantages not available to other users of the BitMEX platform.  While making money trading against BitMEX's own customers, this operation, which Defendants refer to as "anchor market maker," receives many special trading privileges that are not available to other exchange users. This creates even greater financial incentive for Defendants to manipulate cryptocurrency markets and financially benefit from the manipulations through the aforesaid for-profit trading desk operation.

17.     A substantial portion of the bitcoin-denominated proceeds of market manipulation, money laundering, operating unlicensed money transmitting business and multitude of various other nefarious acts taking place on the BitMEX platform were subsequently laundered and continue to be laundered, by all Defendants, through the Defendant Unknown Exchange, by means of converting bitcoins into various traditional ("fiat") currencies, including United States

dollars and Hong Kong dollars, and by Defendants Reed, Agata Reed, Barbara Reed and Trace Reed, through a real estate investment scheme that they set up in Wisconsin and Massachusetts. For this purpose, the aforesaid Defendants employed fraudulent nominee shell companies Defendant Grape Park and Defendant Mark Sweep to disguise or conceal the true illegal nature of the funds in the Defendants' general account (bitcoin wallet), which were ultimately used to acquire the corresponding real estate properties and the acquired real estate's true ownership or control, Ex. 12, 13.  Defendants Agata Reed, Barbara Reed and Trace Reed are in possession of two real estate properties located in Lake Tomahawk, WI 54539 and Norwell, MA 02061, with the aggregate market value of over $2,500,000, acquired using funds misappropriated from Plaintiff and laundered by Defendants through the Defendant Unknown Exchange and their real estate investment scheme.

18.     Despite all the claims to the contrary, Defendants HDR, Hayes, Delo and Reed maintain numerous close connections with the United States and this District.  Defendant HDR's own website BitMEX.com lists San Francisco as the location of one of Defendant HDR's offices, where all the technology behind BitMEX has been and continues to be developed.  Defendants use United States – based Amazon, Inc. AWS infrastructure, with offices in northern California, for storing all of its customer and trading data and for executing its order matching system and its liquidation engine.  Moreover, Defendants use Redwood City, California – based SendGrid, Inc. for handling all their bulk email communications with its customers.  Finally, Defendants' website BitMEX.com is a commercial website, enabling traders to enter into binding derivative purchase and sale contracts, through which Defendants HDR, Hayes, Delo and Reed conduct high-volume derivatives trading business with numerous individuals and companies residing in the United States, State of California and this District and which by itself is sufficient for subjecting Defendants to the jurisdiction of this Court pursuant *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997).

## NATURE OF ACTION

19.     This is an action for conspiracy to conduct and conducting enterprise's affairs

through a pattern of racketeering activity, arising under Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et seq. (2012) and for cryptocurrency market manipulation arising under the CEA, 7 U.S.C. §§ 1 et seq. (2012).

## PARTIES

20.     Plaintiff Dolgov incorporates the allegations set forth in Paragraphs 1-18 above as if fully set forth herein.

21.     Plaintiff Dolgov is an individual, who is a citizen of Russian Federation, and who also presently resides in Moscow, Russian Federation. Plaintiff Dolgov is the real party in interest.

22.     Defendant HDR was created by individual Defendants in order to perpetrate fraud and dodge regulation and taxes and purports to be a Republic of Seychelles International Business Company, company number 148707, with a registered office at Suite 23, 1st Floor, Eden Plaza, Vistra Corporate Services Centre, Eden Island, Mahe, Seychelles.  Defendant HDR was organized by Defendants Hayes, Delo and Reed, who are the three primary ultimate owners of HDR and its various subsidiaries, each holding approximately a one-third ownership interest in Defendant HDR, in or about 2014.  Despite being incorporated in the Seychelles, Defendant HDR does not have, and never has had, any operations or employees in the Seychelles. Defendant HDR operates, or has operated during the Relevant Period, out of various locations and offices throughout the world, including in New York, San Francisco, Milwaukee, Hong Kong, Singapore, and Bermuda.  When asked about the reasons for incorporating Defendant HDR in the Republic of Seychelles, Defendant HDR's Chief Executive Officer (CEO) Defendant Hayes has publicly claimed, in July of 2019, that the government of Seychelles was cheaper to bribe than the government of the United States and when asked how much he had to pay Seychelles to bribe them, Defendant Hayes answered "a coconut", Ex. 11.

23.     When, in July of 2019, an early investor in BitMEX Elfio Guido Capone asked Defendants Hayes, Delo and Reed about a status of his investment in the BitMEX platform, Defendant Delo responded with a meme image, cynically suggesting that BitMEX could dodge

its legal obligations to its own investors simply by using a shell company incorporated in the Seychelles to defeat personal jurisdiction of the United States Courts.



24.     In addition to publicly admitting to bribery of foreign government officials as alleged in the preceding Paragraphs, Defendant Hayes has publicly admitted to perpetrating bank fraud by falsifying his residence address on bank account application documents with the purpose of opening a bank account in China, to which he, as a resident of Hong Kong, was not entitled, Ex. 10.  The Chinese bank account was admittedly opened by Defendant Hayes using a fake Chinese residence address, which he personally falsified, in order to enrich himself on 40% premium in the price of bitcoin in China compared to the rest of the world, Ex. 10.  In perpetrating the admitted bank fraud, Defendant Hayes was motivated by personal greed.

25.     Admissions of multiple instances of personal greed-motivated illegal conduct as alleged in the previous Paragraphs, attempting to dodge legitimate legal obligations to its own investors using sham offshore companies as well as the alleged patently illegal manner in which BitMEX platform operates, all establish a clear pattern of brazen lawlessness on part of all Defendants.

26.     Defendant HDR is controlled by Defendants Hayes, Delo and Reed, who all hold

themselves out as co-founders of BitMEX.   In fact, name "HDR" is an abbreviation composed of first letters of last names of Defendants Hayes, Delo and Reed.  Defendant Hayes serves as the CEO of Defendant HDR.  Defendant Reed serves as the Chief Technology Officer (CTO) of Defendant HDR.

27.     According to BitMEX's website (https://www.BitMEX.com) ("BitMEX



website"), its owner HDR Global Trading Limited maintains three offices throughout the world, located in San Francisco, Hong Kong and Singapore. BitMEX's Terms of Service ("Terms of Service"), posted on the BitMEX website, provide that: "BitMEX (website: https://www.BitMEX.com) is a Bitcoin-based trading platform that is wholly owned by HDR Global Trading Limited."

28.     The San Francisco office of Defendant HDR is the largest of all three by both the employee headcount and technical staff headcount.  Its addresses are 301 Battery Street, 4th Floor, San Francisco, California 94111, 340 Brannan Street, 2nd Floor, San Francisco, California 94107 and/or 2 Embarcadero Center, 8th Floor, San Francisco, California 94111.  Defendant HDR closed its other United States offices and consolidated all of its United States personnel into an office location in San Francisco sometime in April of 2019, as confirmed by Defendant Hayes in an email to Defendant HDR's early investor Mr. Elfio Guido Capone stating, "Consolidation of people in one office in SF."

29.     Hong Kong office of Defendant HDR is located at 45/F, Cheung Kong Centre, 2 Queen's Road Central, Hong Kong Central, Hong Kong Island, Hong Kong Special Administrative Region of the People's Republic of China.  The employee headcount in the Hong Kong office of Defendant HDR is about half of the headcount in Defendant HDR's San Francisco

office.  Singapore office of Defendant HDR is the smallest of all three.

30.     Defendant HDR's affiliates and subsidiaries, including Defendant HDR's wholly-owned subsidiary and alter ego Defendant ABS, are so organized and controlled, and their affairs are so conducted, as to make them merely an instrumentality, agency, conduit, or adjunct of a single unitary BitMEX enterprise. See Las Palmas Assoc. v. Las Palmas Ctr. Assoc., 235 Cal.App. 3d 1220, 1249 (1991). Each Defendant HDR affiliate or subsidiary is so dominated in its finances, policies, and practices that these controlled corporations have no separate mind, will, or existence of their own, and are but business conduits for their principal, Defendant HDR, such that all of the affiliated corporations may be deemed to be a single business enterprise. See Toho-Towa Co., Ltd. v. Morgan Creek Prods., Inc., 217 Cal.App.4th 1096, 1107 (2013); Greenspan v. LADT LLC 191 Cal.App.4th 486, 514 (2010).

31.     On information and belief, each entity in the BitMEX enterprise functions solely to contribute to and develop the BitMEM.com commercial website, which revenues then flow solely to Defendant HDR and its owners. These entities are analogous to departments within a single corporation and are run as such. On information and belief, each sub-entity in the BitMEX enterprise is funded solely by revenues provided by Defendant HDR.

32.     Further, as Defendant Hayes has explained in a publicly filed sworn declaration, as CEO of Defendant HDR, he is "advised by an advisory body currently comprised of twelve individuals responsible for different <u>departments</u> within the HDR Group." (emphasis added). Hayes labels Defendant HDR and its affiliates collectively as the "HDR Group" as opposed to the BitMEX enterprise, but in function the entities operate as a single corporate enterprise, and they may be properly held to account for each other's wrongdoing.

33.     Defendant Hayes himself has also admitted that the BitMEX enterprise entities are really a single entity.  In a Monthly Report circulated on March 2, 2018, Defendant Hayes wrote "Ben [Delo], Sam [Reed], and myself are very excited to host the <u>entire company</u> at our Hong Kong <u>office</u> from March 12th – 25th. Given the rapid and continued growth in terms of headcount in 2017 and 2018, this offsite is our first chance to bond <u>as a company</u>." (emphasis added).

34.     All of this notwithstanding that Defendant HDR has submitted in multiple public filings that its only offices are in the Seychelles. It claims the offices in Hong Kong belong to another BitMEX-affiliated entity.

35.     On April 11, 2018, Defendant Hayes wrote again to say that the Hong Kong "company offsite was a resounding success. Ben, Sam, and I were delighted to meet many of you for the first time. We continue to be amazed at the quality of people that work for the organization. BitMEX is a collection of individuals who are all interesting." On information and belief, employees from all of the BitMEX enterprise's entities were present at the March 2, 2018 company-wide offsite, including those from San Francisco-based Defendant ABS.

36.     Defendants' casual disregard of corporate form and their regular usage of shell companies is also apparent through their latest corporate conduct: on July 15, 2020, Defendant Hayes announced that a new entity, "100x,"[2] "will become the new holding structure for HDR Global Trading Limited" and all of BitMEX's other assets, "including the BitMEX platform." In turn, the "HDR Group" was also rebranded as the "100x Group." This re-labeling makes little difference to the continued functioning of the entities as a single enterprise, however; Defendant Hayes explained that "[t]he BitMEX platform, brand and legal structure remain entirely unchanged."

37.     This further demonstrates that the unitary BitMEX enterprise consists of the various affiliates and subsidiaries worldwide, and that the enterprise and each of its constituent parts are fully dominated and controlled by Defendants Hayes, Delo, Reed and the other stakeholders as a single enterprise.

38.     Defendant ABS is a California-based wholly owned subsidiary and alter ego of Defendant HDR, which designs, develops, implements, operates and supports the online derivatives trading platform BitMEX from within this District.  Defendant ABS purports to be a Delaware corporation, Delaware Secretary of State file number 6393256, with registered office at

---

[2] The name 100x is a reference to traders' ability on the BitMEX platform to trade at 100 times the leverage of their deposited bitcoin.

3411 Silverside Road Tatnall Building, Ste 104, Wilmington, DE 19810.  Defendant ABS was organized by Defendants Hayes, Delo and Reed on or about April 27, 2017. Name "ABS" is an abbreviation constructed of first letters of first names (Arthur, Ben and Samuel) of individual Defendants Hayes, Delo and Reed, who ultimately own and control Defendant ABS.  Defendant Hayes asserted that Defendant HDR owns the entire issued share capital of Defendant ABS, and that Defendant ABS has an office in San Francisco, California.

39.     Specifically, Defendant ABS, which is a United State-based alter ego of Defendant HDR, has two offices: 301 Battery St., 4th Fl., San Francisco, CA, 94111 and 340 Brannan Street, 2nd Floor, San Francisco, California.  Defendants Hayes, Delo and Reed continue to control Defendant ABS with Defendant Hayes serving as the President, CEO, Secretary and Chief Financial Officer thereof and Defendant Reed serving as a Chief Technology Officer of Defendant ABS.

40.     Plaintiff Dolgov is informed and believes and thereon alleges that Defendant HDR dominates and controls every aspect of Defendant ABS' operations and uses its San Francisco offices to manage BitMEX's engineering, security and back-office operations, such that Defendant ABS is a mere instrumentality of the BitMEX enterprise.  In particular, all its operations are controlled by its principal and alter ego, Defendant HDR, wherein Defendant ABS provides development, software engineering, containerized application deployment, site reliability and digital security services, including development of the interface of the BitMEX Platform, through which all trading transactions take place.  Thus, Defendants ABS and HDR operate as a single business enterprise for the purpose of operating the BitMEX derivatives trading platform.

41.      Plaintiff Dolgov is informed and believes and thereon alleges that Defendant HDR funds all of Defendant ABS operations, including paying for all of its employees, overhead, and lease and rent obligations, and is Defendant ABS' sole source of income.

42.     Defendants Hayes, Delo and Reed, collectively own a controlling interest in Defendant ABS through their ownership of Defendant HDR, which wholly owns Defendant ABS.

Defendant Hayes is the sole director, president, secretary, and treasurer of Defendant ABS, and executes agreements on its behalf.  Defendant Hayes runs Defendant ABS's activities without regard to its corporate form and for the sole benefit of Defendant HDR.

43.     Defendants Hayes, Delo and Reed have created Defendant ABS as a false "shell" company as part of a broader United State federal and state law, regulation and tax dodge designed to tell regulators and tax authorities that BitMEX has no California or United States operations or investors.

44.     However, in reality, California is where most or all of its technology and services are managed and developed, and where almost all of the key personnel who perform those functions live, work and run BitMEX's operations.   Specifically, Defendant ABS handles the majority of the development of the BitMEX Platform, and it is both the heart of the BitMEX enterprise and its nerve center.

45.     Plaintiff Dolgov is informed and believes and thereon alleges that Defendants intentionally and specifically targeted California when locating and developing the nerve center of the operations of the BitMEX enterprise. This is because, from the beginning of BitMEX's existence, traders based in the United States accounted for the vast majority of the enterprise's revenues, and even presently United States and California traders, as described below, are the most active and lucrative traders on the BitMEX Platform.  This is also due to the fact that California's Silicon Valley has some of the world's best engineers and developers, and as such, Defendant ABS houses the most engineering personnel out of any BitMEX entity.

46.     Defendant ABS aided and abetted, authorized, ratified and controlled Defendant HDR illegal acts described herein.

47.     Defendants HDR and Hayes relied upon their domestic agents, employees and affiliates, including without limitation ABS, to help implement and conceal the illegal acts alleged herein. The agency relationships formed among the Defendants with respect to the acts, violations, and common course of conduct alleged herein were consensually formed.

48.     Defendant ABS acted in the United States and abroad within the scope of its

agency with the full knowledge, consent, permission, authorization and ratification, either express or implied, of each of the other Defendants in carrying out the acts alleged herein.

49.     Defendants are individually sued as principals, participants, agents, aiders and abettors, and co-conspirators in the wrongful conduct complained of and the liability of each arises from each Defendant's engagement in all or part of the illegal acts alleged herein.

50.     Additional and other facts regarding Defendants' joint action, alter ego status and aiding and abetting of one another regarding the misconduct against Defendants is hidden from Plaintiff at this time. Such information is uniquely within Defendants' possession, custody and control.  Plaintiff accordingly reserve the right to supplement and amend these allegations if appropriate or necessary following completion of relevant fact discovery.

51.     Defendant HDR is the sole and exclusive owner of BitMEX brand, as evidenced, for example, by the Terms of Service and by numerous trademark filings for the protection of this brand made by Defendant HDR in the United States and throughout the world.

52.     Defendant Grape Park is a State of Delaware limited liability company, Delaware Secretary of State file number 7554178, with registered office at 3411 Silverside Road Tatnall Building, Ste 104, Wilmington, DE 19810, which was used by Defendants to further launder funds derived from money laundering, market manipulation, operating unlicensed money transmitting business and other nefarious acts taking place on the BitMEX platform through investments into United States real estate, Ex. 12.  Defendant Reed dominates and controls every aspect of business of Defendant Grape Park and funds its operations.  Defendant Grape Park is an alter ego of Defendant Reed.

53.     Defendant Mark Sweep is a State of Delaware limited liability company, Delaware Secretary of State file number 7449568, with registered office at 3411 Silverside Road Tatnall Building, Ste 104, Wilmington, DE 19810, which was used by Defendants to further launder funds derived from money laundering, market manipulation, operating unlicensed money transmitting business and other nefarious acts taking place on the BitMEX platform through investments into United States real estate, Ex. 13.  Defendant Reed dominates and controls every

aspect of business of Defendant Mark Sweep and funds its operations.  Defendant Mark Sweep is an alter ego of Defendant Reed.  It should be noted that Defendants ABS, Grape Park and Mark Sweep share the same registered office address in the State of Delaware.

54.     Defendant Unknown Exchange is a cryptocurrency-to-fiat off-ramp exchange (over-the-counter exchange services provider).  Defendant Unknown Exchange was and is being used by Defendants to launder funds derived from money laundering, market manipulation, operating unlicensed money transmitting business and other nefarious acts taking place on the BitMEX platform through converting the illegally obtained bitcoins into various fiat currencies, including United States dollars and Hong Kong dollars.  Plaintiff will amend this Complaint when they ascertain the identity of the Defendant Unknown Exchange based on discovery propounded on Defendants.

55.     Defendant Hayes is an individual, who is a United States citizen.  On papers filed with California Secretary of State, Defendant Hayes claimed to have resided in Kennedy Town, Hong Kong Special Administrative Region of the People's Republic of China.  However, Plaintiff is informed and believes and thereon alleges that Defendant Hayes also resides in Buffalo, NY 14221-1840 and was last seen at his residence there on August 18, 2020.  Defendant Hayes owns property in the U.S., and files U.S. income tax returns. During the Relevant Period, Defendant Hayes held his ownership interest in the BitMEX entities through a Delaware limited liability company that maintains bank accounts at financial institutions in the U.S. and owns property in the U.S.  Defendant Hayes is sued as *sui juris*.

56.     Defendant Delo is an individual, who is a citizen of United Kingdom, and who resides in Hong Kong Special Administrative Region of the People's Republic of China. Defendant Delo is sued as *sui juris*.

57.     Defendant Reed is an individual, who is a United States citizen and who resides in Milwaukee, WI 53202.  Defendant Reed is sued as *sui juris.*  United States residence of



Defendant Reed is further evidenced by his own professional profile on LinkedIn professional network, where he lists the United States as his country of residence.   Defendant Reed maintains an office in and conducts business from Milwaukee, Wisconsin.

58.     Defendant Agata Reed is an individual, who is a citizen of the United States, and who resides in Norwell, MA 02061.  Defendant Agata Reed is sued as sui juris.

59.     Defendant Barbara Reed is an individual, who is a citizen of the United States, and who resides in Lake Tomahawk, WI 54539.  Defendant Barbara Reed is sued as sui juris.

60.     Defendant Trace Reed is an individual, who is a citizen of United States, and who resides in Lake Tomahawk, WI 54539.  Defendant Trace Reed is sued as sui juris.

61.     Plaintiff Dolgov is informed and believes and thereon alleges that each of the individual Defendants sued herein was the agent and employee of each of the remaining Defendants and was at all times acting within the purpose and scope of such agency.

**DEFENDANTS' EXTENSIVE CONTACTS WITH THE UNITED STATES
AND THIS DISTRICT**

62.     Plaintiff Dolgov incorporates the allegations set forth in Paragraphs 1-61 above as if fully set forth herein.

63.     Defendant ABS is qualified to do business in California and has appointed an agent for service of process in this State.  Despite all the claims to the contrary, Defendants HDR, Hayes, Delo and Reed maintain numerous close connections with the United States, State of California and this District.

64.     Corporate Defendants HDR and ABS were established by individual Defendants Hayes, Delo and Reed due to seed funding provided by at least two United States-based entities – Ohio-based RGB COIN LTD. and a startup accelerator SOSV with offices in San Francisco and New York.

65.     Defendant HDR is managed by Defendants Hayes, Delo and Reed with advice of an advisory board consisting of 12 members, three of which are located in the United States.

66.     Due to his role as the President, CEO, Secretary and Chief Financial Officer of Defendant ABS and his CEO position with Defendant HDR, Defendant Hayes manages and directs operations of both Defendants HDR and ABS in the United States and in this District.

67.     On the most recent California Secretary of State Statement of Information form filed by Defendant ABS with the State of California on or about August 22, 2019, Defendant Hayes's address in the State of California is listed as: 340 Brannan Street, 2nd Floor, San Francisco, California 94107.

| Names and Complete Addresses of the Following Officers (The corporation must list these three officers.  A comparable title for the specific officer may be added; however, the preprinted titles on this form must not be altered.) | | | | |
|---|---|---|---|---|
| 7.  CHIEF EXECUTIVE OFFICER/   ADDRESS<br>ARTHUR  HAYES     340 BRANNAN ST 2ND FL, SAN FRANCISCO, CA 94107 | | CITY | STATE | ZIP CODE |
| 8.  SECRETARY   ADDRESS<br>ARTHUR  HAYES     340 BRANNAN ST 2ND FL, SAN FRANCISCO, CA 94107 | | CITY | STATE | ZIP CODE |
| 9.  CHIEF FINANCIAL OFFICER/   ADDRESS<br>ARTHUR  HAYES     340 BRANNAN ST 2ND FL, SAN FRANCISCO, CA 94107 | | CITY | STATE | ZIP CODE |

68.     Due to his role as the CTO of both Defendants HDR and ABS and his supervisory involvement in the software development of the BitMEX platform, Defendant Reed, who resides in Wisconsin, manages and directs operations of both Defendants HDR and ABS in the United States and in this District, where the majority of the software developers and engineers working

on the BitMEX platform are located.

69.     As evidenced by BitMEX website, on or about April 27, 2018, Defendant Reed stated: "We serve customers <u>all over the world</u>, in five languages, and have become the premier platform for Bitcoin price discovery and liquidity" (emphasis added).  This statement constitutes an admission that Defendants knowingly serve customers in the United States and the State of California.

70.     BitMEX website www.BitMEX.com/careers/ lists San Francisco as the location of



one of the Defendant HDR's offices, where all the technology behind BitMEX is being developed. Defendant HDR actively recruited individuals for this office using recruiting websites



such as GlassDoor.com, Angel.co and LinkedIn.com. According to professional network LinkedIn, BitMEX's owner Defendants HDR has at least 74 current and former employees in the United States, most of which are residents of this District.

71.      In a publicly released and publicly available video first aired on CNBC news channel, Defendant Hayes can be seen broadcasting from the San Francisco office of CNBC, on



or about July 19, 2018.

72.      United States residents can freely trade on BitMEX platform from the United States because, as Defendant Hayes concedes and journalists and other commentators have explained, and BitMEX's marketing of itself in the United States demonstrates, accessing BitMEX is trivially easy from the United States using widely available and inexpensive virtual private network (VPN) software that masks trader's geographical location.  This is because Defendants purport to restrict access to the BitMEX Platform for residents in the United States and California, by using an impotent IP-address check mechanism. Defendants, however, knowingly allow United States and California residents to circumvent the IP-address check mechanism via simple, inexpensive, and widely available software tools such as by using a VPN. Defendants have exploited this loophole to avail themselves of United States and California markets.  Defendant Hayes stated in a January 2019 interview that BitMEX users can mask their

location using VPNs to assign their computer an IP address from other countries, bypassing filters put in place.  In fact, all web pages on BitMEX.com commercial website, except for a user account page, are freely accessible from the United States without any VPN.  This is done purposefully in order to entice United States persons to trade on the BitMEX platform.  If Defendants truly wanted to exclude United States traders from their platform, they would have blocked access to all web pages on the BitMEX.com commercial website from the United States.

73.     In fact, in an interview in January of 2019, Defendant Hayes himself publicly taunted the fact that users from banned jurisdictions like the United States can easily bypass the cryptocurrency exchange's geoblock by using the VPN service, thereby directly encouraging United States traders to trade on the BitMEX platform in violation of its own Terms of Service.

74.     Defendant HDR uses United States based Amazon, Inc.'s Amazon Elastic



Kubernetes Service ("Amazon EKS"), which combines Amazon Web Services ("Amazon AWS") with managed high-availability Kubernetes infrastructure for containerized deployment of all of its order matching and liquidation engines and for storing all of its customer and trading data.



Amazon AWS has offices in San Francisco, California.   San Francisco office of Defendant HDR employs at least five Kubernetes engineers who interact with Amazon AWS in this District on a daily basis.

75.    Moreover, the recent email data leak of BitMEX has shown that Defendant HDR

uses San Francisco, California – based Twilio Inc. and its subsidiary SendGrid, Inc., with offices

at 889 Winslow St., Redwood City, California 94063, United States, for handling all of its bulk email communications with its customers.  Twilio Inc. and its subsidiary SendGrid, Inc. as well as Intercom, Inc. store a database of all BitMEX users in this District, including email addresses and all other contact information of all users, which BitMEX uses for all its customer communications.

76.     Defendants use ReCAPTCHA service provided by Google, Inc., headquartered in this District to provide human verification for the users of the BitMEX's platform.

77.     Defendants further use YubiKey device and YubiCloud service provided by Palo Alto-based YubiKey, located in this District, to provide 2-factor authentication capability to the users of BitMEX's platform.

78.     Defendants further use service operated by Jumio Netverify, based in Palo Alto, California, through which Jumio collects personal data from BitMEX users directly, including photos of user's faces and ID documents and performs identity verification of the users for BitMEX platform.

79.     Defendants further use Freshdesk service provided by Palo Alto-based FreshWorks, headquartered in this District, for handling all customer support queries, notes and replies associated with the BitMEX platform.

80.     Defendants further use segment.io service provided by San-Francisco based Segment.io, Inc., and Google Analytics service provided by Google, Inc., both of which are headquartered in this District, for gathering data collected on BitMEX.com servers and generating visitor statistics for BitMEX platform.

81.     Defendants further use services provided by San Francisco-based Functional Software, Inc. (Sentry.io), San Francisco-based Pagerduty and Austin, Texas-based Solarwinds (Papertrail) to monitor all site and service issues associated with the BitMEX platform.

82.     Defendants further use services provided by Google Firebase and Amazon SNS platforms, operated by Google, Inc. and Amazon Web Services, Inc., respectively, both of which are headquartered in this District, to deliver mobile push notifications to all user devices.

83.     The above-alleged facts clearly show that the vast majority of the vital services used by BitMEX platform are provided by United States vendors located in this District and that without such services of United States and California origin, BitMEX platform would not have existed in its present form.  Therefore, BitMEX is able to operate its platform only due to its connections with the service providers located in the United States and this District.

|     | Service Provider to BitMEX | Services Provided to BitMEX | Service Provider Location |
|-----|---------------------------|----------------------------|--------------------------|
| 1. | Amazon Web Services | Kubernetes infrastructure for containerized deployment of all of its order matching and liquidation engines and for storing all of its customer and trading data | San Francisco, California |
| 2. | Twilio, Inc. | Communications with all BitMEX users | San Francisco, California |
| 3. | SendGrid, Inc. | Email communications with all BitMEX users | Redwood City, California |
| 4. | Google, Inc. | Human verification for the users, and generating visitor statistics | Mountain View, California |
| 5. | YubiKey, Inc. | 2-factor authentication capability | Palo Alto, California |
| 6. | Jumio, Inc. | Identity verification of the users | San Francisco, California |
| 7. | FreshWorks | Customer support queries, notes and replies | Palo Alto, California |
| 8. | Segment.io, Inc. | Generating visitor statistics | San Francisco, California |
| 9. | Functional Software, Inc. | Monitor all site and service issues for BitMEX platform | San Francisco, California |
| 10. | Intercom, Inc. | Electronic communications with | San Francisco, California |

| | | all BitMEX users | |
|---|---|---|---|
| 11. | ProofPoint, Inc. | Hosting of BitMEX's internal corporate email accounts, outbound data loss prevention, social media, mobile devices, digital risk, email encryption, electronic discovery, and email archiving. | Sunnyvale, California |

84. Furthermore, Plaintiff Dolgov is informed and believes and thereon alleges that San Francisco, California-based quant trading firm Galois Capital freely trades on BitMEX from this District generating millions of dollars of business for Defendant HDR. This trading is done with the knowledge, permission, approval, assistance and encouragement of Defendants.

85. Defendants knowingly and willfully permitted United States citizens and residents of this District as well as United States based companies to freely trade on the BitMEX exchange because of the lucrative business relationships between Defendants and the aforesaid individuals and companies, which financially benefitted Defendants.

86. Moreover, Defendant's HDR website BitMEX.com is a commercial website, in English language, enabling traders to enter into binding derivative purchase and sale contracts, through which Defendants conduct substantial business with the residents of the United States, the State of California and this District and which by itself is sufficient for subjecting Defendants to the jurisdiction of this Court pursuant *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997). Instead of performing a proper document check before allowing users to open an account on BitMEX.com, Defendants deliberately and knowingly use utterly ineffective IP address check, which they all well know is uniformly subverted by very simple, inexpensive and widely available software tools. Using the aforesaid commercial website operated by Defendants, residents of the United States, the State of California and this District are able to

place binding trading orders of virtually unlimited monetary size, enter into binding derivative purchase and sale contracts, and transfer virtually unlimited amount of funds anywhere in the world.

87.    Moreover, Defendants deliberately made their commercial website BitMEX.com accessible from the United States even without using VPN software in violation of BitMEX's own Terms of Service ("Terms of Service") in order to entice United States residents to trade on the BitMEX's platform.  Specifically, BitMEX's Terms of Service provide: "[y]ou are not allowed to access or use the Services or the Trading Platform if you are located, incorporated or otherwise established in, or a citizen or resident of: (i) the United States of America… 'Services' means websites, applications and any services provided by any member of the HDR Group, including: a) … the BitMEX Testnet Platform."  However, BitMEX.com website specifically induces United States resident users to try BitMEX Testnet Platform, by clearly stating: "please

> ⊘ **Note on Restricted Jurisdictions**
>
> At this time, BitMEX cannot serve customers in Puerto Rico. You may still create an account, but you will be unable to deposit or trade. If you wish to try simulated trading, please try our BitMEX Testnet. Access to the BitMEX Testnet is not for trading purposes, and is not intended as investment advice or as a solicitation to engage in any form of trading activity and should not be construed as such.

try our BitMEX Testnet."  This is not an innocent mistake, it is intentionally done by Defendants in order to entice United States traders to subsequently trade on the BitMEX Trading Platform in direct violation of the prohibition contained in its own Terms of Service.  In fact, all web pages on BitMEX.com commercial website, except for a user account page, are freely accessible from the United States without any VPN.  This is purposefully done to entice United States persons to trade on the BitMEX platform.  If Defendants truly wanted to exclude United States traders from their platform, they would have blocked access to all web pages on the BitMEX.com commercial

website from the United States.

88.     Therefore, any and all provisions contained in the Terms of Service prohibiting United States users from using the BitMEX's platform were in fact sham provisions and lacked any meaningful enforcement by Defendants.  In fact, Defendants' own actions clearly demonstrated complete disregard of the provisions of their own Terms of Service.  Moreover, Defendants willfully and deliberately used IP country blocking, which has been proven utterly ineffective for its intended purpose and easily subverted, to leave a back door for the United States residents to trade on the BitMEX platform.

89.     Furthermore, Defendants purposefully invoked the benefits and protections of the

**Current Search:** S2: (HDR GLOBAL TRADING)[OW] docs: 7 occ: 21

|  | Serial Number | Reg. Number | Word Mark | Check Status | Live/Dead |
|---|---|---|---|---|---|
| 1 | 88070906 | | REKT | TSDR | LIVE |
| 2 | 87824309 | | BMEX | TSDR | LIVE |
| 3 | 87856285 | | BMEX | TSDR | LIVE |
| 4 | 87859996 | | HDR GLOBAL TRADING | TSDR | LIVE |
| 5 | 87856295 | | BITMEXQ | TSDR | LIVE |
| 6 | 87856272 | | BITMEX | TSDR | LIVE |
| 7 | 87607952 | | BITMEX | TSDR | LIVE |

United States Federal laws when they filed for and obtained from the United States government official Notices of Allowance for seven (7) United States trademark applications all relating to BitMEX's platform that is the subject of this Complaint.

90.     For example, trademark applications serial Nos. 87856272 and 87607952, both for mark "BITMEX" were filed by Defendants in connection with "[d]ownloadable software for trading crypto-products and providing crypto-currency information" and "exchanging money, financial management, futures brokerage, capital investment, electronic funds transfer, providing financial information via a website, financing services, investment of funds, business liquidation services, financial services, namely, operation and management of hedge funds, commodity pools and other collective investment vehicles, and trading for others of cryptocurrency, decentralized

application tokens and protocol tokens, blockchain based assets and other cryptofinance and digital assets, securities, options, futures, derivatives, debt instruments and commodities," respectively, which are BitMEX's core services.  Invoking benefits and protections of the United States Federal laws clearly made it foreseeable for Defendants that they would end up in a United States Court.

91.     In the aforesaid trademark filings with the United States Patent and Trademark Office, Defendant HDR swore, under penalty of perjury, that it "has a continued bona fide intention, and is entitled, to use the mark[s] in commerce [in the United States] on or in connection with all of the goods/services listed in the Notice of Allowance or as subsequently modified for this specific class."

92.     In a recent legal filing, Defendant Hayes swore that: "[i]n my capacity as CEO, I am advised by an advisory body currently comprised of twelve individuals responsible for different departments within the HDR Group. A majority of the HDR Group's advisory committee has always been located in Hong Kong, and nine of the twelve members currently on the committee are located outside of the United States."  Therefore, three out of 12 members of the advisory committee of Defendant HDR are located in the United States.

93.     Professional network LinkedIn, as well as other information available on the Internet, provides publicly available evidence of dozens individuals, who reside in the United States and in this District and who identify themselves as cryptocurrency derivative traders on the BitMEX platform.  Forty three examples of the Unites States resident BitMEX traders, who trade on BitMEX through the aforesaid commercial website BitMEX.com, are provided in the below table:

|  | BitMEX Trader Name | BitMEX Trader Residence |
|---|---|---|
| 1. | Scrembo Paul | Los Angeles, California |
| 2. | Aaron Aloyan | Greater San Diego, California, Area |
| 3. | Christopher Smitherman | Atlanta, Georgia |

| 4. | Daniel Spivak | Greater Chicago Area |
|---|---|---|
| 5. | Harrison Davis | Greater New York City Area |
| 6. | Vesko P. | Greater Los Angeles Area |
| 7. | Matthew Wellman | Lexington, Kentucky |
| 8. | Uriel Scott | Chicago, Illinois |
| 9. | Sahand Akbari | Sacramento, California Area |
| 10. | Malik Crypto | Orlando, Florida Area |
| 11. | Saif Amer | Greater Chicago Area |
| 12. | Nelson Riley | Aspen, Colorado |
| 13. | John Roberts | Greater New York City Area |
| 14. | Andres Santana | Greater New York City Area |
| 15. | Thomas Chen | Evanston, Illinois |
| 16. | Alex Sherman | San Jose, California |
| 17. | Phillip James | St. Cloud, Minnesota Area |
| 18. | David Siddiqui | La Jolla, California |
| 19. | Zach Brodsky | Talent, Oregon |
| 20. | Philip Dustin Du Amarell | Laguna Beach, California |
| 21. | Jiale (Etta) Qin | Cupertino, California |
| 22. | Bokmoon Jung | Boise, Idaho |
| 23. | Lionel Girardin | Greater Chicago Area |
| 24. | Arijit Santra | Berkeley, California |
| 25. | Sankha Banerjee | Greater New York City Area |
| 26. | Connor Van Dorpe | Madison, Wisconsin |
| 27. | Ryan Rim | San Francisco Bay Area |
| 28. | Gianny R. Banda | Miami, Florida |
| 29. | Michael Peterson | Syracuse, New York Area |
| 30. | Anthony Agrait | Tempe, Arizona |
| 31. | Dustin G. | Burlington, Vermont Area |
| 32. | Kevin Cotugno | Phoenix, Arizona |
| 33. | Calvin Leung | Santa Monica, California |
| 34. | Anthony Wittemann | Santa Monica, California |

| 35. | Catherine Wood | Greater New York City Area, New York |
|---|---|---|
| 36. | Ryan Gill | Delaware, Ohio |
| 37. | Eric J. Waidergorn | Greater Chicago Area, Illinois |
| 38. | Eric Crown | Hillsboro, Oregon |
| 39. | Like Martin (Venturecoinist) | Knoxville, Tennessee Area |
| 40. | Edward Ornelas | Albuquerque, New Mexico |
| 41. | Richard Bae | United States |
| 42 | Roger Xu | Brooklyn, New York |
| 43. | Wen Hou | Irvine, California |

94.     Professional network LinkedIn as well as other Internet resources further provide evidence of at least fourteen companies, which are incorporated and based in the United States and which trade derivatives using Defendant's HDR commercial website BitMEX.com:

| | Name of U.S. Company Trading on BitMEX | Company Address |
|---|---|---|
| 1. | CMT Capital Markets Trading | 156 N Jefferson St., Suite 102, Chicago, IL 60661 |
| 2. | Eastmore Group / Eastmore Management, LLC | 40 Wall Street, Suite 1700, New York, NY 10005 |
| 3. | Clerkenwell Asset Management LLC | 90 State Street Ste 700, Office 40, Albany, NY 12207 |
| 4. | Galois Capital | 150 Post Street, Suite 442, San Francisco, CA 94108 |
| 5. | Adaptive Fund I, LP | 16192 Coastal Hwy, Lewes, DE 19958 |
| 6. | Swing Trade Pros | 1600 S. Indiana Ave, Chicago, IL 60616 |
| 7. | FalconX | 66 Bovet Rd #380, San Mateo, CA 94402 |
| 8. | Cumberland DRW | 540 W Madison St Chicago, IL 60661 |
| 9. | Circle Partners | 1395 Brickel Avenue, Suite 913 |

| | | Miami, FL 33131 |
|---|---|---|
| 10. | Fund3 Capital LP/Fund3 LLC | 11244 Huntley Place, Culver City, CA 90230 |
| 11. | South Lake Computers | 82 W Highway 50, Clermont, FL 34711 |
| 12. | ARK Investment Management LLC | 3 East 28th Street, 7th Floor, New York, NY 10016 |
| 13. | Coincident Capital | 310 Lake Street, Huntington Beach, CA 92648 |
| 14. | Leotank Capital | 250W 50th Street, Apt. 3d2, New York, NY 10019 |

95.     Adaptive Fund I, LP, which is a Delaware limited partnership, funded primarily by investors who are United States residents, as the result of market manipulation which took place on BitMEX's platform on or about March 13, 2020, lost 60% of its equity, or roughly $12,000,000.  These catastrophic monetary losses were suffered by numerous Unites States residents who invested in that fund.  In communications to investors following the losses, fund manager Murad Mahmudov admitted to personally executing trades on BitMEX's platform with United States investors' money.  Due to the high profile of the fund and fund managers involved, Defendants clearly knew of the United States origin of the money that the Adaptive Fund I, LP was trading on BitMEX platform and Defendants deliberately and willfully allowed such trading to proceed.

96.     Internet video portal YouTube is replete with video evidence of traders residing in the United States and in this District freely placing high dollar bets through Defendant's HDR commercial website BitMEX.com.  The following table identifies just 40 examples of such video evidence:

| | BitMEX Trader's YouTube Account User Name | Trader Residence | Video Date | Video Title |
|---|---|---|---|---|
| 1. | Jacob Canfield | Florida, United | 02/25/2020 | How Wales Manipulate Bitcoin Using Spoofing on Bitmex (Live $400,000 |

| | | States | | Short Trade) |
|---|---|---|---|---|
| 2. | Edward Ornelas | United States | 08/21/2018 | Bitmex Leveraging Tutorial Introduction for Beginner |
| 3. | Crypto Gnome | United States | 06/03/2019 | Bitmex, Deribit, & Bybit Bitcoin Leverage Trading - Afternoon Trading Session |
| 4. | Bitcoin Trading Challenge | United States | 05/24/2019 | Copy-Trading with Bitmex Trollbox + New Trading Challenge |
| 5. | Crypto Corny | United States | 01/14/2019 | WATCH ME TURN $350 INTO $35,000! 0.1 to 10 Bitcoin Trading Challenge |
| 6. | Scrembo Paul | United States | 08/27/2018 | Bitmex Leverage Trading Tutorial For Beginners Bitcoin |
| 7. | Crypto Gnome | United States | 04/03/2020 | Weekly Trading Bot Update - Binance Futures, Bybit, & Bitmex Bitcoin & Crypto |
| 8. | Crypto Gnome | United States | 05/14/2019 | How to Automate Your Trades on Bitmex & Deribit |
| 9. | Crypto Gnome | United States | 09/25/2019 | Goat Alerts - TradingView Bot & Shadow Trading for Bybit & Bitmex |
| 10. | Crypto Gnome | United States | 08/12/2018 | How to Set a STOP LOSS on BitMEX |
| 11. | Crypto Gnome | United States | 11/29/2018 | How to use a Trailing Stop on BitMEX - MORE PROFITS! |
| 12. | Crypto Gnome | United States | 07/25/2018 | How to Short Bitcoin on Bitmex |
| 13. | Crypto Gnome | United States | 08/11/2018 | How to Save on Fees When Trading on BitMEX |
| 14. | Crypto Gnome | United States | 07/25/2018 | How to SHORT/LONG Bitcoin Futures on BITMEX Tutorial |
| 15. | Crypto Gnome | United | 07/30/2018 | Free Profit Tracking Spreadsheet for |

Consensus Law CryptoCurrency Attorneys

Compl. for Violation of RICO (Demand for Jury Trial)   - 36 -   Dolgov v. HDR et al.   Case No. 3:20-cv-7140

| | | States | | Trading on Bitmex |
|---|---|---|---|---|
| 16. | Crypto Gnome | United States | 01/04/2019 | Bitmex & Deribit Pivot Point Robot Trading |
| 17. | Richard Heart | United States | 08/14/2018 | Get rich trading crypto? Secret tips on Bitcoin & Ethereum 100x margin trading on Bitmex, futures |
| 18. | Lazy MF | United States | 07/02/2018 | Bitmex LiveTrading |
| 19. | Lazy MF | United States | 03/12/2019 | Bitmex Live trading BitcoinMF |
| 20. | Slingshot Futures | United States | 02/05/2018 | Trading BitMEX Bitcoin On NinjaTrader; www.SlingshotFutures.com |
| 21. | CryptoSailor | United States | 01/22/2018 | BITMEX trading during Crash-Buying the Dip with Leverage |
| 22. | CryptoSailor | United States | 03/07/2018 | BEST TIME TO SHORT BITCOIN! BITMEX |
| 23. | Bitcoin Trading Challenge | United States | 01/08/2019 | Scalping Bitmex Liquidations |
| 24. | Digital Millionaire | United States | 10/31/2019 | BitMEX Tutorial For Beginners - How To LONG AND SHORT Bitcoin With LEVERAGE! |
| 25. | Patrick Corsino | United States | 01/13/2020 | Beginner Method: $100-$1000/Day Passive Cryptocurrency Trading 2020! Bitcoin Bitmex, Binance, Bybit |
| 26. | Crypto Corny | United States | 01/14/2019 | WATCH ME TURN $350 INTO $35,000! 0.1 to 10 Bitcoin Trading Challenge |
| 27. | Crypto Corny | United States | 01/31/2019 | 70% DOWN, 9930% TO GO... 0.1 To 10 BITCOIN TRADING CHALLENGE – Bitmex |

| | | | | |
|---|---|---|---|---|
| 28. | MiningTrades | United States | 01/23/2018 | My Algorithmic Trading BOT trades $XBT Bitcoin Futures LIVE! | BitMex Jan 23rd 2018 |
| 29. | Crypto Minds | United States | 09/07/2018 | How to Long and Short Bitcoin and Altcoins on Bitmex |
| 30. | Jaydn's Crypto Channel | California, United States | 05/06/2018 | How to get a Bitmex account in the U.S. + Bitmex Cryptocurrency Walkthrough |
| 31. | Crypt0W1SE | Michigan, United States | 12/30/2018 | Live BitMEX trading!!! 1 to 100 btc challenge! |
| 32. | ORACLE CRYPTO AVENGER! | United States | 02/08/2020 | $100,000 1 DAY PROFIT LEVERAGE TRADING BITSEVEN BYBIT BITMEX |
| 33. | ORACLE CRYPTO AVENGER! | United States | 10/15/2018 | BITMEX WATCH A SHORT TRADE THE ENDED OVER 103% WIN! |
| 34. | ORACLE CRYPTO AVENGER! | United States | 01/23/2018 | 50X BITMEX LIKE A BOSS OVER 98% ROI -WHY YOU CAN'T DO THIS. |
| 35. | ORACLE CRYPTO AVENGER! | United States | 11/07/2018 | BCH MARKET MANIPULATION - MANIPULATE BITMEX TO PROFIT! |
| 36. | Alexander Lorenzo | Gainesville, FL, United States | 01/26/2019 | Scavenger Bot Bitmex SCAM |
| 37. | Swing Trade Pros | 1600 S. Indiana Ave. Chicago, IL 60616 | 03/09/2020 | Live Bitcoin Trading on Bitmex with Swing Trade Pros Indicators! |
| 38. | Sell The Spike | Burlington, Vermont | 07/03/2019 | How to use a TRAILING STOPLOSS on Bitmex |

|     |               | Area                         |            |                                                                                                |
|-----|---------------|------------------------------|------------|------------------------------------------------------------------------------------------------|
| 39. | Sell The Spike | Burlington, Vermont Area     | 06/09/2018 | Bitmex Tutorial - Placing Orders, Setting Stoplosses and Targets, Leverage and Margin, Walkthrough |
| 40. | Bitcoin for Beginners | United States          | 12/22/2018 | How To Use BitMEX Exchange For Beginners! (BitMEX Tutorial)                                     |

97.     "Several sources close to the company" have disclosed to media sources that nearly 15 percent of the BitMEX's 2019 trading volume—or about $138 billion worth—is attributable to traders located in the United States.  This number is consistent with the evidence available on YouTube and LinkedIn.

98.     YouTube is also replete with dozens of videos teaching how to access Defendant's HDR commercial website BitMEX.com from the United States using inexpensive and widely available VPN software to avoid Internet protocol (IP) address blocking.  Below are 11 examples of such videos:

|     | BitMEX Trader's YouTube User Name | Trader Residence              | Video Date | Video Title                                                                  |
|-----|-----------------------------------|-------------------------------|------------|------------------------------------------------------------------------------|
| 1.  | Crypto Gnome                      | United States                 | 08/09/2018 | How to Sign Up for BitMEX in the US                                          |
| 2.  | Bot Mentality                     | Atlanta United States         | 03/22/2018 | How to use Bitmex in the United States                                       |
| 3.  | Jaydn's Crypto Channel            | California United States      | 05/06/2018 | How to get a Bitmex account in the U.S. + Bitmex Cryptocurrency Walkthrough  |
| 4.  | CryptoJunkies                     | United States                 | 08/15/2019 | How To Trade Bitmex In America!                                             |
| 5.  | Crypto Guru                       | United States                 | 03/16/2019 | How to Trade on Bitmex for USA and Canada Residents \| Bitcoin Generator     |

| | | | |
|---|---|---|---|
| 6. | Crypto Kam Kam | United States | 01/08/2020 | How to trade on BITMEX in the USA 100X LEVERAGE !! Bitcoin BTC ETH LTC EOS XRP TRX BCH & ADA |
| 7. | Crypto Renegade | United States | 06/24/2019 | Crypto VPN - Do I Need A VPN For Crypto Transactions? | Best Crypto VPN's For Bitcoin Exchanges |
| 8. | RChrisFord.com | United States | 10/31/2017 | BitMex Bitcoin Trading - How to setup a U.S. account |
| 9. | Casey Watkins | United States | 08/23/2018 | Bitmex - Signing up from the USA |
| 10. | Krown's Crypto Cave | United States | 05/07/2018 | ***MEX Millionaire*** EVERYTHING You Must Know!- ***BITMEX Tutorial*** |
| 11. | CRYPTOCASH 305 | United States | 02/01/2019 | Como Usar Bitmex desde USA (Bitmex Tutorial). [Spanish] |

99.     Defendant HDR assigns a six-symbol alphanumeric affiliate codes to all BitMEX account holders and uses these affiliate codes to pay compensation to its users for enticing other users, including United States residents, to open accounts on BitMEX.com commercial website by posting a URL pointing to the BitMEX registration page and incorporating the aforesaid assigned affiliate code.   The so assigned affiliate code uniquely identifies the corresponding account holder and its BitMEX account.   Thus, presence of the affiliate code indicates that a person who invites others to register with Defendant's HDR commercial website by way of an affiliate link himself has a BitMEX account.   Table below provides 22 examples of BitMEX affiliate codes being assigned to the United States residents for receiving compensation for enticing other United States residents to join the BitMEX platform:

| BitMEX Trader's Name or Alias | Trader Residence | BitMEX Assigned Affiliate Code (identifies trader's BitMEX account) |
|---|---|---|

| 1. | Tone Vays | United States | cMvHXg |
|---|---|---|---|
| 2. | Flood | United States | ir2Xqa |
| 3. | Crypto Corny | United States | 0rsCIx |
| 4. | Krown's Crypto Cave | Hillsboro, Oregon, United States, United States | ou4vcl |
| 5. | Crypto Hippo Trading | United States | gZ0Y10 |
| 6. | Edward Ornelas | Albuquerque, New Mexico, United States | kpdzGl |
| 7. | CryptoSailor | United States | AOIyp0 |
| 8. | MiningTrades | United States | i110zC |
| 9. | Crypto Minds | United States | OIv1fe |
| 10. | Moonin Papa | United States | GG2kor |
| 11. | Josh Olszewicz | Washington DC-Baltimore Area, United States | s7sqNI |
| 12. | Digital Millionaire | United States | P2DBFt |
| 13. | Patrick Corsino | New York, New York, United States | TD6yks |
| 14. | Crypt0W1SE | Michigan United States | rLMJ0, DYBmFQ, rLMJ0L |
| 15. | Casey Watkins | United States | lf9P89 |
| 16. | ORACLE CRYPTO AVENGER! | United States | WXNej9 |
| 17. | Swing Trade Pros | New York, New York, United States | G4cfM4 |
| 18. | Bitcoin for Beginners | United States | 5i7rOb |

| 19. | Crypto Gnome | United States | EOsLBm |
|---|---|---|---|
| 20. | Sell The Spike | Burlington, Vermont Area | KO33NC |
| 21. | Scrembo Paul | Los Angeles, California | BlQzsA |
| 22. | Like Martin (Venturecoinist) | Knoxville, Tennessee Area | 9e4hqj |

100.   Professional network LinkedIn provides publicly available evidence of 74 individuals, who are United States residents and who identify themselves as present and former employees of Defendant HDR, located in the United States and in this District:

| | LinkedIn Member Name | Position at BitMEX | Residence |
|---|---|---|---|
| 1. | Max Shapiro | Associate at BitMEX Ventures | New York, New York |
| 2. | Kumar Dandapani | Head of BitMEX Ventures | San Francisco Bay Area |
| 3. | Alena Gilevskaya | Senior Software Engineer at BitMEX | San Francisco, California |
| 4. | Alex Manusu | Senior Frontend Engineer at BitMEX | San Francisco, California |
| 5. | Maxim Wheatley | Former Head of Venture Development at BitMEX | San Francisco, California |
| 6. | Lisa Loud | Former CMO Operations at BitMEX | Greater New York City Area |
| 7. | Lucky Odisetti | Senior Software Engineer at BitMEX | Menlo Park, California |
| 8. | Niroj Shankhadev | Web Developer at BitMEX | San Francisco, California |
| 9. | Samuel Reed | Co-Founder and CTO at BitMEX | United States |
| 10. | Eric Zinnikas | Security Engineer at BitMEX | San Francisco, California |
| 11. | Molly Lubow | Talent Acquisition Specialist at | San Francisco Bay Area, |

| | | BitMEX | California |
|---|---|---|---|
| 12. | Evan Ricketts | Senior Software Engineer at BitMEX | Milwaukee, Wisconsin |
| 13. | Michael Carlson | Security Engineering Manager, Application Security at BitMEX | San Francisco, California |
| 14. | Monzer Aldimassi | Technical Program Manager (TPM) at BitMEX | Campbell, California |
| 15. | Patrick Fiscina | Vice President Of Engineering at BitMEX | San Francisco Bay Area, California |
| 16. | Allison Sommers | Security Engineer at BitMEX | San Francisco Bay Area, California |
| 17. | Conner McNicholas | Data Engineering at BitMEX | San Francisco, California |
| 18. | Brandon Schlenker | Engineering Manager at BitMEX | San Francisco, California |
| 19. | Riley Hutchinson | Director, People at BitMEX | San Francisco, California |
| 20. | Benson Wong | Senior IT Support Engineer at BitMEX | San Carlos, California |
| 21. | Peter M. | Security Engineer at BitMEX | San Francisco, California |
| 22. | Jerry Aldrich | Site Reliability Engineer at BitMEX | Seattle, Washington |
| 23. | Emilio Rivera | Technical Recruiter at BitMEX | San Francisco, California |
| 24. | Tom Dimopoulos | Senior Product Manager at BitMEX | San Francisco, California |
| 25. | Mahmoud Ali | Head of Security Assurance at BitMEX | San Francisco, California |
| 26. | Quentin Machu | Head of DevOps at BitMEX (Powering the world's largest cryptocurrency trading platform with Kubernetes, at the edge of financial and infrastructure technologies. Scaling BitMEX's | San Francisco, California |

| | | | |
|---|---|---|---|
| | | infrastructure, culture and practices from 10 employees to 150 employees, from \$1B to \$11B traded daily, and 150x more trades.) | |
| 27. | Maus Stearns | Security Engineering Manager at BitMEX | San Francisco, California |
| 28. | Andrew MacPherson | Security Engineer - Detection and Response at BitMEX | San Francisco, California |
| 29. | Chris Gates | Director of Offensive Security at BitMEX | Washington, DC Metro Area |
| 30. | Supriya Premkumar | Software Engineer - Kubernetes at BitMEX (Working on building Kubernetes Infrastructure that can handle tens of thousands of low latency transactions per second at one of the world's largest crypto exchanges.) | San Francisco, California |
| 31. | David Vidal | Security Engineer at BitMEX | San Francisco, California |
| 32. | Scott H. | Site Reliability Engineering Lead at BitMEX | San Francisco, California |
| 33. | Chris McCann | Vice President, Chief Information Security Officer at BitMEX (Leading the Security & IT organizations at the world's highest volume Cryptocurrency exchange.  Building a world class Security team to protect our customers, assets and | Palo Alto, California |

| | | brand.) | |
|---|---|---|---|
| 34. | Javier Marcos de Prado | Staff Security Engineer at BitMEX | San Francisco, California |
| 35. | Shivali Singh | Senior Manager Security Assurance at BitMEX | San Francisco, California |
| 36. | Felipe Loyola Andrade | Software Engineer at BitMEX | San Francisco, California |
| 37. | Felix Böhm | Senior Software Engineer at BitMEX (Tech lead for the institutional side of BitMEX) | San Francisco, California |
| 38. | Neel Patel | Engineering Leader, Lead Data Engineer at BitMEX | Burlingame, California |
| 39. | Taylor Hesselgrave | Senior Software Engineer at BitMEX | San Francisco, California |
| 40. | Alisa Isovic | Product Manager at Bitmex at BitMEX | San Francisco, California |
| 41. | Armando Cerna | Site Reliability Engineer at BitMEX (Primary on call in a high traffic production environment.) | San Francisco, California |
| 42. | Miguel Bernadin | Kubernetes Engineer at BitMEX | San Francisco, California |
| 43. | Elliot S. | Senior Software Engineer - API Technical Lead at BitMEX | San Francisco, California |
| 44. | Bernard S. | Security Investigations Manager at BitMEX | United States |
| 45. | Josie Pappas | HR Operations Specialist at BitMEX | San Francisco, California |
| 46. | Jinny Wong | Product Designer at BitMEX | San Francisco, California |
| 47. | Claire F. | Information Technology Management at BitMEX | San Francisco, California |
| 48. | Can Selcik | Senior Software Engineer at BitMEX | San Francisco, California |

| | | | |
|---|---|---|---|
| 49. | Eoghan McKee | Threat Intelligence, Insider Threat, Incident Response at BitMEX | San Francisco, California |
| 50. | Lawson Kight | Head of User Experience at BitMEX | San Francisco, California |
| 51. | Shawhin M. | Project Manager at BitMEX | San Francisco, California |
| 52. | Ladi D. | Platform Security Engineer at BitMEX | San Francisco, California |
| 53. | Neil Eads | Quality Assurance (QA) Manager at BitMEX | San Francisco, California |
| 54. | Michael Curry | Vice President, Head of Product at BitMEX | Oakland, California |
| 55. | Joshua Philippe | Principal Visual Designer, User Experience at BitMEX | San Francisco, California |
| 56. | Tim L. | IT Infrastructure Engineer at BitMEX | San Francisco, California |
| 57. | Hunter Shaw | Communication Director and BitMEX | San Francisco, California |
| 58. | Brian Rankin | Senior Security Program Manager at BitMEX | San Francisco, California |
| 59. | Bradley Cruce | Senior Product Manager at BitMEX | San Francisco, California |
| 60. | Simone Bottecchia | Senior Software Engineer at BitMEX | San Francisco, California |
| 61. | Julia Zhu | Former Head of Data at BitMEX | San Francisco, California |
| 62. | Yifan Gu | Kubernetes Engineer at BitMEX | San Francisco, California |
| 63. | Uday Shankar | Product Manager at BitMEX (My average week at BitMEX involves product research, market research, data analysis, scouring through support tickets, | San Francisco, California |

| | | | |
|---|---|---|---|
| | | watching social channels for opportunities in terms of new features and improvements to existing features collaborating with Engineering, Program, QA, Security, Legal and Compliance teams. I manage expectations across Design, Engineering and Management orgs and ensuring the product ideas and solutions are communicated, wireframed and pitched in the right fidelity to get all stakeholders onboard and scope our short term and long term roadmaps for each projects.) | |
| 64. | Victor Levasseur | Principal / Lead senior software engineer at BitMEX focused on a product driven approach and with great business | San Francisco, California |
| 65. | Jason Bond Pratt | Former Executive Vice President of Product and Engineering ( Built and led the North American arm of an overseas cryptocurrency derivatives exchange, hiring a team of 40 during a period of 100x growth. (BitMEX was then and remains the largest crypto exchange, by volume, in the world.) | San Francisco, California |

| | | | |
|---|---|---|---|
| | | • Grew product and engineering team from 1 to 40 across 5 operational groups, and hired or developed hiring managers for each of them. • Established a culture that valued diversity, respect, inclusion and appreciation, emphasizing team-first principles and a humble, servant leadership ethic throughout our organization. • Hired or developed global leads for Security, DevOps, Recruiting, IT, UX, Mobile, and API/Web Engineering, and led the first D&I initiatives at the company. Secured long term Class A space in the FiDi. • Served on the global exec team and coordinated regularly with peers and founders in Hong Kong, London, and NYC. Managed a budget of $15mm.) | |
| 66. | Ska Ska Morales-Murray | Former Project Office Manager – Global Marketing and Business Development at BitMEX | New York, New York |
| 67. | Tim Tickel | Head of Security at BitMEX (Securing cryptocurrency exchange infrastructure) | San Mateo, California |

| 68. | Chenqi 'Ashley' X. | Data Science Manager at BitMEX | San Francisco, California |
|---|---|---|---|
| 69. | Kev Zettler | Former Senior Software Engineer at BitMEX | Oakland, California |
| 70. | Cynthia P. | Former Art Director at BitMEX (Led a cross-functional rebrand project with Marketing, Product, and Brand collaborators to build the BitMEX brand for institutional and retail audiences. Deliverables included brand and style guidelines, visual assets, content strategy, digital and print editorial campaigns.) | New York, New York |
| 71. | Natalie Case | Technical Writer at BitMEX | Walnut Creek, California |
| 72. | Deb Baratz | Former Content Manager at BitMEX | New York, New York |
| 73. | Robbin Kyle | Former Operations Supervisor at BitMEX | Livingston, New Jersey |
| 74. | Jacob H. | Former Senior DevOps Engineer at BitMEX (Migrated legacy services to Kubernetes, Established effective CI patterns and provisioning strategies, Worked with security team to integrate auth/sso into dev workflows, Created tooling for use by DevOps and Product Teams) | Indianapolis, Indiana |

101.     Based on the publicly available LinkedIn data, while 74 of Defendant HDR

employees are located in the United States, only 34 are located in Hong Kong, which is the home for second largest Defendant HDR office.  Therefore, more than two thirds of Defendant HDR employees worldwide are residing in the United States and in this District.  Moreover, the vast majority of the 74 United States employees of Defendant HDR are engaged in software development and engineering, while in Hong Kong, there are only six software developers and engineers employed by Defendant HDR.  Moreover, all three Site Reliability Engineers Jerry Aldrich, Scott H. and Armando Cerna, personally responsible for the fraudulent system overloads and server freezes, are located in this District.  Therefore, the United States and, specifically, this District is unquestionably the central location where all the technology behind the BitMEX platform has been and continues to be developed, from which the BitMEX platform is operated and managed by Defendants and where the illegal acts alleged in this Complaint took place.

102.    In addition, BitMEX website lists 17 job openings for Defendant HDR San Francisco office.  For comparison, the other two offices of Defendant HDR – Hong Kong and Singapore list 14 and two job openings, respectively.  Furthermore, out of 17 advertised job openings in Defendant HDR San Francisco office, 15 are openings in engineering and software development.  On the other hand, in Hong Kong office, only four job openings are in software development and engineering.  This fact further supports the conclusion that the United States and, specifically, this District is unquestionably the central location where all the technology behind the BitMEX platform has been and continues to be developed, from which the BitMEX platform is operated and managed and where the illegal acts alleged in this Complaint took place.

103.    BitMEX conducts offsites for the entire company hosted at its San Francisco office location, at least one of which occurred in November of 2017, in which Defendant Hayes and the rest of BitMEX's employees globally came to San Francisco and the San Francisco office.

104.    Because the vast majority of BitMEX personnel, as alleged in Paragraph 100, almost the entire engineering team (all but six) as well as all three Site Reliability Engineers Jerry Aldrich, Scott H. and Armando Cerna, as alleged in Paragraph 101, and almost all vital external service providers to BitMEX, as alleged in Paragraph 83, are located in this District, and because

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Defendant ABS, which develops, operates, enables, supports and services BitMEX platform is located in this District, this District is the home base of the largest operation of Defendant DHR, the nerve center of the operation of the BitMEX platform, and it is the location where the illegal acts alleged in this complaint took place, including, without limitation, racketeering in violation of 18 U.S.C. §§ 1962(d) and (c), wire fraud in violation of 18 U.S.C. § 1343; money laundering in violation of 18 U.S.C. § 1956(a); engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957(a); conducting, controlling, managing, supervising, directing, or owning all or part of an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), interstate transportation of stolen property in violation of 18 U.S.C. § 2314 and cryptocurrency market manipulation in violation of the CEA, 7 U.S.C. §§ 1 et seq. (2012) and CFTC Regulations promulgated thereunder, 17 C.F.R. §§ 1 et seq. (2018). Moreover, the alleged illegal acts were all performed on servers and other IT infrastructure owned and operated by United States based Amazon EKS.  Furthermore, the illegal acts alleged herein were all perpetrated by Defendants through their commercial website BitMEX.com, accessible, via widely available and inexpensive VPN software, by users located in the United States and this District.  Defendants knew that users located in the United States and this District were accessing their commercial website BitMEX.com.

105.    Numerous citizens and residents of the United States and this District conducted and continue to conduct a high volume derivatives trading on the BitMEX platform using Defendants' commercial website BitMEX.com.

106.    The same commercial website BitMEX.com was used by Defendants to perpetrate all the illegal acts alleged in Paragraph 104, resulting in injuries to Plaintiff, for which Plaintiff seeks redress in this Complaint.  Accordingly, Defendants' connections with the United States and this District through the commercial website BitMEX.com, used by the United States residents and residents of this District, are directly related to the causes of action asserted by Plaintiff in this Complaint.

107.    For the reasons stated in the previous Paragraphs of this Complaint, BitMEX is a

domestic United States cryptocurrency exchange.

## U.S. TRADERS ON BITMEX LEADERBOARD

108.    While Defendants and their counsel are busy disingenuously swearing to Courts that "U.S. persons are expressly prohibited from trading on BitMEX platform," Defendants' own public Leaderboard posted on Defendants' website (https://www.bitmex.com/app/leaderboard) reveals that just four U.S.-based traders who decided to reveal their real names (evidently in an effort to assist with fundraising): Roger Xu of Leotank Capital Inc. and Bryce Gilleland, Wen Hou and Sunil Shah of Coincident Capital (Ex. 14) generated almost $70,000,000 in trading

# Leaderboard

The following shows some of the most profitable traders on BitMEX.
These lists are anonymous. Each name always represents the same user, but is not personally identifiable.

## Top 25 Traders by Notional

| Rank | Name | Profit | Is Real Name |
|------|------|--------|--------------|
| 1 | Mercury-Wood-Sprite | 8,161.2198 XBT | ✖ |
| 2 | Quick-Grove-Mind | 8,047.8158 XBT | ✖ |
| 3 | Heavy-Autumn-Wolf | 7,574.4154 XBT | ✖ |
| 4 | Alameda Research | 5,244.5830 XBT | ✖ |
| 5 | Hot-Relic-Fancier | 4,216.5159 XBT | ✖ |
| 6 | coincidentcapitalltd | 2,610.2783 XBT | ✔ |
| 7 | Skitter-Peridot-Raven | 2,329.1721 XBT | ✖ |
| 8 | Honeysuckle-South-Rib | 2,111.6555 XBT | ✖ |
| 9 | CSW is a fraud | 2,086.7229 XBT | ✖ |
| 10 | Tree-Surf-Dragon | 2,053.2285 XBT | ✖ |
| 11 | Roger-LeotankCapital | 1,764.5478 XBT | ✔ |
| 12 | alamedaresearchltd@gmail.com | 1,696.7039 XBT | ✖ |
| 13 | Jade-Platinum-Legs | 1,675.8174 XBT | ✖ |
| 14 | Circle_Trade | 1,619.6382 XBT | ✔ |
| 15 | Winter-Pink-Fang | 1,542.1702 XBT | ✖ |
| 16 | daniel3 | 1,514.6067 XBT | ✔ |
| 17 | Cream-White-Ox | 1,476.3798 XBT | ✖ |
| 18 | xorq | 1,473.0086 XBT | ✔ |
| 19 | Disco-Solar-Fang | 1,452.1775 XBT | ✖ |
| 20 | Roger_LeotankCapital | 1,441.3349 XBT | ✔ |
| 21 | Ebony-Fair-Bat | 1,390.0500 XBT | ✖ |
| 22 | aoa | 1,386.5926 XBT | ✔ |
| 23 | Quill-Rift-Hoof | 1,363.3790 XBT | ✖ |
| 24 | Brown-Peat-Myth | 1,248.5080 XBT | ✖ |
| 25 | Denim-Sun-Speaker | 1,218.5577 XBT | ✖ |

*(Handwritten annotations:)*
- 1. Sunil Shah, 310 Lake St., Unit #310, Huntington Beach, CA 92648
- 2. Bryce Gilleland, 1400 Calle De Las Flores, San Dimas, CA 91773
- 3. Wen Hou, 2253 Martin St. Apt 113, Irvine, CA 92612
- $31,000,000 Exhibits: 6, 7, 8
- Roger Xu, 250 50th St. Apt 3d2 New York, NY 11220 — $21,000,000 Exhibits: 9, 10, 11
- Roger Xu, 250 50th St. Apt 3d2 New York, NY 11220 — $17,000,000 Exhibits: 9, 10, 11

profits on Defendants' BitMEX platform.  As attached Ex. 8 clearly shows, Bryce Gilleland, Wen Hou and Sunil Shah reside in California, while Roger Xu resides in New York.

109.    Moreover, the above staggering amount of business was conducted by Defendants

in the United States and the State of California without obtaining a money transmission license and without complying with the mandatory FinCEN regulations in violation of 18 U.S.C. § 1960(a).  Notably, all the above evidence was obtained from Defendants' own public website without any benefit of discovery.  Plaintiff is informed and believes that this is a mere tip of the iceberg and that up to third of all traders on the BitMEX Leaderboard generating half a billion dollars of profits are U.S. persons.

### ATTEMPTS TO MISLEAD COURTS REGARDING MATERIAL FACTS

*"U.S. persons are expressly prohibited from accessing and trading on the BitMEX platform."  Mr. Hibbard, Defendants' counsel.*

110.    It is simply inconceivable that Defendants and their litigation counsel somehow did not know that some of their top traders who generated almost $70,000,000 in profits on Defendants' own platform were U.S. persons, Ex. 8.  Obviously, such high profile traders are universally known by name.  Yet, with full knowledge that some of BitMEX's top trading accounts which generated almost $70,000,000 in trading gains were in fact operated by U.S. persons, Defendant Hayes, with the assistance and encouragement of Defendants' counsel, nevertheless disingenuously swore under the penalty of perjury in a California Superior Court proceeding, in a motion challenging Court's jurisdiction that "U.S. persons are expressly prohibited from accessing or trading on the BitMEX platform."   Defendants' counsel, not to be outdone, repeated this travesty thirteen (!) more times throughout his various motions and oppositions.  Various representations of material facts made by Defendant Hayes and his counsel to Courts as well as the true facts are summarized in the table below:

| Court Name, Case and Document | Date | Defendant Hayes' Representations | Defendants' counsel's Representations and | The True Facts and Exhibits |
|---|---|---|---|---|
| N.D. Cal. 3:20-cv-3345-WHO, Defendants' Opposition to Ex Parte Application for Evidence Preservation Order [Dkt. | 6/12/20 | | "No further time and attention of this Court is warranted as there is no need for a court to order someone to do what they are already doing."<br><br>"Our clients understand their document | "Contrary to requirements imposed on DCMs and SEFs, BitMEX has failed to maintain required records, and in fact has actively deleted required records including critical customer identification information." Ex. 5, p. 16, |

| | | | | |
|---|---|---|---|---|
| No. 26, p. 3, 5]. | | | preservation responsibilities and have acted responsibly to fulfill them. As such, there is no dispute, and there is no need for a document preservation order." | ¶ 49. |
| San Francisco County Superior Court, CGC19581267, Declaration in Support of Motion to Quash | 2/27/20 | "U.S. persons are expressly prohibited from accessing or trading on the BitMEX platform under the terms of service." | | "BitMEX operated its trading platform in large part from the United States, and engaged in transactions with thousands of U.S. persons. BitMEX accepted bitcoin deposits worth more than $11 billion from at least 85,000 user accounts with a U.S. nexus." Ex. 5, p. 3, ¶ 3. |
| San Francisco County Superior Court, CGC19581267, MPA in Support of Motion to Quash | 2/27/20 | | "HDR is a holding company that ultimately owns the BitMEX-branded trading platform that allows the trading of digital assets (such as cryptocurrency derivatives) *by certain non-U.S. persons*." | "BitMEX even maintained an internal dashboard of open accounts from supposedly restricted jurisdictions… Delo altered a U.S. resident's (and prominent BitMEX user) account location to Canada for a user that brought in 1,336 user accounts through BitMEX's affiliate program… Hayes, Delo, and Reed received or had access to spreadsheets and reports that showed the trading volume, revenue to BitMEX, and other account and transactional information for U.S. based traders. For example, BitMEX country revenue reports from October 2018 contain information about the number of U.S traders on its platform."  Ex. 5, p. 24, ¶ 91.

Some of BitMEX's most profitable trading accounts openly listed on BitMEX's public Leaderboard, which generated almost $70,000,000 in trading |
| San Francisco County Superior Court, CGC19581267, MPA in Support of Motion to Quash | 2/27/20 | | "Further, U.S. persons are prohibited from accessing and trading on the BitMEX platform." | |
| San Francisco County Superior Court, CGC19581267, MPA in Support of Motion to Quash | 2/27/20 | | "U.S. persons are prohibited from trading on the BitMEX platform." | |
| San Francisco County Superior Court, CGC19581267, Declaration in Support of Motion to Quash | 6/16/20 | "U.S. persons are expressly prohibited from accessing or trading on the BitMEX platform under the terms of service." | | |
| San Francisco County Superior Court, CGC19581267, MPA in | 6/16/20 | | "HDR is a holding company that ultimately owns the BitMEX-branded trading platform that allows the | |

| | | | | |
|---|---|---|---|---|
| Support of Motion to Quash | | | trading of digital assets (such as cryptocurrency derivatives) *by certain non-U.S. persons.*" | profits, were and continue to be operated by four U.S. persons Bryce Gilleland, Wen Hou, Sunil Shah and Roger Xu. |
| San Francisco County Superior Court, CGC19581267, MPA in Support of Motion to Quash | 6/16/20 | | "U.S. persons are expressly prohibited from accessing and trading on the BitMEX platform." | Bryce Gilleland resides at: 1400 Calle De Las Flores, San Dimas, CA 91773, Ex. 8. |
| San Francisco County Superior Court, CGC19581267, MPA in Support of Motion to Quash | 6/16/20 | | "Plaintiffs allege that … U.S. persons trade on the BitMEX platform despite being prohibited from doing so. Regardless of the truth of these allegations—most of which are false or otherwise misleading…" | Wen Hou resides at: 2253 Martin Ct. Apt. 113, Irvine, CA 92612, Ex. 8.<br><br>Sunil Shah resides at: 310 Lake St., Unit #310, Huntington Beach, CA 92648, Ex. 8.<br><br>Roger Xu resides at: 250W 50th Street, Apt. 3d2, New York, NY 10019, Ex. 8. |
| San Francisco County Superior Court, CGC19581267, MPA in Support of Motion to Quash | 6/16/20 | | "Further, U.S. persons are prohibited from trading on the BitMEX platform." | Due to the enormous sizes of the trading gains involved and the high profile of the traders, it is absolutely inconceivable for Defendants and their counsel not to have known this fact at the time Defendants and their counsel made the material representations to the courts regarding jurisdictional facts. |
| San Francisco County Superior Court, CGC19581267, MPA in Support of Motion to Quash | 6/16/20 | | "U.S. persons are prohibited from trading on the BitMEX platform." | |
| San Francisco County Superior Court, CGC19581267, Opposition to Motion to Compel | 6/23/20 | | "U.S. persons are expressly prohibited from accessing and trading on the BitMEX platform." | |
| San Francisco County Superior Court, CGC19581267, Opposition to Motion to Compel | 6/23/20 | | "Plaintiffs allege that … some U.S. persons trade on the BitMEX platform despite being prohibited from doing so. Regardless of the truth of these allegations—most of which are false or otherwise misleading." | |

| | | | | |
|---|---|---|---|---|
| San Francisco County Superior Court, CGC19581267, MPA in Support of Motion for Protective Order | 6/25/20 | | "U.S. persons are expressly prohibited from accessing and trading on the BitMEX platform." | |
| San Francisco County Superior Court, CGC19581267, MPA in Support of Motion for Protective Order | 6/25/20 | | "Plaintiffs allege that … some U.S. persons trade on the BitMEX platform despite being prohibited from doing so. Regardless of the truth of these allegations—most of which are false or otherwise misleading." | |

111.    While the conduct of Defendants and their counsel alleged in the previous paragraph may not be technically a perjury, a plain and clear attempt to mislead Courts as to very material facts critical for the jurisdictional inquiry is evident.  This speaks volumes as to the "catch me if you can" strategy adopted by all Defendants.  Defendants' counsel, on the other hand, who is an officer of the court and who is charged to act as a gatekeeper, seems to take special pride in perpetuating untruths concocted by Defendants to try to wiggle their way out of facing justice for their misdeeds.

112.    Less than 48 hours after Plaintiff brought the above facts to the attention of the Court in the CMC Statement filed on August 11, 2020, Dkt. 33, Defendants abruptly instituted a so called "BitMEX User Verification Programme," solely intended to create an apparent excuse for previously misleading Courts regarding U.S. traders on BitMEX platform, Ex. 9.  Evidently, Defendants intend to disingenuously claim to the Court that, prior to the sudden institution of the aforesaid 11th hour "BitMEX User Verification Programme," Defendants somehow did not know that U.S. persons were trading on BitMEX en masse and also did not know who their top traders were, despite maintaining an official Leaderboard for more than 4 years.  In view of all the above facts, Defendants' 11th hour firefighting efforts are clearly disingenuous.

1

## ACCEPTANCE OF TAINTED FUNDS AS PAYMENT FOR
## MISLEADING COURTS BY DEFENDANTS' ATTORNEYS

2

3          113.    Not only was Defendants' counsel eagerly willing to mislead Courts regarding

4   material jurisdictional facts to get Defendants off the hook no matter the cost, he also gladly

5   accepted funds tainted with proceeds of money laundering in violation of 18 U.S.C. §§ 1956 and

6   1957 and proceeds of operating an unlicensed money transmitting business in violation of 18

7   U.S.C. § 1960(a) as his fee for doing so.

8          114.    As alleged above, BitMEX knowingly collects hundreds of millions of dollars in

9   trading fees from the money laundering transactions taking place on its platform on a daily basis,

10  including during each of the specific Manipulation Times alleged in Paragraph 353 below, which

11  constitute "proceeds" of money laundering under 18 U.S.C. §§ 1956 and 1957 and which are

12  deposited into its general account (bitcoin wallet), from which all legal fees of BitMEX attorneys

13  are paid (after currency conversion).  Thus, BitMEX's employee salaries, office rents and even

14  legal fees that BitMEX attorneys collect are tainted with the proceeds of money laundering in

15  violation of 18 U.S.C. §§ 1956 and 1957.

16         115.    Moreover, BitMEX has been recently caught red-handed doing at least

17  $70,000,000 of business in New York and California without obtaining a money transmitting

18  license in those states and without complying with FinCEN regulations, in violation of 18 U.S.C.

19  § 1960(a), Ex. 8.  This violation has been conclusively proven using BitMEX's own Leaderboard,

20  Ex. 8.  Even Defendants themselves acknowledged this fact by hastily instituting a "User

21  Verification Programme" less than 48 hours after being caught doing unlicensed business in the

22  United States, Ex. 9.  In total, BitMEX has 65 individual and 14 institutional United States traders

23  that Plaintiff is aware of, see Paragraphs 93, 94, 99.  The amount of $70,000,000 of unlicensed

24  United States business exceeds any possible threshold for the obligation to obtain the money

25  transmitting license under 18 U.S.C. § 1960(a).  Specifically, in *United States v. Faiella*, 39 F.

26  Supp. 3d 544 (S.D.N.Y. 2014), the threshold for triggering 18 U.S.C. § 1960(a) liability was

27  $1,000,000 in unlicensed bitcoin transmissions.  In *United States v. Klein*, 6:17-cr-03056 (W.D.

28  Mo. 2017), the threshold for 18 U.S.C. § 1960(a) liability was less than $30,000 in unlicensed

bitcoin transmissions.  Based on these cases, Defendants have exceeded the legal threshold for triggering 18 U.S.C. § 1960(a) liability by a factor of 2,333x (two thousand three hundred thirty three times).

116.    Consequently, all the fees that BitMEX collected from its trading operations and deposited into its general account (bitcoin wallet) are proceeds of unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a) (in addition to being proceeds of money laundering in violation of 18 U.S.C. §§ 1956 and 1957, as explained in Paragraph 114 above).  Legal fees for Defendants' counsel's "services" aimed at misleading Courts were paid from the same general account, which contained the tainted funds.

117.    It should be further noted that the Safe Harbor Provision of 18 U.S.C. § 1957(f)(1) applies to criminal matters only, while Defendants' counsel received tainted funds for representing Defendants in civil cases.  Therefore, the Safe Harbor Provision of 18 U.S.C. § 1957(f)(1) does not apply and the acceptance of tainted funds for counsel's efforts to mislead Courts, itself constitutes money laundering in violation of 18 U.S.C. §§ 1956 and 1957.

118.    Thus, all the fees paid to Defendants' legal counsel in this and other civil matters by Defendants, including fees paid for misleading Courts regarding material jurisdictional facts as alleged in Paragraphs 110 and 111, were tainted with proceeds of money laundering in violation of 18 U.S.C. §§ 1956 and 1957 and proceeds of operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a).  Moreover, Defendants' counsel was clearly on notice of very serious issues with Defendant Hayes, as Mr. Hayes has previously publicly admitted to bribery of foreign government officials and bank fraud, Ex. 10, 11, of which Defendants' counsel was specifically informed.  Thus, Defendants' counsel's conduct of misleading Courts about material facts and accepting tainted money as fees for doing so was clearly intentional.  Notably, some of the Defendants used the same tainted funds from their general account to acquire real state in Wisconsin and Massachusetts as alleged in Paragraph 334.

## JURISDICTION AND VENUE

119.    Plaintiff Dolgov incorporates the allegations set forth in Paragraphs 118 above as

1  if fully set forth herein.

2       120.    This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. §

3  1964 as well as 28 U.S.C. §§ 1331 and 1332(a).  Specifically, this action arises under RICO and

4  CEA, both of which present a federal question.

5       121.    This Court has jurisdiction over the statutory and common law claims of violations

6  under California law pursuant to this Court's supplemental jurisdiction under 28 U.S.C. §

7  1367(a).

8       122.    This Court has personal jurisdiction over Defendants, and each of them, pursuant

9  to California long arm statute codified in Cal. Code Civ. Proc. § 410.10 as well as RICO personal

10  jurisdiction provisions of 18 U.S.C. § 1965(a) and (b).

11      123.    Defendant HDR conducts and has conducted a substantial, systematic, and

12  continuous business in the State of California as alleged hereinabove.

13      124.    Defendant ABS conducts and has conducted a substantial, systematic, and

14  continuous business in the State of California as alleged hereinabove.

15      125.    Defendant Hayes conducts and has conducted a substantial, systematic, and

16  continuous business in the State of California as alleged hereinabove.  Moreover, Defendant

17  Hayes transacts his affairs in this District within the meaning of 18 U.S.C. § 1965(a), at least

18  through his alter ego Defendant ABS, headquartered in this District, of which is he a founder,

19  CEO, CFO, secretary and director.  As alleged in Paragraph 38, name "ABS" is an abbreviation

20  constructed of first letters of first names (Arthur, Ben and Samuel) of individual Defendants

21  Hayes, Delo and Reed.

22      126.    Defendant Delo conducts and has conducted a substantial, systematic, and

23  continuous business in the State of California as alleged hereinabove.  Moreover, Defendant Delo

24  transacts his affairs in this District within the meaning of 18 U.S.C. § 1965(a), at least through his

25  alter ego Defendant ABS, headquartered in this District, of which is he a founder.  As alleged in

26  Paragraph 38, name "ABS" is an abbreviation constructed of first letters of first names (Arthur,

27  Ben and Samuel) of individual Defendants Hayes, Delo and Reed.

28

127.     Defendant Reed conducts and has conducted a substantial, systematic, and continuous business in the State of California as alleged hereinabove.  Moreover, Defendant Reed transacts his affairs in this District within the meaning of 18 U.S.C. § 1965(a), at least through his alter ego Defendant ABS, headquartered in this District, of which is he a founder and CTO. As alleged in Paragraph 38, name "ABS" is an abbreviation constructed of first letters of first names (Arthur, Ben and Samuel) of individual Defendants Hayes, Delo and Reed.

128.     This Court clearly has personal jurisdiction over at least one of the participants in the alleged multi-district RICO conspiracy – Defendant ABS, which is headquartered in this District.  In fact, this Court also has personal jurisdiction over Defendant HDR as well as other Defendants.  In a San Francisco County Superior Court case CGC19581267, Judge Schulman flatly rejected some of the same Defendants' fraudulent shell games and held that Defendants operated as a single enterprise for California law purposes.  Therefore, Defendant HDR as well its California alter ego Defendant ABS is a single enterprise with extensive presence in this district (over 80 employees).  See Systems Div., Inc. v. Teknek Elect., Ltd. 253 F. App'x 31, 37 (Fed. Cir. 2007) ("The exercise of jurisdiction over an alter ego is compatible with due process because a corporation and its alter  ego are the same entity—thus, the jurisdictional contacts of one are the jurisdictional contacts of  the other for purposes of the International Shoe due process analysis."). Defendant ABS, which is an alter ego of Defendant HDR, has its headquarters and over 70 employees in California.  Attributing these contacts to Defendants HDR clearly subjects it to the personal jurisdiction of this Court.  Moreover, Defendants and their counsels' failed attempts to hide the fact that BitMEX's top traders generating almost $70,000,000 in trading profits are U.S. persons clearly supports holding Defendants accountable for their actions in a United States District Court.

129.     There is no other District within the United States in which a Court would have a personal jurisdiction over all of the alleged RICO co-conspirators. Defendants Reed, Barbara Reed and Trace Reed reside in Wisconsin.  Defendant Agata Reed resides in Massachusetts. Defendants Grape Park and Mark Sweep are incorporated in Delaware.  Therefore, it is in the

interests of justice to bring all the remaining Defendants before this Court pursuant to RICO's nationwide jurisdiction provision of 18 U.S.C. § 1965(b).

130.    Venue is proper in this District pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b)(1).  Venue is similarly proper pursuant to 7 U.S.C. § 25(c) in that this is a District wherein a defendant is found, resides, or transacts business, or wherein any act or transaction constituting the violation occurred.

## INTRADISTRICT ASSIGNMENT

131.    Pursuant to Civil Local Rule 3-5 of the United States District Court for the Northern District of California, the San Francisco division is the proper venue because substantial part of the events or omissions, which give rise to this action has occurred in San Francisco county, where Defendants' HDR and ABS principal offices are located.

## BACKGROUND - BITCOIN

132.    Plaintiff Dolgov incorporates the allegations set forth in Paragraphs 1-131 above as if fully set forth herein.

133.    Bitcoin is form of cryptocurrency.  It is a trustless, decentralized digital currency without a central bank or single centralized administrator that can be sent from user to user on the peer-to-peer bitcoin network without the need for intermediaries or a trusted central authority.

134.    Bitcoin was invented in or about 2008 and described in a whitepaper entitled "Bitcoin: A Peer-to-Peer Electronic Cash System" authored by an unknown person or group of people using the name Satoshi Nakamoto and started in 2009 when its source code was released as an open-source software.  Bitcoins are created as a reward for a process known as mining. They can be exchanged for other currencies, products, and services.

135.    Bitcoin transactions are verified by a network of nodes through cryptography and recorded in a public distributed ledger called a blockchain, which is maintained by multiple bitcoin network nodes through the use of a consensus protocol.  Every bitcoin transaction starting from the very first one may be viewed and verified using the blockchain.  The blockchain consists of a chronologically ordered sequence of blocks holding records of bitcoin network transactions.

A new block is generated by miners every 10 minutes.  The integrity of the blockchain is maintained by including a hash of each block in to the subsequent block.  This way, if any block is altered (forged) after its creation, all the subsequent blocks would have to be also modified or the hash discrepancy caused by the modification will be immediately detected by all the network nodes.

136.     Bitcoins are traded for United States dollars, Euros and other fiat currencies and cryptocurrencies on centralized online marketplaces called exchanges.  Usually, transactions taking place inside exchanges, such as executions of buy and sell orders are not recorded on the public blockchain and, therefore, it is hard to independently verify them using the blockchain. Most exchanges do not have internal protections against bitcoin price manipulation as well as other fraudulent behavior, which is rampant due to low trading liquidity of the bitcoin market.

137.     Stablecoins are cryptocurrencies designed to minimize the volatility of the price of the stablecoin, relative to some "stable" asset or basket of assets. The value of a stablecoin can be pegged to a cryptocurrency, fiat money, or to exchange-traded commodities (such as precious metals or industrial metals).  Most frequently used stablecoins are those pegged to United States dollar, including, without limitation, Tether (USDT), USDC and the like.

138.     Since at least 2015, the CFTC has maintained that bitcoin, and other virtual currencies, fit the definition of a commodity primarily through administrative actions.  In re *Coinflip, Inc.*, CFTC Docket No. 15-29, 2015 WL 5535736 at *3 (Sept. 17, 2015).  *CFTC v. McDonnell*, 287 *F. Supp. 3d* 213, *228* (E.D.N.Y. 2018) was the first time the CFTC's position was given judicial approval. The court noted that "[v]irtual currencies can be regulated by the CFTC as a commodity," because virtual currencies can be exchanged in a market for a uniform quality and value. The Court's reasoning makes clear that bitcoin and other virtual currencies fall within both the common law definition of commodity and the CEA's definition of a commodity.

### BITCOIN PRICE MANIPULATION TECHNIQUES

139.     Plaintiff Dolgov incorporates the allegations set forth in Paragraphs 1-138 above as if fully set forth herein.

140.    On or about September 9, 2019, Chairman of the United States Security Exchange Commission ("SEC") Jay Clayton stated: "[i]n the trading area, it troubles me that people look on these venues and think it has got the same level of protection that you'd have on an equity market in the US NASDAQ and MYSZ. Nothing could be further from the truth, we have lengthy rulebooks, all sorts of protections to make sure that prices are not manipulated in the equity markets, I don't see those in the Crypto asset markets."

141.    Bitcoin derivatives and especially spot markets remain thinly traded making them particularly susceptible to pumps-and-dumps, Barts, stop loss hunts, liquidation cascades, spoofing, as well as other forms of market manipulation.  The primary beneficiaries of such illegal manipulation are the perpetrators, who are able to fill their orders at better than market prices at the expense of other traders, as well as cryptocurrency exchanges, such as BitMEX, which benefit through increased trading volumes as well as trader position liquidations.   This provides very strong financial incentive for exchanges to manipulate cryptocurrency markets.

142.    Pump-and-dump is the fraudulent practice of perpetrators encouraging unwitting investors to buy an asset, such as bitcoin, to inflate its price artificially, and then selling it when the price reaches a predetermined threshold.  Pumps-and-dumps are designed to deceive the inventors as to the state of market supply and demand for the asset by means of artificially increasing the price and trading volume of the asset that is designed to entice unwitting investors to join the hype, and to buy the asset at an artificially inflated price, which they would not have



CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

done otherwise. When the perpetrators behind the scheme sell (dump) their bitcoins and stop pumping it, the price plummets, and other investors are left holding the asset that is worth significantly less than they paid for it.   As the result, traders who bought the bitcoin on margin, may be subject to execution of stop losses as well as liquidations.

143.    Bart patterns or simply "Barts" are a variety of pumps-and-dumps involving intense pumps or dumps occurring within a very short time frame causing price action to find a new high or low for a very short period, followed by equally violent return to the previous level. Perpetrators using this manipulation tactic benefit by having their sell/buy orders filled, and causing the unwitting investors to open positions against the trend.

144.    Barts are created by perpetrators using Momentum Ignition Algorithms, which work by creating a sharp spike in buy or sell action within a market with the purpose of deceiving the market participants as to market-based forces of supply and demand for an asset and enticing



unsuspecting traders, or other trading algorithms, to follow the trade and place orders that they would not have otherwise placed.  Barts are intended to trick other market participants into

Consensus Law
CryptoCurrency
Attorneys

Compl. for Violation of RICO (Demand for Jury Trial)     - 64 -     Dolgov v. HDR et al.   Case No. 3:20-cv-7140

reacting to an apparent change and imbalance of supply and demand by buying and selling bitcoin derivatives at times, prices and quantities that they otherwise would likely not have traded. Additionally, unsuspecting traders will place buy orders above significant zones, to catch up trends, and short sellers will place stops losses in similar areas, these are effectively buy orders. In order for the malicious algorithm to be most effective it has to push price into these liquidity zones, triggering buys, and from there it can disengage.  Sometimes, several hours later, a floor of buy orders is removed, and a momentum ignition may be activated in the opposite direction causing a dump.

145.    Stop loss hunting is a type of market manipulation, when the perpetrators attempt to artificially move the price for an asset to a predetermined price value to force other market participants out of their positions.  This type of manipulation is performed by executing one or more buy or sell orders with the purpose to drive the price of an asset to a level where many market players have chosen to set their stop-loss orders.  Stop loss orders are orders that get automatically executed at market price should the price of bitcoin reach a predetermined price threshold.  The perpetrator buys or sells spot bitcoin or bitcoin derivative until the price threshold is reached.  When the stop loss orders are triggered due to a stop loss hunt manipulation, the trader's asset holdings are sold at prevailing market prices causing the market to be filled with a large number of market orders, which has the ability to move the asset price even further triggering more stop loss orders and can even result in liquidations.  The result is a cascading execution of a large number of market orders.  The perpetrators place their buy or sell orders such as to have them filled at the bottom or at the top of the resulting stop loss execution cascade at artificially below or artificially above market prices, respectively.  After the initial market move, the price of the asset sometimes recovers and perpetrators generate a profit due to their illicit actions.

146.    Liquidation cascade is an extreme case of the stop loss hunt, when the perpetrator pushes the price of the asset or derivative to reach position liquidations levels for multiple traders and the resulting multiple market liquidations take place in a very short time interval moving the

price even further.   This triggers additional liquidations causing a cascading execution of a large number of liquidation orders.  Similarly to the stop loss hunt, the perpetrators place their buy or sell orders such as to have them filled at the bottom or at the top of the resulting liquidations cascade, at artificially below or artificially above market prices, respectively.

147.   The manipulative price actions alleged hereinabove perpetrated by culprits on one cryptocurrency spot or derivatives exchange quickly propagate to all other exchanges due to the widespread use of arbitrage bots, which are algorithms coded in software that take advantage of the price discrepancy between exchanges by buying or selling an asset in one market and simultaneously selling or buying it in another market at a more favorable price.  Thus, a manipulative price action on one cryptocurrency exchange results in a substantially similar price action on all other exchanges.

148.   Because cryptocurrency derivatives exchanges contracts are based heavily on bitcoin spot index price on a handful of relatively illiquid spot exchanges, a large bitcoin spot price move may be accomplished by executing relatively small market orders on the illiquid spot exchanges.  For example, .BXBT index price used by Defendants for BitMEX's XBTUSD Perpetual Swap contract is based substantially on bitcoin prices on United States based exchanges BitStamp USA Inc., which owns and operates cryptocurrency exchange online platform BitStamp.net ("BitStamp"), see Ex. 14; Coinbase Inc. ("Coinbase Pro") and Kraken[3] ("Kraken"), which are much less liquid than BitMEX itself.

149.   Once initiated using helper accounts on BitStamp, Coinbase Pro and/or Kraken, the aforesaid price move spreads, through the aforesaid index, to order books of very liquid derivatives exchanges, such as BitMEX and causes massive, multimillion dollar instant liquidations of derivatives positions of retail traders like Plaintiff.  Such liquidations provide a financial windfall to derivatives exchanges such as BitMEX due to the increased trading volume as well as confiscation by the exchanges of the residual collateral of the liquidated retail traders, if

---

[3] Kraken is owned and operated by Payward, Inc. with offices at 237 Kearny Street Suite 102, San Francisco, CA 94108 United States.

the exchange is able to close the traders' positions at prices better than bankruptcy price.  In BitMEX, the amount of funds so confiscated from liquidated traders exceeded, as of August 24, 2020, 36,341 bitcoins valued at $427,000,000, which amount is stored in a winner account on the BitMEX exchange.

150.    Pumps-and-dumps, Barts, stop loss hunts and liquidation cascades may be utilized by perpetrators for purposes of money laundering, especially when exchanges do not require any documents to open an account.  For example, in case of a liquidation cascade, a first person or entity may execute a relatively small market order to trigger the liquidation cascade and a second, separate, person or entity, acting from a separate exchange account, opened on the same or different exchange, may place large buy or sell orders, respectively, to have them filled at the artificially low or high (below or above market) prices caused by the liquidation cascade triggered by the actions of the first person or entity.  The first entity generally would book a loss, while second entity would book a profit.  The first entity may be officially located in a high tax jurisdiction, such as California, while the second entity may be incorporated in a tax-heaven jurisdiction, such as British Virgin Islands.  Furthermore, the first entity may execute the order on an illiquid spot exchange, such as BitStamp, to amplify the effect of the initiating market order while the second entity may operate on a high liquidity derivatives exchange such as BitMEX, which uses the price of the spot exchange in calculating its index.

151.    In a criminal commodity derivatives market manipulation case *USA v. Smith et al.* (N.D. IL 2019), the United States Department of Justice (DOJ) took a position that placing orders for commodity derivatives contracts in a manner that was intended to deliberately trigger or deliberately avoid triggering a specific price-based event, such an option execution, is unlawful.  Consistent with that position, the all above alleged price manipulation actions are also unlawful.

152.    In *SEC v. Shuang Chen et. al*. Civil Action: 1:19-cv-12127-WGY (D. MA 2019) "[t]he Defendants generally used at least two brokerage accounts when manipulating the price of a particular publicly traded stock. The Defendants first typically used at least one account to place multiple small purchase or sale orders to create upward or downward pressure on the stock price

(hereinafter referred to as a "helper" account). Then, the Defendants typically used at least one other account (hereinafter referred to as a "winner" account) to purchase or sell larger quantities of stock at prices that had been affected by the manipulative orders placed by the helper account(s). The Defendants often held the winner and helper accounts at different brokerage firms to conceal from each brokerage firm the coordination between the two types of accounts."  The illegal stock price manipulation technique alleged by SEC is identical to the techniques alleged hereinabove and used as well as aided and abetted by Defendants on a daily basis during the time period starting on January 1, 2017 and until now ("Relevant Period") to manipulate the prices of cryptocurrencies.  According to SEC, all those techniques are illegal.

153.    Spoofing is an unlawful practice of making buy or sell orders, called deceptive orders, with an intent to cancel them before execution.  The deceptive orders are used by perpetrators to inject false and misleading information about genuine supply and demand for bitcoin or bitcoin derivatives into the markets and to deceive other participants in the market into believing something untrue, namely that the visible order book accurately reflected market-based forces of supply and demand.  This false and misleading information was intended to trick other market participants into reacting to an apparent change and imbalance of supply and demand by buying and selling bitcoin derivatives at times, prices and quantities that they otherwise would likely not have traded.

154.    Bitcoin price manipulation such as pumps-and-dumps, Barts, stop hunts, liquidation cascades, and spoofing, as well as numerous other forms of illicit market manipulation are generally believed to be the abuses that prevent SEC from approving numerous bitcoin Exchange Traded Fund (ETF) applications that have been filed throughout the years by various cryptocurrency industry players.

### BITMEX WAS DESIGNED FROM GROUND UP TO BENEFIT FROM MANIPULATION
*"Regulatory agencies can be bought." Defendant Arthur Hayes*

155.    Plaintiff Dolgov incorporates the allegations set forth in Paragraphs 1-154 above as if fully set forth herein.

156.     BitMEX was launched in 2014 by Defendants Hayes, Delo and Reed.  BitMEX was one of the first cryptocurrency exchanges that offered derivative products based on the price of bitcoin.  At its inception, as Defendant Hayes described it, BitMEX was to serve Wall Street institutional investors "who were going to want the same type of products" they were used to trading at sophisticated multinational banks. Yet for the first six months after BitMEX went live in late 2014, "no one came" to the trading platform, including traders from Wall Street. Therefore, BitMEX changed its business model to "focus[] on degenerate gamblers; [also known as] retail investors" by offering "100X leverage" trades.  Since then, its first-mover advantage has paid off: it is consistently among the largest cryptocurrency derivatives traders by volume and has been for years. It now frequently trades over $3 billion worth of transaction in a single day.

157.     In allowing retail customers to leverage their bets at the extraordinary ratio of 100:1—about twenty times higher than the common ratio in derivatives trading — BitMEX positioned itself to benefit consistently, significantly, and predictably from the combination of attracting overly hopeful investors and small price fluctuations on other exchanges. This structure creates substantial incentives for Defendants to surreptitiously cause such fluctuations.

158.     Implementing its business approach, Defendants deliberately based the index price of their Perpetual Swaps on spot-market exchanges that have limited liquidity and are thus relatively easy to manipulate. BitMEX would then engage in manipulative trading on those exchanges to change the price of bitcoin or ether. Even if only temporary, these price changes would then affect the prices of the Perpetual Swaps offered on BitMEX in a way that benefitted BitMEX by allowing it to make margin calls and liquidate its highly leveraged traders.

159.     Automatically liquidating contracts that were out of the money, BitMEX would cover the trader's losses but would also take all of the trader's collateral. By setting the liquidation point higher than necessary to protect against the risk of a loss greater than the trader's collateral, BitMEX consistently profited from these liquidations. BitMEX would place these profits in its insurance fund ("Insurance Fund"), marketed as a way to ensure that BitMEX has cash on hand for the rare occasions where the losses exceeded the collateral. Despite its name, the

Insurance Fund is almost never drawn upon and instead has grown consistently such that it now contains assets worth hundreds of millions of dollars.

160.    BitMEX also acted on similar financial incentives by trading against its customers, a secret BitMEX kept as long as it could. BitMEX employed an undisclosed trading desk with special privileges and insights that allowed BitMEX to take favorable positions opposite its own customers. BitMEX only revealed the existence of the desk in 2018, under pressure from an independent analyst armed with trade data reflecting its existence. As a desk with access to otherwise-hidden information, it was in a perfect position to enhance BitMEX's manipulation.

161.    BitMEX has compounded the effect of these manipulative schemes by routinely



**⚠ Order Submission Error.**                     7:31:01 PM  ⊗

Order could not be submitted: The system is currently overloaded. Please try again later.

freezing its servers—which BitMEX blames on technical glitches and limitations—to profit during moments of high volatility. During these freezes, customers are unable to change their positions, but the market continues to operate and BitMEX trades. BitMEX would thus prevent its customers from escaping positions until they fell to a level at which BitMEX could liquidate those positions at a profit to itself.

162.    BitMEX's operations on March 13, 2020, are a recent and good example. During a period in the day with high market volatility and crashing bitcoin prices (from nearly $8,000 to



**BitMEX** ✔
@BitMEXdotcom

Between 02:16 and 02:40 UTC 13 March 2020 we became aware of a hardware issue with our cloud service provider causing BitMEX requests to be delayed. Normal service resumed at 03:00 UTC. As a reminder, latest system updates can be found on our status page status.bitmex.com

1:04 AM · Mar 13, 2020 · Twitter Web App

$4,000 per bitcoin), resulting in a substantial sell-off, BitMEX's trading platform went offline for twenty-five minutes. As a result of the outage, BitMEX did not dip into its Insurance Fund, but rather liquated $800 million of its customers' highly leveraged positions for its own profit. This server outage, in short, effectively protected BitMEX and the Insurance Fund from the cascading effects of sell-offs of BitMEX's highly leveraged and volatile products.  It should be noted that BitMEX' three Site Reliability Engineers, responsible for the bitMEX trading platform uptime, are all located in this District and the deliberated and fraudulent outage on March 13, 2020 was perpetrated by them from this District.  To cover up their fraud, Defendants first concocted a story of a hardware failure that allegedly caused the BitMEX platform outage.

163.    However, Defendants soon realized that all hardware used by BitMEX platform was managed by Amazon EKS and not Defendants themselves and that such a fake excuse would clearly not hold up if Amazon is asked to investigate the alleged hardware issue.  Therefore, Defendants quickly changed their story and invented a fake distributed denial-of-service attack



**BitMEX** ✔
@BitMEXdotcom

We have identified the root cause of two DDoS attacks at 02:16 UTC and 12:56 UTC, 13 March 2020. For a full account of what happened and how we are responding, please refer to our blog: blog.bitmex.com/how-we-are-res...

2:35 AM · Mar 17, 2020 · Twitter Web App

(DDoS attack) as an excuse for deliberately shutting down their own trading platform to avoid severe financial losses to themselves.

164.    Defendants and each of them have thus manipulated the price of bitcoin and ether, harming Plaintiff and other traders who had their positions liquidated, in violation of the Commodity Exchanges Act, 7 U.S.C. §§ 9, 25 (2012).

165.    BitMEX's founder and CEO, Defendant Hayes, is cryptocurrency's P.T. Barnum. Describing trading on cryptocurrency as "the entertainment business," he has embraced a role as

showman and promoter for the "degenerate gamblers" he solicits, and encourages speculative trading by flaunting his lavish lifestyle and making bold predictions designed to elicit responses and move the market in a way that is profitable for BitMEX.

166.    Defendant Hayes repeatedly flaunts his wealth like this to followers of the BitMEX platform, while also sharing his positions and profits he makes by betting on the price of bitcoin and other cryptocurrencies. The implication of these types of promotion is clear: you too could live like this, if you trade on my platform.

167.    For example, when promoting BitMEX at a large conference in New York, Hayes flaunted his arrival in an exotic Lamborghini car.

168.    The BitMEX platform also has casino features built in. It promotes "winners" with a leaderboard of successful traders, just like casinos showcase their successful players.  All these features are designed to serve only one purpose - entice more gamblers to place even riskier bets.

169.    BitMEX also runs promotions for its products to promote gambling, providing prizes to "[t]he trader who continuously quotes the largest two-sided volume within a 0.5 percent spread" or "[t]he trader who has the largest profit (in XBT) from trading the NEO (NEOG18) contract gets the third prize."

170.    These promotions attract numerous retail investors and distract them from the fact that BitMEX created an exchange that facilitates its own manipulative and fraudulent behavior.

171.    Since its inception, BitMEX has flouted financial regulators worldwide for operating as an unregistered exchange, hiding behind its offshore status.

172.    In 2018, the financial regulator for the province of Quebec, Canada, ordered BitMEX to close accounts linked to customers in Quebec because it was operating as an unregistered exchange.

173.    In July 2019, according to reports, the CFTC opened an investigation to determine whether the exchange is targeting and allowing United States traders to use the platform, after numerous press reports detailed the lack of any "know your customer" practices at BitMEX and the ease with which users can access the site from the United States - indeed one New York

journalist has detailed his use of BitMEX.

174.   Most recently, on March 3, 2020, the United Kingdom's Financial Conduct Authority (FCA) issued a notice that BitMEX "is not authorised by us and is targeting people in the UK. Based upon information we hold, we believe it is carrying on regulated activities which require authorisation."

175.   BitMEX's flouting of financial regulators is consistent with the attitude of its founders, as Defendant Hayes has freely admitted to falsifying banking documentation in China in order to take advantage of arbitrage opportunities in the price of bitcoin.

176.   BitMEX is not the only entity that offers swaps and futures products on bitcoin. BitMEX, however, structures its products and operations with features more akin to a casino, focusing on products that expose customers to greater volatility and an increased risk of loss.

177.   One of BitMEX's earliest and still most popular products is the XBTUSD Perpetual XBTUSD Leveraged Swap ("Perpetual Swap").



178.   This product allows traders to buy or sell a contract that tracks the price of the exchange rate between bitcoin and the U.S. Dollar. If you buy the contract, you will make a profit if the price of bitcoin goes up in U.S. Dollars. Conversely, if you sell the contract, you will make a profit if the price of bitcoin goes down in U.S. Dollars—effectively a short sale on the price of bitcoin.

179.     Unlike a typical futures contract, XBTUSD Perpetual Swap has no set expiry date. Further, unlike a traditional futures product, the XBTUSD Perpetual Swap price closely tracks the price of the underlying asset, bitcoin. Put differently, in a traditional futures market, there are separate prices for the futures product and for the underlying asset. If ACME Corp. is trading at $100 a share today, the contract to buy one share of ACME Corp. at $120 in three months might trade for $5. Instead, XBTUSD Perpetual Swap tracks the price of bitcoin by exchanging among contract holders that are long (or short) a "funding rate" every eight hours if the price of bitcoin is higher (or lower) than what the contract is trading for on BitMEX. These mechanics incentivize buying the contract when the price of the contract is lower than the price of bitcoin, thus raising the contract's price, and vice- versa. The "funding rate" amount depends on the spread between the XBTUSD contract price and the referenced exchange rate. The funding rate is exchanged directly peer-to-peer among contract holders. BitMEX does not charge a fee for it.

180.     Because BitMEX does not list bitcoin itself, it must look to other exchanges that do trade bitcoin to determine the price of bitcoin for products like XBTUSD. For BitMEX to function properly, the data from the other exchanges must be trustworthy. If the spot market for the underlying cryptocurrencies listed on those exchanges is thinly traded and illiquid, then the price of the cryptocurrency becomes susceptible to price manipulation, which in turn could affect the price of the products on BitMEX. BitMEX knows this. BitMEX's products are particularly sensitive to price manipulation because BitMEX allows traders to operate on substantial amounts of leverage. BitMEX allows traders to leverage their position up to 100 times the amount of collateral, or "margin," they post. Put differently, traders can buy or sell 100 bitcoin worth of XBTUSD contracts for only 1 bitcoin of collateral. This leverage magnifies both gains and losses: if the price of the XBTUSD goes up, a buyer who is 100x leveraged will experience 100 times the profit, but if the price declines even 1 percent, the buyer will have lost all his collateral. In this way, BitMEX structures its products to offer the allure of large, lottery-ticket payoffs for very limited money.

181.     BitMEX's fees, however, are calculated based on the leveraged position, not on

the underlying collateral. Thus, where BitMEX advertises a fee of 0.075 percent for bitcoin Perpetual Swaps, that percentage refers to the amount of the unleveraged position. For a 100x leveraged Perpetual Swap, BitMEX is effectively charging a fee of 7.5 percent.

182.    In a leveraged trade, BitMEX limits a trader's loss to solely the posted margin. In contrast, major derivatives exchanges, such as the Chicago Mercantile Exchange, expose traders to unlimited risk. When the unrealized loss of their position exceeds the posted margins, those exchanges will ask traders to post additional collateral to supplement their margin. This is known as a margin call. For example, if you had a $10,000 position supported by $100 of margin, and the position fell 1 percent to $9,900, it would trigger a margin call.

183.    To limit traders' losses to the posted margin, BitMEX uses a liquidation engine to close positions with unrealized losses close to the amount of the posted collateral and prevent losses greater than the collateral posted by the trader while ensuring that the winner receives their full profits. While the promise that a trader can only lose the minimal margin put up for a highly leveraged bet may be alluring to retail investors, in reality BitMEX uses this promise to lure them into a false sense of security. BitMEX's system encourages traders to place highly leveraged bets under this pseudo-protection but takes their money in liquidations. Put differently, when BitMEX liquidates a position, there is going to be a winning trader and a losing trader, but even beyond receiving the transaction fees, BitMEX almost always takes a large part of one trader's collateral, allowing it to profit from the liquidation.

184.    BitMEX's model of encouraging its users to experience volatility disproportionate to their collateral through substantial leveraging requires a mechanism that prevents those users from experiencing losses greater than they can handle—there is, after all, someone on the other end of the transaction that expects to get paid. BitMEX achieves this through the use of an automatic liquidation system. This system, however, does more than liquidate positions with insufficient collateral—it also creates substantial profits for BitMEX at the expense of its customers.

185.    Because BitMEX allows traders to make purchases with large amounts of

leverage, there is a risk that that a trader may not be able to pay the winner for his position. In order to prevent winners from being adversely affected by the lack of a counterparty's collateral, BitMEX agrees to cover their winnings. In exchange, it automatically takes the loser's collateral. It then seeks to sell the position on the market at the best price available, with the purchaser stepping into the shoes of the liquidated party with responsibility for covering the counterparty's profits after sale.4 This process of taking the loser's collateral in exchange for covering the winner's profits until a counterparty is found is the automatic-liquidation system. BitMEX, however, does not wait to liquidate until the collateral can no longer cover the losses. Instead, it liquidates when the collateral is worth approximately twice the losses incurred, even though the trader has half of the initial collateral remaining. Even if the system is able to find a price for the position after the liquidation that would have allowed the trader to recoup some his losses, however, the trader receives nothing. Instead, BitMEX keeps that recovery for itself and puts it into the Insurance Fund.

186.    To use an example from BitMEX's own website, consider a trader who has taken a long position on 100 ether using only 1 bitcoin as collateral while bitcoin and ether are each trading at $4,000. This trader is 100x leveraged, such that a rise in the price of ether by $10 will cause the trader to gain $1,000. Because of this level of leverage, the trader runs a substantial risk of not being able to pay off an unsuccessful contract; his collateral can absorb only a $40 decrease in the price of ether. The price at which the trader's collateral can no longer cover the losses on the position is the "bankruptcy price." In this example, the bankruptcy price is slightly over $3,960, as ether falling to that price would mean that the 1 bitcoin used as collateral would exactly cover the losses. Rather than using this bankruptcy price as the liquidation point, BitMEX imposes a 0.5 percent "maintenance margin," such that the position will automatically be liquidated if the price of ether falls to $3,980. This maintenance margin is remarkable relative to the amount of leverage in the position, as a change of less than 1 percent in the price of bitcoin can result in an automatic liquidation. If the price hits $3,980 and this liquidation occurs, BitMEX will seize the collateral and then seek to sell the 100-bitcoin position to another customer, while

covering the gains of and without terminating the contract of the original counterparty. If this sale occurs at a price of $3,978, reflecting a $2 bid-ask spread, the purchase as a whole will have incurred a loss of $2,200 against the initial $4,000 wagered—a $22 loss multiplied by the 100x leverage. BitMEX, which takes the full collateral, has accordingly profited $1,800 from the liquidation of its customers' position and places this profit in the Insurance Fund. The trader, meanwhile, loses the full $4,000.

187.   It is possible for BitMEX to lose money in a liquidation if the market lacks sufficient liquidity to allow BitMEX to sell the liquidated position at the bankruptcy price. If, for example, the price of ether hits $3,980 but BitMEX is not able to find a purchaser to take over Perpetual Swap at a price above $3,920, the 1 bitcoin used as collateral will not cover BitMEX's losses. Hypothetically, the Insurance Fund would be used to cover BitMEX's losses in this scenario.

188.   The profitability of the Insurance Fund is thus tied to the liquidity of the market— as BitMEX itself has stated, the Insurance Fund will profit from each liquidation as long as the bid-ask is smaller than the maintenance margin.

189.   Despite being described as a mechanism intended "to help ensure winners receive their expected profits, while still limiting the downside liability for losing traders" by making sure that BitMEX always has cash on hand to pay off losing trades, BitMEX's Insurance Fund shows substantial overall profit from these liquidations. As their own data shows, the Insurance Fund has grown every year, as BitMEX takes in far more from liquidating its customers' positions than it pays out to cover contracts it cannot close quickly enough. Despite its role as an insurance backstop, it grows in value nearly every day: over the last 100 (volatile) days, it has begun only five of them with a balance less than it began with the day before. Its largest posted one-day loss in the last 100 days has been around 20 bitcoin. In fact, on August 24, 2020, the Insurance Fund contained over 36,341 bitcoins, representing 0.2 percent of the total bitcoin in circulation and valued over $427,000,000. Moreover, BitMEX partitions the fund by contract type, and, when no more contracts of a given type remain (because, for example, the contract was tied to a time

period that expired) the portion of the Insurance Fund for that contract type is given to BitMEX as profit.

190.    BitMEX has thus profited from the vast majority of the automatic liquidations it conducts on behalf of its customers. Even independent of how these automatic liquidations can be used with market manipulation, the structure of BitMEX's automatic liquidations creates an incentive for BitMEX to induce liquidations as long as there is sufficient liquidity in the market that the bid-ask spread is smaller than the maintenance margin. As long as this liquidity is present, BitMEX profits when it causes its customers' positions to automatically liquidate. Defendants' ability to manipulate the prices on BitMEX for their own profit and at the expense of Plaintiff and other cryptocurrency traders was protected and enhanced by persistent issues BitMEX maintained in its server that locked out users at crucial times that enabled BitMEX to profit.

191.    BitMEX's risk-management process, which performs the system's automatic liquidations, must check the entire system whenever the price of a Perpetual Swap changes. This process, although sometimes completed quickly, supposedly causes BitMEX's servers to freeze on average between two and three times a day. During these server freezes, customers lose the ability to trade until the servers unfreeze.

192.    These server issues are not present in other exchanges that regularly handle far more transactions per second. While BitMEX has purposefully not made all of the data about its server capacity public, it has indicated that, as of May 2019, it was processing around 200,000,000 trades a week, purportedly taxing its system and leading to server shutdowns. This works out to an average load of around 330 trades a second. BitMEX has indicated that its peak transactions can reach 30 times the average, for a peak of just under 10,000 trades a second. ByBit, which also transacts primarily in swaps and derivatives, can process 100,000 transactions a second. Binance, another large exchange, can process 1.4 million transactions a second, more than 100 times the peaks that purportedly cause BitMEX's servers to freeze.

193.    When BitMEX's servers are frozen, preventing customers from executing any

trades, the prices of the Perpetual Swap contracts are not frozen. Instead, they continue to move, processing some transactions while refusing to accept transactions from others. This means that a BitMEX trader can be prevented from executing a trade by a server freeze only to find, once the server reopens, that the price at which they wished to transact is no longer available. They can also find that an offer they had made before the freeze but wished to retract during it has since been accepted.  Any trader with the ability to have its transactions prioritized over others during this period could reap substantial profits. The digital assets on which the BitMEX Perpetual Swaps are based, such as bitcoin or the Tokens, continued to trade on other exchanges with functioning servers while BitMEX's remained frozen to most users. A privileged trader—such as those that operate BitMEX's internal trading desk—could see that the price of bitcoin had risen during a freeze and arbitrage on that information before the regular traders had the ability to react. Additionally, because most traders are unable to operate during these freezes, a trader who is able to act could survey all of the items on offer during the freeze and cherry-pick whichever seemed most appealing in light of the market's movements.

194.    The limitations of BitMEX's server also helps enable profitable automatic liquidations, because these liquidations continue to occur during the freeze. A customer who has a 100x leveraged position on one bitcoin that will liquidate if the price of bitcoin falls from $4,000 to $3,980, for example, would be heavily incentivized to sell when the price hits $3,985, accepting a loss of $1,500 but retaining the capital. If the frozen servers prevent this sale from transpiring, however, the customer will lose all of their capital when the price hits $3,980. Such a scenario profits BitMEX, which collects the capital.

195.    The timing of these freezes is not random. The most important and profitable time for BitMEX to freeze is during a period of high volatility. BitMEX's automatic liquidations exacerbate the volatility of the derivatives that BitMEX markets, particularly in periods of high volatility. Specifically, by automatically executing sell orders in response to a market decline, BitMEX pushes prices even lower. This response could result in catastrophically cascading sell orders during a period of a rapid decline—that is, a "flash crash." BitMEX does not disclose those

risks to retail investors and, instead, uses server freezes to protect its Insurance Fund and its derivatives market as a form of undisclosed "circuit breaker."

196.    Moreover, high volatility and rapidly changing prices allow more customers to be liquidated. Indeed, an expert statistical analysis conducted of freeze periods reported on BitMEX's website has revealed that these server freezes occur 80 percent more often during periods of high volatility in bitcoin prices. This result is statistically significant at a 95 percent confidence level. Moreover, the statistical analysis reveals that compared to periods without a server incident, the volatility is 130 percent higher when there is a server incident. This result is also statistically significant at 95 percent confidence level.

197.    BitMEX server freezes most often occurred during the highest periods of volatility when BitMEX could effectively liquidate traders' positions.

198.    These server freezes are not justifiably caused by transaction volume, which would approximate server load. For example, on May 12, 2019, BitMEX announced a new record of over $10 billion in transaction volume, with no server incidents reported that day.

199.    The interaction between BitMEX's server problems and its liquidation policy was recently demonstrated on March 13, 2020, when the price of bitcoin fell from $7,200 to a 10-month low of $5,678 in just 15 minutes. This sort of event is precisely why BitMEX claims to maintain the Insurance Fund—a series of cascading liquidations in the face of such a rapid fall could prevent BitMEX from selling the liquidated positions above their bankruptcy price, causing losses that are designed to be covered by the Insurance Fund. Yet BitMEX's servers shut down in the middle of the crash. BitMEX first blamed the server shut down on "a hardware issue with our cloud service provider," before later claiming, without any support, that the server failure was the result of an attack by a "botnet."

200.    When the servers were restored, bitcoin's price had stabilized, preventing the need for BitMEX to dip into its Insurance Fund. The traders who had hit their margins during the crash, however, were liquidated nonetheless. In short, a conveniently timed server outage turned a potentially catastrophic loss for BitMEX's Insurance Fund into a profit-item.

201.     BitMEX could remove the potential for these manipulative actions and prevent users from suffering from periods of denied access to a moving market by prohibiting its system from accepting any transactions during these freezes. Instead, BitMEX profits from the system it employs, either by having its for-profit trading desk manipulate the markets in such freezes, by selling the right to do so, or by profiting from liquidations that occur while customers are unable to escape increasingly unfavorable positions.

## BITMEX TRADES AGAINST ITS CUSTOMERS

202.     Plaintiff Dolgov incorporates the allegations set forth in Paragraphs 1-201 above as if fully set forth herein.

203.     On April 28, 2018, an independent researcher requested comment from BitMEX regarding "information on record about insider accounts (possibly friends / acquittances of Bitmex staff) having special advantages over other Bitmex users." BitMEX responded the same day, denying that it gave "preferential treatment" to any "customers." This proved to be false, and that its prior statements had been materially misleading.

204.     On April 30, 2018, BitMEX updated its terms of service and for the first time revealed that "BitMEX has a for-profit trading business that, among other things, transacts in products traded on the BitMEX platform." BitMEX also revealed that its trading desk had the monopoly on making a market in its bitcoin options product. BitMEX hid the role of its trading desk by labeling the employee in charge of the desk as part of "Risk Management." Prior to April 30, 2018, BitMEX had never disclosed that it played a role on its exchange that extended beyond the management and administration of the exchange itself.

205.     BitMEX had never indicated that it took direct positions on the assets it was trading.  Traders, when traded on the BitMEX platform, had done so on the belief that the other participants were on similar footing to them.  If traders knew that its counterparty could be BitMEX itself, equipped with proprietary knowledge, they would have recognized the possibility that they were participating in an unfair game.

206.     As an inside entity trading against its own customers, the BitMEX trading desk

enjoys a number of advantages. First, an internal BitMEX desk could have a higher trade priority than other traders, allowing its trades to be processed first when the total number of trades exceeds BitMEX's server capacity. Second, an internal BitMEX trading desk could potentially view the leverage amounts for previously created positions and the price at which its liquidation will be triggered. This information would make it easy to profitably manipulate the market. If, for example, the trading desk sees that a number of short bitcoin Perpetual Swaps are near their liquidation point, it could enter a large buy order. This order would cause the price of bitcoin on the BitMEX exchange to rise, triggering the liquidation of these Perpetual Swaps. The liquidation would create a buy order for the liquidated contract, further increasing the price. Once this chain of liquidations had caused the price to rise far beyond the price at which the internal desk made its initial purchase, it could sell bitcoin at this higher price to fulfill the forced buy orders. Because these trades are automatic, an inside desk could execute this trade very quickly and with a high confidence of success.

207. Even without placing trades that cause cascading liquidations, however, the BitMEX desk helps create the liquidity that keeps the forced liquidations profitable, including those that occur during server freezes. As BitMEX has admitted, it profits from each liquidation as long as the bid-ask is smaller than the maintenance margin. By creating liquidity through market-making, and freed from the possibility of being liquidated itself, BitMEX's desk helps maintain an environment that keeps the liquidations profitable.

208. The interaction between the Insurance Fund and the trading desk creates a pernicious result when the desk serves as the purchaser of a liquidated position. When a customer stakes $4,000 on a position only to have BitMEX liquidate it, sell it to its own desk at a price that recovers $3,500 of that $4,000, and then keep the $3,500, the customer has essentially been robbed. BitMEX has walked away with both the position and the initial capital, leaving the customer with nothing.

209. Nor is the trading desk the only inside entity trading on BitMEX. Defendant Hayes has admitted that he himself trades on the platform, against BitMEX's customers. The customers

Consensus Law
CryptoCurrency
Attorneys

Compl. for Violation of RICO (Demand for Jury Trial)   - 82 -   Dolgov v. HDR et al.   Case No. 3:20-cv-7140

on the other side of Hayes's contracts have no way of knowing that they are trading against an insider with access to non-public information about their trades, including their liquidation limits. Hayes has even gloated about the possibility of such misconduct, stating that "[t]he digital token trading markets like traditional forex markets are not regulated, and will struggle to be. Therefore, if you can't stomach insider trading, then don't take on short-term positions."

210.    On information and belief, BitMEX has manipulated the price of the assets underlying the derivatives on the exchange in order to force liquidations of traders for the benefit of its Insurance Fund.

211.    Through 2019, BitMEX looked to a relatively limited number of exchanges to price bitcoin and ether for its derivative products. This made the exchange susceptible to price manipulation. In part of mid-2019, for example, BitMEX determined the price of ether by referring to just three exchanges: BitStamp, Coinbase Pro, and Kraken.

212.    Any swaps trader would have an incentive to manipulate the price of bitcoin or ether on those exchanges to cash in on their leverage trade. For example, a trader who was short bitcoin on BitMEX would be incentivized to go to BitStamp and suddenly drive down the price of bitcoin by selling it, making the Perpetual Swap position more valuable. The trader's profitability would depend on the liquidity available at BitStamp for bitcoin and the details of the Perpetual Swap positions on BitMEX. Lower liquidity in bitcoin trading would make it easy for the trader to move the price on BitStamp quickly and cheaply. A large, highly leveraged position at BitMEX would justify a large selloff of bitcoin below prevailing market prices. Moreover, this could be an ongoing process: as the price of bitcoin falls and the Perpetual Swap positions become profitable, the trader could cash out some existing Perpetual Swap positions for more bitcoin and then continue to sell that new bitcoin on BitStamp while opening additional Perpetual Swap short positions.

213.    Structurally, however, this kind of manipulation is more likely to succeed on short positions rather than long, because BitMEX settles all of its Perpetual Swaps in bitcoin. If the trader attempts to manipulate the price of bitcoin up because of outstanding long positions, she

would be unable to continue the process after the initial "pump" because her Perpetual Swap contracts are all paid out in bitcoin. She would have no way to buy additional bitcoin with those proceeds without selling the proceeds—thus defeating the purpose of the pump. Thus, to pull off a manipulation scheme when long on bitcoin, the trader would need a large reservoir of traditional currency with which to buy bitcoin, and could not use any proceeds from the manipulation itself to continue driving up the price of bitcoin. Nonetheless, throughout 2019, BitStamp was subject to numerous pumps and dumps of bitcoin and ether including on days when Kraken was down for maintenance and unavailable for pricing derivatives on BitMEX. For example, on April 2, 2019, there was a massive pump on BitStamp's bitcoin price by nearly 20 percent. Then on May 17, 2019, bitcoin lost 20 percent of its value on BitStamp for about thirty minutes before recovering. Later, on July 14, 2019 when Kraken was down for maintenance— thus increasing the weight of BitStamp on BitMEX's Perpetual Swaps products—the price of ether dropped dramatically due to the sell order on BitStamp by a single user that accounted for over 15 percent of BitStamp's entire volume for the day, causing $164 million worth of liquidations on BitMEX.

214.    Of the possible manipulators, BitMEX is the best positioned to take advantage of the consequences of these schemes. First, BitMEX operates its own proprietary trading desk that can take long and short positions and engage in a pump and dump scheme, like the hypothetical trader described above. Second, beyond profiting from any positions it takes, BitMEX alone profits greatly from liquidations, even during severe price movements. Third, BitMEX alone knows the trading positions of its users and can precisely tailor its manipulation to generate mass liquidations with minimal effort and risk. Fourth, as a large institution, BitMEX would be one of the entities with sufficient resources to engage in pump schemes that require a lot of capital in traditional currency to buy the underlying commodity.

215.    Unsurprisingly, for these reasons numerous commentators, including a tenured professor at NYU's Stern Business School, point to BitMEX as the culprit behind these price movements.

216.     On or about 11:00PM EDT on May 16, 2019 (May 17, 2019 3:00AM UTC), one or more perpetrators launched a trading software algorithm configured to sell about 3600 bitcoin, valued at the time at about $28 million on a United States based bitcoin spot exchange BitStamp[4]. The trading algorithm wiped the buy order book of BitStamp from $7,838 all the way down to $6,178, sitting on the ask side of the aforesaid order book the entire time.  The artificial price move that resulted from the execution of the aforesaid malicious trading software algorithm brought bitcoin price on BitStamp from $7,838 all the way down to $6,178.

217.     The hereinabove alleged artificial bitcoin price decline on BitStamp, in turn, led to a liquidation of $250 million (about 10x times the size of the BitStamp sell order) long positions on the BitMEX derivatives exchange, which further resulted in significant price declines on all other crypto exchanges throughout the world, including multiple exchanges in the United States, costing bitcoin traders and investors hundreds of millions of dollars.

218.     The above-alleged manipulation was repeated, almost perfectly, on Sunday, July 14, 2019, when a perpetrator or group of perpetrators collectively acted to crash the market by putting in a massive sell order of 15,000 ETH, valued a $4 million, on BitStamp.  This made up 15% of its entire trading volume of BitStamp on that Sunday – all in one trade.  This giant sell order immediately plunged the price of ETH on BitStamp from $270 to $190, which is otherwise known as a "flash crash".

219.     Like a disease, the alleged flash crash spread to ETH Perpetual Swap contracts traded on BitMEX, which bases the Perpetual Swap contracts' price 33% on the Bitstmap's price. As the result of the crash, $164 million of long Perpetual Swap contracts were liquidated on BitMEX in the blink of an eye and spread to bitcoin Perpetual Swaps traded on BitMEX, again causing significant price declines on all other crypto exchanges throughout the world, including multiple exchanges in the United States, costing bitcoin traders and investors hundreds of

---

[4] Bitstamp USA Inc. is incorporated in Delaware, maintains its headquarters at 27 Union Square West, Suite 205, New York, NY 10003, United States and owns the cryptocurrency exchange online platform BitStamp.net, used in the alleged manipulation, see Ex. 14, p. 2, item 6.  BitStamp.net cryptocurrency exchange online platform used in the alleged manipulation was hosted on Amazon AWS servers located in Denver, Colorado.

millions of dollars.

220.    Plaintiff Dolgov is informed and believes and thereon alleges that the alleged devastating manipulations were deliberately enabled by BitMEX.  Specifically, the aforesaid artificial price action were made possible by the fact that BitMEX deliberately designed its indexes based on price data for cryptocurrencies from just three exchanges – BitStamp, Kraken and Coinbase Pro, all three of which have way lower liquidity than BitMEX.   This design was specifically intended to amplify any large price moves to increase the amount of liquidated traders on BitMEX.

221.    Plaintiff Dolgov is informed and believes and thereon alleges that the reason why BitMEX, the most liquid exchange, calculates its contracts index price based on other exchanges with way less liquidity is because BitMEX is the major financial benefactor of the catastrophic market manipulation events, such as May 17, 2019 and July 14, 2019 events alleged hereinabove.

222.    Plaintiff Dolgov is informed and believes and thereon alleges that, at times, trader liquidations account for up to half of BitMEX entire revenue.  When Defendants liquidate a trader, they take the remainder of funds left after paying the trade counterparty and deposit it into the Insurance Fund.  The Insurance Fund has been steadily growing throughout the years.

223.    Plaintiff Dolgov is informed and believes and thereon alleges that BitMEX's internal trading desk is the second major financial benefactor of the catastrophic market manipulation events, such as May 17, 2019 and July 14, 2019 events, alleged hereinabove, which were in fact perpetrated by Defendants Hayes, Delo and Reed in order to achieve financial gain for themselves.

224.    BitMEX enables the perpetrators of the alleged market manipulations to avoid detection by authorities by providing the perpetrators with the ability to open an unlimited number of anonymous document check-free trading accounts on BitMEX without any trading and withdrawal limits.

225.    Plaintiff Dolgov is informed and believes and thereon alleges that BitMEX further facilitates the market manipulation by using fraudulent "system overloads" excuse to accept some

trading orders and reject others during large market moves in order to exacerbate the artificial prices and increase the number of liquidations with the purpose to financially benefit therefrom. The aforesaid fraudulent "system overloads" were orchestrated from San Francisco offices of Defendant HDR, where BitMEX's three Site Reliability Engineers are all located.  Additionally, the aforesaid fraudulent "system overloads" were all perpetrated by Defendants through the same commercial website BitMEX.com, which is accessible and is extensively used, via widely available and inexpensive VPN software, by users located in the United States and this District. Therefore, these illegal acts resulting in injuries, for which Plaintiff seeks redress in this Complaint are directly related to Defendants' connections to the United States and this District through their commercial website BitMEX.com.

226.    Plaintiff Dolgov is informed and believes and thereon alleges that BitMEX further facilitates the market manipulation by using fraudulent and deliberate server freezes to lock at least some traders out of their accounts during large market moves in order to exacerbate the artificial prices and increase the number of liquidations with the purpose to financially benefit therefrom.  The aforesaid fraudulent and deliberate server freezes are orchestrated from San Francisco offices of Defendant HDR, where BitMEX's three Site Reliability Engineers are all located.  In addition, Defendants' servers and other IT infrastructure that were involved in the alleged deliberate freezing are deployed on United States based Amazon EKS with offices in this District.  Yet additionally, the fraudulent and deliberate server freezes were all perpetrated by Defendants through the same commercial website BitMEX.com, which is accessible and is extensively used, via widely available and inexpensive VPN software, by users located in the United States and this District.  Therefore, these illegal acts resulting in injuries, for which Plaintiff seeks redress in this Complaint are directly related to Defendants' connections to the United States and this District through their commercial website BitMEX.com.

227.    Plaintiff Dolgov is informed and believes and thereon alleges that the various specific acts perpetrated by Defendants to manipulate the prices of cryptocurrencies or to aid and abet such manipulation by other perpetrators, with the purpose to financially benefit from it,

violate a number of United States federal criminal statutes, including, without limitation, 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1956(a) (money laundering); 18 U.S.C. § 1957(a) (engaging in monetary transactions in property derived from specified unlawful activity); 18 U.S.C. § 1960(a) (conducting, controlling, managing, supervising, directing, or owning all or part of an unlicensed money transmitting business) and 18 U.S.C. § 2314 (interstate transportation of stolen property).  These specific criminal acts alleged hereinbelow constitute predicate acts for purposes of RICO and were perpetrated by Defendants in course of conducting or conspiring to conduct affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1962(d) and (c).

228.    As a direct result of Defendants' manipulation of the market for their derivative products, including through the use of the server freezes and a (formerly concealed) internal trading desk to create profitable liquidations, Plaintiff have suffered significant damages in an amount to be proven at trial.

229.    While the precise measurement of the harm caused to Plaintiff by Defendants' actions is not calculable at this stage, an approximation can be found in the value of the Insurance Fund, which is filled with the profits of Defendants' liquidations. As of August 24, 2020, the Insurance Fund contained over 36,341 bitcoins valued at over $427,000,000.

## **DERIVATIVES TRADED BY PLAINTIFF**

230.    Plaintiff Dolgov incorporates the allegations set forth in Paragraphs 1-229 above as if fully set forth herein.

231.    On May 13, 2016, BitMEX launched its first swap product, a "perpetual bitcoin U.S. dollar leveraged swap product," which it has described generally as "the XBTUSD perpetual swap" ("XBTUSD Bitcoin/US Dollar Perpetual Inverse Swap Contract").  BitMEX claims its XBTUSD Bitcoin/US Dollar Perpetual Inverse Swap Contract is "the most traded cryptocurrency product of all time."

232.    Between November 22, 2014 and February 9, 2020, BitMEX has had over 2.5 trillion contracts traded on its platform. Most of that volume—more than two trillion contracts—

1

has been in the XBTUSD Bitcoin/US Dollar Perpetual Inverse Swap Contract.

2

233.    During Relevant Period, Plaintiff Dolgov directly traded (bought, sold and owned)

3

the Bitcoin/US Dollar Perpetual Inverse Swap Contract with ticker symbol XBTUSD on U.S.

4

based BitMEX exchange.  Bitcoin/U.S. Dollar Swap Contract with ticker symbol XBTUSD

5

traded by Plaintiff Dolgov on BitMEX is priced based on the underlying price is the XBT/USD

6

exchange rate as recorded in the .BXBT Index, which Defendants manipulated using helper

7

accounts on U.S. based exchanges Bitstamp, Kraken and Coinbase Pro, as alleged in this

8

Complaint.  Both the underlying .BXBT index and the swap contract XBTUSD are quoted in

9

USD.  Margin and PNL are denominated in Bitcoin.  The XBTUSD Bitcoin/U.S. Dollar Swap

10

Contract traded on Kraken is priced based on bitcoin spot price on that exchange, which was

11

12

## BITCOIN / US DOLLAR PERPETUAL INVERSE SWAP CONTRACT

13

XBTUSD

14

**10695.0** USD  −144.5 (−1.33%)    10839.5 PREV    10839.5 OPEN    808.363M VOLUME    10650.0 — 10842.0 DAY'S RANGE

15

● MARKET OPEN (SEP 30 20:51 UTC)

☐ Follow XBTUSD

16

Overview    Ideas

17

18

## XBTUSD Crypto Chart

📈 Full-featured chart

19

| BitMEX 10695.0 | Kraken 10705.6 |

20

manipulated by Defendants by placing large market orders from helper accounts in that exchange.

21

Both of the above derivative contracts meet the definition of a "swap" under CEA, 7 U.S.C. §

22

1a(47)(a)(IV), which defines "Swap" as:  "(iv) … an agreement, contract, or transaction that is, or

23

in the future becomes, commonly known to the trade as a swap."  For example, TradingView,

24

with 15 million monthly active site users and over 40,000 publishers, brokerages, and fintechs

25

utilizing its investing tools, is the industry standard used by about every trader out there.  It lists

26

both aforesaid XBTUSD contracts from BitMEX and Kraken as "Swaps"

27

(https://www.tradingview.com/symbols/XBTUSD/).

28

234.    Therefore, the traded Bitcoin/US Dollar Perpetual Inverse Swap Contract with ticker symbol XBTUSD is a swap under CEA 7 U.S.C. § 1a(47)(a)(iv) (agreement, contract, or transaction that is, or in the future becomes, commonly <u>known</u> to the trade as a swap).

235.    Defendant HDR itself specifically admitted that its XBTUSD contract is known to the trade as a "swap," thus meeting definition under CEA:



236.    In addition, Plaintiff Dolgov traded Ether/U.S. Dollar Swap Contract with ticker symbol ETHUSD on BitMEX, which is also a "swap" under CEA, 7 U.S.C. § 1a(47)(a)(iv). Ether/U.S. Dollar Swap Contract with ticker symbol ETHUSD traded by Plaintiff Dolgov uses the .BETH index price, which Defendants manipulated using helper accounts on U.S. based exchanges Bitstamp, Kraken and Coinbase Pro, as alleged in this Complaint.

237.    Moreover, the aforesaid XBTUSD contract that Plaintiff traded on BitMEX is also "swap" pursuant to 7 U.S.C. § 1a(47)(a)(iii)(XXII), which defines a "swap" as a  "a commodity swap."  Because bitcoin is commodity, both XBTUSD contracts are "commodity swaps" under 7 U.S.C. § 1a(47)(a)(iii)(XXII).

238.    Yet, furthermore, according to CFTC Complaint, ¶ 125, "products that have traded on BitMEX, including "perpetual swaps" or "perpetual contracts" on bitcoin, ether, and litecoin, are swaps as defined by 7 U.S.C. § 1a(47)."  Therefore, Plaintiff can pursue his claims under CEA, 7 USC § 25(a)(1)(D), which specifically covers "swaps."

239.    Plaintiff was enticed to trade on BitMEX through BitMEX's own advertisements

specifically directed at Plaintiff and traders like Plaintiff.

## THE RAKETEERING ENTERPRISE

240.    Plaintiff Dolgov incorporates the allegations set forth in Paragraphs 1-239 above as if fully set forth herein.

241.    Each of the Defendants HDR, ABS, Hayes, Delo and Reed are respective persons or entities capable of holding a legal or beneficial interest in property.

242.    From at least January 2017 and until present, Defendants HDR, ABS, Defendant Unknown Exchange, Grape Park, Mark Sweep, Hayes, Delo, Reed, Agata Reed, Barbara Reed and Trace Reed have been a union or group of entities and individuals associated in fact collectively constituting a continuing "enterprise" ("Enterprise") within the meaning of RICO as defined in 18 U.S.C. § 1961.  Since at least January of 2017, each of HDR, ABS, Defendant Unknown Exchange, Grape Park, Mark Sweep, Hayes, Delo and Reed, Agata Reed, Barbara Reed and Trace Reed has been a person separate and distinct from the Enterprise itself, while, at the same time, being a member of the Enterprise.  The purposes of the Enterprise included, among others: (1) maximizing profits and minimizing trading losses for the Defendants, and each of them, and their co-conspirators, through unlawful trading practices; (2) concealing trading gains obtained through unlawful practices from regulatory and tax authorities; (3) generating illicit income from unlicensed money transmissions; (4) promoting and enhancing the racketeering conspiracy and the activities of the Defendants, and each of them, and their co-conspirators; (5) concealing the unlawful activities of the Defendants, and each of them, and their co-conspirators from scrutiny by cryptocurrency exchanges and law enforcement; and concealing or disguising the nature, the location, the source, the ownership, or the control of the proceeds of unlawful activities by investing said proceeds into United States real estate using nominee entities.

243.    The activity of the Enterprise and the predicate acts of racketeering alleged hereinbelow affect interstate or foreign commerce.  Specifically, the Enterprise directly engaged in the production, distribution, or acquisition of goods and services in interstate commerce, including, without limitation, cryptocurrency derivatives trading services.

244.    At various times during the Relevant Period each of the Defendants HDR, ABS, Hayes, Delo and Reed was employed in or associated with the Enterprise as alleged hereinabove.

### ROLES OF DEFENDANTS IN THE ENTERPRISE

245.    Plaintiff Dolgov incorporates the allegations set forth in Paragraphs 1-244 above as if fully set forth herein.

246.    Plaintiff Dolgov is informed and believes and thereon alleges that individual Defendants Hayes, Delo and Reed were the masterminds behind the alleged Enterprise and the predicate criminal acts alleged hereinbelow.  Specifically, Plaintiff Dolgov is informed and believes and thereon alleges that Defendant Hayes was responsible for, among other things, conducting overall planning, oversight and supervision of the affairs of the Enterprise and coordination between the remaining co-conspirators as well as controlling bank accounts and financial flows within the Enterprise.  Plaintiff Dolgov is informed and believes and thereon alleges that Defendant Reed was responsible for, among other things, planning and initiating the deliberate server freezes and fraudulent system overloads on BitMEX as alleged herein as well as effective transfers of market manipulation winnings from helper accounts on United States based exchanges Kraken, Coinbase and BitStamp to winner accounts on BitMEX, by placing large market orders on those exchanges with maximum slippage to cause large artificial moves in the .BXBT and index price and .BETH index price on a daily basis, including during each of the specific Manipulation Times alleged in Paragraph 353 below, and performance of other illegal acts conducted by the Enterprise, by issuing electronic wire transmissions containing trading orders and other computer system commands and writing, deploying and remotely executing software scripts from his office located in Milwaukee, WI 53202.  Defendant Reed was further responsible, together with each of Defendants Agata Reed, Barbara Reed and Trace Reed, for laundering a substantial portion of the tainted bitcoin-denominated proceeds of the illegal activities on the BitMEX platform from Defendants' general account (bitcoin wallet) through the Defendant Unknown Exchange and a real estate investment scheme involving multiple real estate properties in Wisconsin and Massachusetts with the purpose to conceal or disguise the nature, the

location, the source, the ownership, or the control of the proceeds of the unlawful activities taking place on the BitMEX platform.   Defendants Grape Park and Mark Sweep are nominee shell entities that were used by the Enterprise to conceal or disguise the true source of funds used for acquiring the real estate properties and their true ownership and control, Ex. 12, 13.

247.   Plaintiff Dolgov is informed and believes and thereon alleges that Defendant ABS designs, develops, implements, operates and supports the online derivatives trading platform BitMEX from within this District.  Defendant ABS was responsible for, among other things, day to day operations of the BitMEX platform and for effectuating the market manipulation, including, without limitation deliberate server freezes and fraudulent system overloads alleged herein as well as effective transfers of market manipulation winnings from helper accounts to winner accounts and performance of other illegal acts conducted by the Enterprise.  Plaintiff Dolgov is informed and believes and thereon alleges that Defendant HDR was responsible for, among other things, planning the overall operation of the BitMEX platform to effectuate the market manipulation, including, without limitation deliberate server freezes and fraudulent system overloads alleged herein as well as effective transfers of market manipulation winnings from helper accounts to winner accounts and performance of other illegal acts conducted by the Enterprise.  Finally, Plaintiff Dolgov is informed and believes and thereon alleges that Defendant Delo was responsible for performing liquidations of user positions to rip the benefits of the market manipulation and other illegal acts conducted by the Enterprise and depositing the liquidation proceeds into Insurance Fund.

248.   The individual roles of all Defendants within the Enterprise are summarized in the below table, prepared according to information and belief of Plaintiff Dolgov:

| Defendant | Role of Defendant |
| --- | --- |
| HDR | Defendant HDR is a holding company.  Despite being incorporated in the Seychelles, Defendant HDR does not have, and never has had, any operations or employees in the Seychelles. Defendant HDR operates, or has operated |

| | |
|---|---|
| | during the Relevant Period, primarily from San Francisco office of Defendant ABS and Milwaukee office of Defendant Reed.  Defendant HDR was responsible for, among other things, the planning of the operation of the BitMEX platform to effectuate the market manipulation, including, without limitation deliberate server freezes and fraudulent system overloads alleged herein as well as effective transfers of market manipulation winnings from helper accounts to winner accounts and performance of other illegal acts conducted by the Enterprise. |
| ABS | Defendant ABS designs, develops, implements, operates and supports the online derivatives trading platform BitMEX from within this District. Defendant ABS was responsible for, among other things, day to day operations of the BitMEX platform and effectuating the market manipulation, including, without limitation deliberate server freezes and fraudulent system overloads alleged herein as well as effective transfers of market manipulation winnings from helper accounts to winner accounts and performance of other illegal acts conducted by the Enterprise, as well as creating custom software programs and scripts for performing market manipulation and implementing server freezes. |
| Grape Park | Defendants Grape Park and Mark Sweep were used by the Enterprise to conceal or disguise the true source of funds used for acquiring the real estate properties and their true ownership and control.  Defendant Reed dominates and controls every aspect of business of Defendant Grape Park and funds its operations. Defendant Grape Park is an alter ego of Defendant Reed. |
| Mark Sweep | Defendants Grape Park and Mark Sweep were used by the Enterprise to conceal or disguise the true source of funds used for acquiring the real estate properties and their true ownership and control.  Defendant Reed dominates and controls every aspect of business of Defendant Mark Sweep and funds its operations. Defendant Mark Sweep is an alter ego of Defendant Reed. |

| | |
|---|---|
| Unknown Exchange | Defendant Unknown Exchange was responsible for knowingly, willfully and deliberately laundering a substantial portion of the bitcoin-denominated proceeds of market manipulation, money laundering, operating unlicensed money transmitting business and multitude of various other nefarious acts taking place on the BitMEX platform, by means of converting bitcoins into various traditional ("fiat") currencies, including United States dollars and Hong Kong dollars. |
| Hayes | Defendant Hayes was responsible for, among other things, conducting overall planning, oversight and supervision of the affairs of the Enterprise and coordination between the remaining co-conspirators, as well as controlling bank accounts and financial flows within the Enterprise.  In addition, Defendant Hayes gave directions to other members of the Enterprise, occupied the top position in the "chain of command" of the Enterprise through which the affairs of the Enterprise are conducted and was indispensable to the achievement of the Enterprise's goals of maximizing profits and minimizing trading losses for the Defendants, and each of them, and their co-conspirators, through unlawful trading practices, including market manipulation, concealing trading gains obtained through unlawful practices from regulatory and tax authorities using, without limitation, money laundering, generating illicit income from unlicensed money transmissions, promoting and enhancing the racketeering conspiracy and the activities of the Defendants, and each of them, and their co-conspirators and concealing the unlawful activities of the Defendants, and each of them, and their co-conspirators from scrutiny by cryptocurrency exchanges and law enforcement. |
| Delo | Defendant Delo was responsible for performing liquidations of user positions to rip the benefits of the market manipulation and other illegal acts conducted by the Enterprise and depositing the liquidation proceeds into Insurance Fund.  In |

| | |
|---|---|
| | addition, Defendant Delo gave directions to other members and took directions from Defendant Hayes, occupied a second position in the "chain of command" through which the affairs of the Enterprise are conducted, knowingly and eagerly implemented decisions of Defendant Hayes and was indispensable to the achievement of the Enterprise's goals of maximizing profits and minimizing trading losses for the Defendants, and each of them, and their co-conspirators, through unlawful trading practices, including market manipulation, concealing trading gains obtained through unlawful practices from regulatory and tax authorities using, without limitation, money laundering, generating illicit income from unlicensed money transmissions, promoting and enhancing the racketeering conspiracy and the activities of the Defendants, and each of them, and their co-conspirators and concealing the unlawful activities of the Defendants, and each of them, and their co-conspirators from scrutiny by cryptocurrency exchanges and law enforcement. |
| Reed | Defendant Reed was responsible for, among other things, planning and initiating the deliberate server freezes and fraudulent system overloads on BitMEX as alleged herein as well as effective transfers of market manipulation winnings from helper accounts on United States based exchanges Kraken, Coinbase and BitStamp to winner accounts on BitMEX, by placing large market orders on those exchanges with maximum slippage to cause large artificial moves in the .BXBT and index price and .BETH index price on a daily basis and performance of other illegal acts conducted by the Enterprise, by issuing electronic wire transmissions containing trading orders and other computer system commands and writing, deploying and remotely executing software scripts from his office located in Milwaukee, WI 53202.  Defendant Reed was further responsible for laundering a substantial portion of the tainted proceeds of the illegal activities on the BitMEX platform from Defendants' |

| | general account (bitcoin wallet) through a real estate investment scheme involving multiple real estate properties in Wisconsin and Massachusetts, by concealing the nature of the funds used in acquisition of said properties and the true state of ownership and control thereof.   In addition, Defendant Reed gave directions to other members and took directions from Defendant Hayes, occupied a third position in the "chain of command" through which the affairs of the Enterprise are conducted, knowingly and eagerly implemented decisions of Defendants Hayes and Delo and was indispensable to the achievement of the Enterprise's goals of maximizing profits and minimizing trading losses for the Defendants, and each of them, and their co-conspirators, through unlawful trading practices, including market manipulation, concealing trading gains obtained through unlawful practices from regulatory and tax authorities using, without limitation, money laundering, generating illicit income from unlicensed money transmissions, promoting and enhancing the racketeering conspiracy and the activities of the Defendants, and each of them, and their co-conspirators and concealing the unlawful activities of the Defendants, and each of them, and their co-conspirators from scrutiny by cryptocurrency exchanges and law enforcement. |
|---|---|
| Agata Reed | Defendant Agata Reed was responsible for laundering a substantial portion of the tainted proceeds of the illegal activities on the BitMEX platform from Defendants' general account (bitcoin wallet) through a real estate investment scheme involving real estate properties in Massachusetts with the purpose to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the alleged unlawful activity taking placeon the BitMEX platform.   In addition, Defendant Agata Reed gave directions to other members and took directions from Defendant Reed, occupied a fourth position in the "chain of command" through which the affairs of the Enterprise are |

| | |
|---|---|
| | conducted, knowingly and eagerly implemented decisions of Defendants Hayes, Delo and Reed and was indispensable to the achievement of the Enterprise's goals of maximizing profits and minimizing trading losses for the Defendants, and each of them, and their co-conspirators, through unlawful trading practices, including market manipulation, concealing trading gains obtained through unlawful practices from regulatory and tax authorities using, without limitation, money laundering, generating illicit income from unlicensed money transmissions, promoting and enhancing the racketeering conspiracy and the activities of the Defendants, and each of them, and their co-conspirators and concealing the unlawful activities of the Defendants, and each of them, and their co-conspirators from scrutiny by cryptocurrency exchanges and law enforcement. |
| Barbara Reed | Defendant Barbara Reed was responsible for laundering a substantial portion of the tainted proceeds of the illegal activities on the BitMEX platform from Defendants' general account (bitcoin wallet) through a real estate investment scheme involving real estate properties in Wisconsin, by concealing the nature of the funds used in acquisition of said properties and the true state of ownership and control thereof.    In addition, Defendant Barbara Reed gave directions to other members and took directions from Defendant Reed, occupied a fifth position in the "chain of command" through which the affairs of the Enterprise are conducted, knowingly and eagerly implemented decisions of Defendants Hayes, Delo and Reed and was indispensable to the achievement of the Enterprise's goals of maximizing profits and minimizing trading losses for the Defendants, and each of them, and their co-conspirators, through unlawful trading practices, including market manipulation, concealing trading gains obtained through unlawful practices from regulatory and tax authorities using, without limitation, money laundering, generating illicit income from |

| | |
|---|---|
| | unlicensed money transmissions, promoting and enhancing the racketeering conspiracy and the activities of the Defendants, and each of them, and their co-conspirators and concealing the unlawful activities of the Defendants, and each of them, and their co-conspirators from scrutiny by cryptocurrency exchanges and law enforcement. |
| Trace Reed | Defendant Trace Reed was responsible for laundering a substantial portion of the tainted proceeds of the illegal activities on the BitMEX platform from Defendants' general account (bitcoin wallet) through a real estate investment scheme involving real estate properties in Wisconsin, by concealing the nature of the funds used in acquisition of said properties and the true state of ownership and control thereof.   In addition, Defendant Trace Reed gave directions to other members and took directions from Defendant Reed, occupied a sixth position in the "chain of command" through which the affairs of the Enterprise are conducted, knowingly and eagerly implemented decisions of Defendants Hayes, Delo and Reed and was indispensable to the achievement of the Enterprise's goals of maximizing profits and minimizing trading losses for the Defendants, and each of them, and their co-conspirators, through unlawful trading practices, including market manipulation, concealing trading gains obtained through unlawful practices from regulatory and tax authorities using, without limitation, money laundering, generating illicit income from unlicensed money transmissions, promoting and enhancing the racketeering conspiracy and the activities of the Defendants, and each of them, and their co-conspirators and concealing the unlawful activities of the Defendants, and each of them, and their co-conspirators from scrutiny by cryptocurrency exchanges and law enforcement. |

249.    Additional and other facts regarding Defendants' roles in the Enterprise are hidden from Plaintiff at this time.  Such information is uniquely within Defendants' possession, custody

and control.  To date, Defendants provided absolutely no discovery to Plaintiff what so ever, despite being served with multiple discovery requests, which Defendants stonewalled.  Plaintiff accordingly reserves the right to supplement and amend these allegations, if appropriate or necessary, following completion of relevant fact discovery.

## THE RAKETEERING CONSPIRACY AND RACKETEERING ACTIVITY

250.    Plaintiff Dolgov incorporates the allegations set forth in Paragraphs 1-249 above as if fully set forth herein.

251.    Pursuant to 18 U.S.C. § 1961, "racketeering activity" for purposes of RICO means "any act which is indictable under any of the following provisions of title 18, United States Code: … section 1343 (relating to wire fraud) … section 1956 (relating to the laundering of monetary instruments), section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity), … section 1960 (relating to illegal money transmitters), … sections 2314 and 2315 (relating to interstate transportation of stolen property)."

252.    During the Relevant Period, the Defendants, and each of them, solely or together with other individuals, being persons employed by and associated with Enterprise they engaged in, and the activities of which affected interstate and foreign commerce, knowingly and intentionally, conspired to conduct and participate, directly and indirectly, and actually participated in conduct of the Enterprise's affairs through a pattern of racketeering activity, as that terms is defined in 18 U.S.C. § 1961, consisting of multiple acts, which are indictable under 18 U.S.C. § 1343, 18 U.S.C. § 1956, 18 U.S.C. § 1957, 18 U.S.C. § 1960(a) and 18 U.S.C. § 2314.

253.    It was a part of the conspiracy that each Defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the Enterprise.

254.    The purposes of the alleged racketeering conspiracy of the Defendants, and each of them, included the following, among others: (1) maximizing profits and minimizing trading losses for the Defendants, and each of them, and their co-conspirators, through unlawful trading practices, including market manipulation; (2) concealing trading gains obtained through unlawful practices from regulatory and tax authorities, including, without limitation, by means of money

laundering; (3) generating illicit income from unlicensed money transmissions; (4) promoting and enhancing the racketeering conspiracy and the activities of the Defendants, and each of them, and their co-conspirators; (5) concealing the unlawful activities of the Defendants, and each of them, and their co-conspirators from scrutiny by cryptocurrency exchanges and law enforcement; and (6) laundering the bitcoin denominated proceeds of the market manipulation on the BitMEX platform by first converting them into fiat currencies such as United States dollars using Defendant Unknown Exchange and then reinvesting the converted fiat currency proceeds into real estate properties in Wisconsin and Massachusetts using nominee entities Grape Park and Mark Sweep (collectively "Purposes").

**OVERT ACTS IN FURTHERANCE OF RAKETEERING CONSPIRACY**

255.    Plaintiff Dolgov incorporates the allegations set forth in Paragraphs 1-254 above as if fully set forth herein.

256.    In furtherance of the racketeering conspiracy, and to achieve its purposes, the Defendants committed and caused to be committed the following acts, among others, alleged in this Complaint, in this District and elsewhere: 1) providing traders with extremely high trading leverage (up to 100x); 2) deliberately using .BXBT index price for highly liquid derivatives calculated based on prices of two or three illiquid spot exchanges; 3) enabling manipulators and money launderers to avoid detection by providing them with the ability to open unlimited number of anonymous document check-free trading accounts without any trading and withdrawal limits; 4) weaponizing deliberate server freezes, using fraudulent "system overload" events to accept some trading orders and reject others during large market moves to exacerbate price fluctuations and cause the most liquidations; 5) regularly manipulating price of cryptocurrencies including, without limitation, bitcoin, by executing large market orders from helper accounts on illiquid spot exchanges Coinbase Pro, BitStamp and Kraken in order to cause massive liquidations of traders' derivatives positions on BitMEX and capture resulting market manipulation profits using winner accounts on that exchange; 6) knowingly, willfully and deliberately effectively transmitting market manipulation winnings from the helper accounts to the winner accounts in violation of 18

U.S.C. § 1960(a), 18 U.S.C. § 1957(a) and 18 U.S.C. § 1956(a) and 18 U.S.C. § 2314; and 7) knowingly, willfully and deliberately transmitting a portion of the money from the winner accounts back to the helper accounts in order to replenish them before next manipulation in violation of 18 U.S.C. § 1960(a), 18 U.S.C. § 1957(a) and 18 U.S.C. § 1956(a) and 18 U.S.C. § 2314.  For example, Ex. 3, p. 4 describes how a helper account on BitStamp was used on May 17, 2019 to effectively transmit 80 times of the amount money spent from that helper account to a winner account on BitMEX.  See also Ex. 2, pp. 2-3 describing a similar scheme that used helper accounts on BitStamp to artificially induce massive liquidations of traders, like Plaintiff, on Bitmex on July 14, 2019, resulting in effective transmission of manipulation winnings from helper accounts on BitStamp to winner accounts on BitMEX.  Plaintiff Dolgov is informed and believes and thereon alleges that Defendants use this unlawful scheme on a regular basis using helper accounts operated on United States based cryptocurrency exchanges BitStamp, Kraken and Coinbase Pro.  Additionally, the aforesaid illegal acts of effectively transmitting market manipulation winnings from helper accounts to winner accounts were all perpetrated by Defendants through the same commercial website BitMEX.com, which is accessible and is extensively used, via widely available and inexpensive VPN software, by users located in the United States and this District.  Therefore, these illegal acts for which Plaintiff seeks redress in this Complaint were directly related to Defendants' connections to the United States and this District through their commercial website BitMEX.com.  Moreover, BitMEX platform is operated from this District, which also houses the three site reliability engineers of BitMEX who personally caused the BitMEX servers to freeze during manipulation times.

257.     In addition, in furtherance of the racketeering conspiracy, and to achieve its purposes, the Defendants committed and caused to be committed, in this District and elsewhere, the acts, among others, as alleged in this Complaint.

258.     Plaintiff Dolgov was injured in his property by one or more of the foregoing and other overt acts in furtherance of the alleged racketeering conspiracy.  For example, Plaintiff Dolgov was financially injured when Defendants effectively transmitted funds, which was

perpetrated willfully and deliberately by Defendants through their commercial website BitMEX.com, and with full knowledge of the nature and purpose of the funds involved in the transfer, in violation of 18 U.S.C. § 1960(a), 18 U.S.C. § 1957(a) and 18 U.S.C. § 1956(a) and 18 U.S.C. § 2314 between helper and winner accounts by way of using the helper accounts to perpetrate manipulation by pumping or dumping the cryptocurrency market, thereby causing a liquidation cascade affecting Plaintiff's account, and using the winner accounts to capture the financial benefits of the aforesaid manipulation.  As the result of the actions of the Defendants alleged in this Paragraph, the positions of Plaintiff were liquidated.

259.    Because the vast majority of BitMEX personnel, as alleged in Paragraph 100, almost the entire engineering team (all but six) as well as all three Site Reliability Engineers, as alleged in Paragraph 101, and almost all vital external service providers to BitMEX, as alleged in Paragraph 83, are located in this District, and because Defendant ABS, which formally employs this personnel is an alter ego of Defendant HDR, this District is the home base of the largest operation of Defendant DHR, the nerve center of the operation of the BitMEX platform, and it is the location where the illegal acts and the resulting injuries as alleged herein took place. Moreover, the alleged illegal acts were all performed on servers and other IT infrastructure owned and operated by United States based Amazon EKS with offices in this District.

260.    Moreover, the aforesaid illegal acts of effectively transmitting market manipulation winnings from helper accounts to winner accounts, which resulted in the injury to Plaintiff, were all perpetrated by Defendants through the same commercial website BitMEX.com, which is accessible and is extensively used, via widely available and inexpensive VPN software, by users located in the United States and this District.  Therefore, Defendants' illegal acts resulting in injuries to Plaintiff, for which Plaintiff seeks redress in this Complaint, were directly related to Defendants' connections to the United States and this District through their commercial website BitMEX.com.

1

2

**DEFENDANTS OPERATED AND CONTINUE TO OPERATE AN UNLICENSED MONEY TRANSMITTING BUSINESS IN VIOLATION OF 18 U.S.C. § 1960(a)**

3       261.    Plaintiff Dolgov incorporates the allegations set forth in Paragraphs 1-260 above

4    as if fully set forth herein.

5       262.    Bitcoins and other cryptocurrencies are funds.  *United States v. Murgio*, No. 15-cr-

6    769, 2016 WL 5107128, at *4 (S.D.N.Y. Sep. 19, 2016); *United States v. Budovsky*, No. 15-cr-

7    368, 2015 WL 5602853 (S.D.N.Y. Sep. 23, 2015); *United States v. Faiella*, 39 F. Supp. 3d 544

8    (S.D.N.Y. 2014).  Therefore, bitcoins are subject to all laws and regulations applicable to fiat

9    currency monetary transactions.

10      263.    Plaintiff Dolgov is informed and believes and thereon alleges that during the

11   Relevant Period, Defendants, and each of them, engaged in conducting, controlling, managing,

12   supervising, directing, or owning all or part of an unlicensed money transmitting business in

13   violation of 18 U.S.C. § 1960(a).

14      264.    To use Defendant HDR's unlicensed money transmitting services, one creates an

15

16

17

18

19

20

21

22

23

24

25

26   account by accessing the Defendant HDR's website BitMEX.com.  A user does not need to

27   provide even the most basic identifying information such as date of birth, address, or other

28   identifiers. All that Defendant HDR requires is a name, password, and an email address.

265.     Unlike legitimate payment processors or digital currency exchangers, Defendant HDR does not require its users to validate their identity information by providing official identification documents, given that Defendant HDR does not require an identity at all to open an account and start trading with up to 100x leverage.  For comparison, a legitimate U.S. cryptocurrency exchange Kraken requires email address, full name, date of birth, phone number, and physical address to open the most basic level account.

266.     Thus, a user can create and fund an HDR account with nothing more than an email address, which often has no relationship to the identity of the actual user. Accounts are therefore easily opened anonymously, including by customers in the United States within the Northern District of California.  Using such anonymous account, the user is able to make unlimited deposits, unlimited trades with up to 100x leverage, as well as unlimited withdrawals.  Instead of performing a proper document check before allowing users to open an account on BitMEX, Defendants deliberately and knowingly use utterly ineffective IP address check, which they all well know is uniformly subverted by very simple, inexpensive and widely available software tools.

267.     Moreover, high leverage provided by Defendant HDR to all users enables Defendants and all BitMEX users to launder unlimited funds from one account to another using market manipulation as alleged hereinabove.  For example, one helper account may dump a large amount of cryptocurrency on the market using margin, triggering a liquidation cascade and booking a loss, when a separate, second winner account may buy the cryptocurrency at an artificial below market price caused by the liquation cascade.  This way, unlimited amount of funds may be laundered from the first helper account to the second winner account virtually anonymously in violation of 18 U.S.C. § 1956(a), which is a RICO predicate offense.  Plaintiff Dolgov is informed and believes and thereon alleges that Defendants themselves launder funds and enable BitMEX uses to launder funds in the alleged manner by providing high levels of leverage up to 100x and deliberately failing to conduct KYC upon account creation.  In addition, the knowing, willful and deliberate effective transmissions of the winnings from market

manipulation from the first helper account to the second winner account perpetrated by Defendants on behalf of themselves and/or on behalf of other BitMEX users as described herein, with full knowledge of the nature and purpose of the funds involved in the transfer, constitutes unlicensed money transmitting in violation of 18 U.S.C. § 1960(a), which is also a RICO predicate offense.  Finally, the willful and deliberate money transmission from the winner account back to the helper account in order to replenish it before next manipulation cycle, with full knowledge of the nature and purpose of the funds involved in the transfer, also constitutes unlicensed money transmitting in violation of 18 U.S.C. § 1960(a), which is also a RICO predicate offense.  The same money transmission further constitutes a monetary transaction in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957(a), interstate transportation of stolen property in violation of 18 U.S.C. § 2314 and money laundering in violation of 18 U.S.C. § 1956(a), which are also RICO predicate offenses.  For example, Ex. 3, p. 4 describes how a helper account on BitStamp was used on May 17, 2020 to effectively transmit 80 times of the amount money spent from that helper account to a winner account on BitMEX. See also Ex. 7, illustrating a similar scheme, in which a perpetrator sold $44,000,000 over 22 separate $2,000,0000 orders of XBTUSD Perpetual Swaps on Bitmex on July 27, 2020 to get into a position and then used market orders amounting to some 1000 bitcoins on Coinbase Pro exchange to artificially move the .BXBT index price in a favorable direction in order to close his large BitMEX position at a significant profit.  See also Ex. 2, pp. 2-3 describing a similar scheme that used helper accounts on BitStamp to artificially induce massive liquidations of traders, like Plaintiff, on Bitmex on July 14, 2019, resulting in effective transmission of manipulation winnings from helper accounts on BitStamp to winner accounts on BitMEX.  Plaintiff Dolgov is informed and believes and thereon alleges that Defendants use this unlawful scheme on a regular basis utilizing helper accounts on United States based exchanges BitStamp, Kraken and Coinbase Pro and winner accounts on BitMEX.[5]

---

[5] The funds are being transmitted from one exchange to another by way of arbitrage algorithms that buy cryptocurrency on one platform and simultaneously sell on the other, as alleged in Paragraph 147.

268. At all times relevant to this complaint Defendant HDR had no anti-money laundering ("AML") and/or "Know-Your-Customer" ("KYC") processes and policies in place or the existing policies lacked any meaningful enforcement, as evidenced, for example, by apparent accepting the United States - based companies, including CMT Capital Markets Trading, Eastmore Group / Eastmore Management, LLC, Clerkenwell Asset Management LLC, Adaptive Fund I, LP and Galois Capital, Swing Trade Pros, FalconX, Cumberland DRW, Circle Partners, Fund3 Capital LP/Fund3 LLC, South Lake Computers, ARK Investment Management LLC, Coincident Capital and Leotank Capital as clients, despite claiming that BitMEX is closed to United States persons. As alleged hereinabove, Defendant HDR collected and continues to collect virtually no customer data at all. Nor did Defendant HDR ever register with FinCEN or perform the required AML and KYC functions.

269. A user can fund a Defendant HDR account in numerous different ways. One way involves funding a Defendant HDR account with a user's existing digital currency. A user with existing digital currency, such as bitcoin, could fund an HDR account directly via bitcoin deposits. Defendant HDR users could also use market manipulation to launder funds from one account to another. Plaintiff Dolgov is informed and believes and thereon alleges that this served as another conduit for money laundering as it allowed Defendant HDR's customers and Defendants themselves to withdraw funds from their HDR account and transfer them to other HDR users anonymously.

270. 18 U.S.C. § 1960(a) provides: "(a) Whoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business, shall be fined in accordance with this title or imprisoned not more than 5 years, or both."

271. Pursuant to 18 U.S.C. § 1960(b)(1), "the term "unlicensed money transmitting business" means a money transmitting business which affects interstate or foreign commerce in any manner or degree" and (A) is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law, whether or not the defendant knew that the operation was required to be licensed or that the operation was

so punishable; (B) fails to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section; or (C) otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity.

272.    18 U.S.C. § 1960(a) makes it a crime to operate an unlicensed money transmitting business. The term money transmitting includes "transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier."  This statute makes it a violation to conduct a "money transmitting business" if the business is not registered as a money transmitting business with the U.S. Secretary of the Treasury as required by a separate statute, 31 U.S.C. § 5330 and federal regulations pursuant to that statute.  Moreover, FinCEN Ruling, FIN-2014-R002, at p. 4 provides:

273.    In addition, should the Company begin to engage as a business in the exchange of virtual currency against currency of legal tender (or even against other convertible virtual currency), the Company would become a money transmitter under FinCEN's regulations. Under such circumstances, the Company would have to register with FinCEN, implement an effective, risk-based anti-money laundering program, and comply with the recordkeeping, reporting, and transaction monitoring requirements applicable to money transmitters.

274.    FinCEN Ruling, FIN-2014-R002, at p. 4.  United States Federal District Court decision in  *U.S. v. Stetkiw,* No. 18-20579 (E.D. Mich. Feb. 1, 2019) relied on this Ruling as a basis for denying defendant's motion to dismiss and holding that defendant's alleged conduct of converting fiat money into virtual currency constituted money transmitting under 18 U.S.C. § 1960.  Thus, Defendant HDR is money transmitter under FinCEN's regulations and California law.

275.    The regulations specifically apply to foreign-based money transmitting businesses doing substantial business in the United States.  "Several sources close to the company" have disclosed to media sources that nearly 15 percent of the BitMEX's 2019 trading volume—or

about $138 billion worth—is attributable to traders located in the United States.  In addition, San Francisco based Galois Capital also acts as liquidity provider on BitMEX generating millions of dollars of business for Defendants.  Therefore, Defendant HDR is subject to the aforesaid federal and state money transmitter regulations due to its very substantial business in the United States. See 31 C.F.R. §§ 1010.100(ff)(5), 1022380(a)(2).

276.    Defendant HDR falls under the statutory definition of the "unlicensed money transmitting business" under all of 18 U.S.C. § 1960(b)(1)(A), (B) and (C).  Defendants' unlicensed money transmitting operation clearly affects interstate and foreign commerce, based at least on the high amounts (tens and even hundreds of millions of United States dollars) of funds involved in the money transmissions by Defendants.

277.    With respect to 18 U.S.C. § 1960(b)(1)(A), Defendant HDR's operates without an appropriate money transmitting license issued by the State of California and by any other State of the United States.  Cal. Fin. Code § 2003(q)(3) defines "money transmission" as "receiving money for transmission."  Defendant HDR clearly meets this definition.  Defendant HDR receives funds in a form of a cryptocurrency from its customers and then transmit cryptocurrency to a wallet address.  Cal. Fin. Code § 2030(a) requires persons engaged in money transmission to be licensed.  Finally, Cal. Fin. Code § 2152(b) provides that a "person that knowingly engages in an activity for which a license is required under this division without being licensed or exempt from licensure under this division is guilty of a felony."  Thus, Defendant HDR meets the definition set out in 18 U.S.C. § 1960(b)(1)(A).

278.    With respect to 18 U.S.C. § 1960(b)(1)(B), Defendant HDR failed to register with the U.S. Secretary of the Treasury as required by a separate statute, 31 U.S.C. § 5330 and federal regulations pursuant to that statute.

279.    With respect to 18 U.S.C. § 1960(b)(1)(C), Defendant HDR facilitated and continues to facilitate the transfer of funds involved in cryptocurrency market manipulation and money laundering, including, without limitation, transfer of winnings from market manipulation from the helper accounts into the winner accounts as alleged herein above.  By way of example

and not by way of limitation, Defendants, and each of them, during the Relevant Period, transferred proceeds from illegal price manipulation from BitMEX to other cryptocurrency exchanges, including, without limitation, Coinbase Pro, Kraken and BitStamp in order to replenish helper accounts on those exchanges.  Such transfers were performed by Defendants, and each of them on a daily basis, including during each of the specific Manipulation Times alleged in Paragraph 353 below, during the Relevant Period.  Those proceeds were used by Defendants, and each of them, as well as third party perpetrators to perpetrate further market manipulations as alleged hereinabove.  In addition, Defendants transmitted funds between different exchange accounts, including, without limitation, helper accounts and winner accounts, by way of market manipulation as alleged hereinabove.

280.    Thus, Defendant HDR is clearly "unlicensed money transmitting business[es]" under 18 U.S.C. § 1960(b)(1) and, therefore, Defendants, and each of them, while being employed in or associated with the continuing Enterprise as alleged above, knowingly conducted, controlled, managed, supervised, directed, and owned all and part of an unlicensed money transmitting business affecting interstate and foreign commerce in violation of 18 U.S.C. § 1960(a), which constitute the predicate acts of the Defendants, and each of them, racketeering activity under RICO.

281.    Defendants have been recently caught red-handed doing at least $70,000,000 of business in New York and California without obtaining a money transmitting license.  Specifically, as alleged in Paragraphs 108 and 109, California and United States residents generated almost $70,000,000 in trading profits on the BitMEX platform, which clearly exceeds any threshold[6] for Defendant HDR having been required to obtain a money transmitter license in the United States and comply with the FinCEN regulations pursuant to 18 U.S.C. § 1960(a), which it knowingly and deliberately failed to do.  This conclusively establishes the violation of 18

---

[6] In *United States v. Faiella*, 39 F. Supp. 3d 544 (S.D.N.Y. 2014), the threshold for triggering 18 U.S.C. § 1960(a) liability was $1,000,000 in unlicensed bitcoin transmissions.  In *United States v. Klein*, 6:17-cr-03056 (W.D. Mo. 2017), the threshold for triggering 18 U.S.C. § 1960(a) liability was less than $30,000 in unlicensed bitcoin transmissions.  Based on these cases, Defendants exceeded the legal threshold for triggering 18 U.S.C. § 1960(a) liability by a factor of 2,333x.

U.S.C. § 1960(a) by Defendants.  Had Defendants obtained the money transmitter license and complied with FinCEN regulations, as they were required by law, they would have been forced to institute the mandatory KYC and AML policies on the BitMEX platform, as they did on August 14, 2020, which would have prevented at least some of the market manipulation, money laundering and other nefarious acts, which damaged Plaintiff as alleged in this Complaint, from taking place on the BitMEX platform.  Therefore, Plaintiff's injuries alleged in this Complaint were directly and proximately caused by Defendants operating the unlicensed money transmitting business and failing to comply with FinCEN regulations in violation of 18 U.S.C. § 1960(a).

282.   It should be noted that the sheer magnitude of Defendants' unlicensed money transmitting operation is truly staggering.  According to Defendants' own data, Defendant HDR turnover averages over $3 billion per day.  Thus, Defendants illegally transmitted over $3 billion per day without the required state money transmitter license and the required registration with FinCEN in violation of 18 U.S.C. § 1960(a).

283.   Plaintiff Dolgov is informed and believes and thereon alleges that Defendants, and each of them, charged their customers substantial fees for the unlicensed money transmissions generating substantial illegal income for Defendants.

284.   Plaintiff Dolgov is informed and believes and thereon alleges that predicate acts alleged herein, namely operation of an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), are related by having the same or similar purposes of manipulating cryptocurrency markets, generating illicit income and concealing illegal activities from authorities, results, Defendants – participants, victims, methods of commission or are otherwise interrelated by distinguishing characteristics.

285.   Plaintiff Dolgov is informed and believes and thereon alleges that predicate acts alleged herein, namely operation of an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), are continuous as they constitute an open-ended scheme, which poses a threat of continuity through the long duration of the alleged misconduct, namely over two years, and the threat of continuing criminal conduct, as the alleged criminal conduct perpetrated by Defendants

is still ongoing.

286.     Plaintiff Dolgov is informed and believes and thereon alleges that Defendants, and each of them, used at least a portion of the income derived from their unlicensed money transmitting operations in violation of 18 U.S.C. § 1960(a) to manipulate spot and derivative markets of cryptocurrencies, as alleged herein, which directly and proximately resulted in the substantial monetary cryptocurrency trading losses to Plaintiff Dolgov as alleged hereinbelow.

287.     Plaintiff Dolgov is informed and believes and thereon alleges that Defendants', and each of them, alleged price manipulation schemes, including, without limitation, pumps and dumps, Barts, stop loss hunts and liquidation cascades perpetrated by Defendants, and each of them, to transmit money in violation of 18 U.S.C. § 1960(a) directly and proximately resulted in substantial monetary cryptocurrency trading losses to Plaintiff Dolgov as alleged herein.

## DEFENDANTS CONSPIRED TO LAUNDER, LAUNDERED AND CONTINUE TO LAUNDER FUNDS IN VIOLATION OF 18 U.S.C. § 1956

288.     Plaintiff Dolgov incorporates the allegations set forth in Paragraphs 1-287 above as if fully set forth herein.

289.     18 U.S.C. § 1956 provides that "whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity (A)(i) with the intent to promote the carrying on of specified unlawful activity; or (ii) with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or (B) knowing that the transaction is designed in whole or in part (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or (ii) to avoid a transaction reporting requirement under State or Federal law, shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both."

290.     Plaintiff Dolgov is informed and believes and thereon alleges that, during the

Relevant Period, Defendants, and each of them, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that in, operation of an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), as alleged hereinabove, as well as proceeds of money laundering and unlawful cryptocurrency market manipulation, as alleged hereinbelow.

291.    Defendants, and each of them, willfully and knowingly did conduct and continue to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that in, operation of an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a) as well as proceeds of unlawful cryptocurrency market manipulation.

292.    For example, Defendants, and each of them, transferred, on multiple occasions, proceeds from operating of the unlicensed Defendant HDR money transmission business as well as proceeds from illegal bitcoin Perpetual Swap contracts price manipulation from BitMEX to other cryptocurrency exchanges, including, without limitation, Coinbase Pro, BitStamp and Kraken, with intent to employ those transferred proceeds in further unlawful activity or to launder those proceeds by converting them into fiat currencies or through real estate investment schemes. Those proceeds were in fact subsequently used by Defendants, and each of them, as well as third party perpetrators to perpetrate further market manipulation in violation of applicable laws. Moreover, Defendants, and each of them, used the hereinabove alleged price manipulation schemes, including, without limitation, pumps and dumps, Barts, stop loss hunts and liquidation cascades to launder funds between different exchange accounts controlled by Defendants or third persons.

293.    As a further example, the effective transmissions of the winnings from market manipulation from the first helper account on BitStamp, Kraken or Coinbase Pro to the second winner account on BitMEX perpetrated by Defendants as described herein constitutes money

laundering in violation of 18 U.S.C. § 1956(a).

294.     As yet further example, a substantial portion of the bitcoin-denominated proceeds of market manipulation, money laundering, operating of unlicensed money transmitting business and multitude of various other nefarious acts taking place on the BitMEX platform as alleged in this Complaint, were subsequently converted, by all Defendants, through the Defendant Unknown Exchange, into various fiat currencies, including United States dollars and Hong Kong dollars. All Defendants knew that these financial transactions were designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the specified unlawful activity, namely cryptocurrency market manipulation, money laundering, operating unlicensed money transmitting business and multitude of various other nefarious acts taking place on the BitMEX platform as alleged in this Complaint.

295.     As yet further example, a substantial portion of the bitcoin-denominated proceeds of market manipulation, money laundering and multitude of various other nefarious acts taking place on the BitMEX platform were subsequently converted, by Defendants Reed, Agata Reed, Barbara Reed and Trace Reed, into multiple real estate investments that they set up in Wisconsin and Massachusetts.   For this purpose, the aforesaid Defendants employed fraudulent nominee shell companies Defendant Grape Park and Defendant Mark Sweep to disguise or conceal the true illegal nature of the funds used to acquire the corresponding real estate properties and the acquired real estate's true ownership or control.  All Defendants knew that the aforesaid financial transactions were designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the specified unlawful activity, namely cryptocurrency market manipulation, money laundering, operating unlicensed money transmitting business and multitude of various other nefarious acts taking place on the BitMEX platform as alleged in this Complaint.  All Defendants also knew the tainted nature of the funds in the Defendants' general account (bitcoin wallet), from which the multiple real estate purchases alleged in this Complaint were ultimately funded.

296.     Therefore, Defendants, and each of them, while being employed in or associated

with the continuing Enterprise as alleged above, committed multiple acts that violated 18 U.S.C. § 1956, which further constitute the predicate acts of the Defendants', and each of them, racketeering activity.

297.    Plaintiff Dolgov is informed and believes and thereon alleges that predicate acts alleged herein, namely money laundering in violation of 18 U.S.C. § 1956, are related by having the same or similar purposes of manipulating cryptocurrency markets, generating illicit income, and concealing illegal activities from authorities, results, Defendants – participants, victims, methods of commission or are otherwise interrelated by distinguishing characteristics.

298.    Plaintiff Dolgov is informed and believes and thereon alleges that predicate acts alleged herein, namely money laundering in violation of 18 U.S.C. § 1956, are continuous as they constitute an open-ended scheme, which poses a threat of continuity through the long duration of the alleged misconduct, namely two years, and the threat of continuing criminal conduct, as the alleged criminal conduct perpetrated by Defendants is still ongoing.

299.    Plaintiff Dolgov is informed and believes and thereon alleges that Defendants', and each of them, alleged price manipulation schemes, including, without limitation, pumps and dumps, Barts, stop loss hunts and liquidation cascades perpetrated by Defendants, and each of them, to launder funds between different exchange accounts controlled by Defendants or third persons in violation of 18 U.S.C. § 1956, directly and proximately resulted in substantial monetary cryptocurrency trading losses to Plaintiff Dolgov as alleged hereinbelow.

300.    Plaintiff Dolgov is informed and believes and thereon alleges that Defendants, and each of them, used at least a portion of the proceeds derived from their money laundering operation in violation of 18 U.S.C. § 1956 to manipulate spot and derivative markets of cryptocurrencies, as alleged herein, which directly and proximately resulted in the substantial monetary cryptocurrency trading losses to Plaintiff Dolgov as alleged herein.

### DEFENDANTS ENGAGED IN MONETARY TRANSACTIONS IN PROPERTY DERIVED FROM SPECIFIED UNLAWFUL ACTIVITY IN VIOLATION OF 18 U.S.C. § 1957

301.    Plaintiff Dolgov incorporates the allegations set forth in Paragraphs 1-300 above

as if fully set forth herein.

302.    18 U.S.C. § 1957 provides that "(a) Whoever, in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b)."

303.    Pursuant to 18 USC § 1957(f)(3), the terms "specified unlawful activity" and "proceeds" shall have the meaning given those terms in 18 U.S.C. § 1956.

304.    Plaintiff Dolgov is informed and believes and thereon alleges that, during the Relevant Period, Defendants, and each of them, willfully and knowingly attempted to engage and engaged in monetary transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that in, operation of an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), money laundering in violation of 18 U.S.C. § 1956, wire fraud in violation of 18 U.S.C. § 1343, as well as proceeds of unlawful cryptocurrency market manipulation, as alleged hereinbelow.

305.    Defendants, and each of them, willfully and knowingly did conduct and continue to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that in, operation of an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), money laundering in violation of 18 U.S.C. § 1956, wire fraud in violation of 18 U.S.C. § 1343, as well as proceeds of unlawful cryptocurrency market manipulation, as alleged herein.

306.    For example, Defendants, and each of them, transferred, on a regular basis, proceeds from operating of the unlicensed Defendant HDR money transmission business as well as illegal bitcoin Perpetual Swap contracts price manipulation from BitMEX cryptocurrency exchange to other cryptocurrency exchanges, including, without limitation, Coinbase Pro, BitStamp and Kraken, with intent to employ those transferred proceeds in further unlawful activity.  Those proceeds were in fact subsequently used by Defendants, and each of them, as well as third party perpetrators, to perpetrate further market manipulation in violation of applicable

laws.  Moreover, Defendants, and each of them, used the hereinabove alleged price manipulation schemes, including, without limitation, pumps and dumps, Barts, stop loss hunts and liquidation cascades to launder funds between different exchange accounts controlled by Defendants or third persons.

307.    As a further example, the effective transmissions of the winnings from market manipulation from the first helper account to the second winner account perpetrated by Defendants on behalf of themselves and/or on behalf of other BitMEX users as described herein, with full knowledge of the nature and purpose of the funds involved in the transfer, constitutes violation of 18 U.S.C. § 1957.  The Defendants were fully aware of the nature of the transferred funds and that such funds were the proceeds of specified unlawful activity within the meaning of 18 U.S.C. § 1956.

308.    As yet further example, Defendants, and each of them, knowingly converted through multiple monetary transactions, in interstate or foreign commerce, during the Relevant Period, on a daily basis, including during each of the specific Manipulation Times alleged in Paragraph 353 below, proceeds of the alleged illegal bitcoin Perpetual Swap contracts price manipulation, money laundering, operating unlicensed money transmitting business and other nefarious acts alleged in this Complaint, that took place on the BitMEX platform, into various fiat currencies.

309.    Moreover, Defendants, and each of them, knowingly converted through multiple monetary transactions, in interstate or foreign commerce, during the Relevant Period, on or about July 8, 2019 and August 19, 2019, at least $2,325,000 of the fiat currency converted proceeds of the alleged illegal bitcoin Perpetual Swap contracts price manipulation, money laundering, operating unlicensed money transmitting business and other nefarious acts alleged in this Complaint into real estate investments in the United States, including, without limitations properties located in Lake Tomahawk, WI 54539 and Norwell, MA 02061, Ex. 12, 13.  The specific purpose of the financial transactions alleged herein was to launder those funds through a real estate investment scheme and conceal their true illegal origin as well as ownership and

control.

310.     Therefore, Defendants, and each of them, while being employed in or associated with the continuing Enterprise as alleged above, committed multiple acts that violated 18 U.S.C. § 1957, which further constitute the predicate acts of the Defendants', and each of them, racketeering activity.

311.     Plaintiff Dolgov is informed and believes and thereon alleges that predicate acts alleged herein, namely engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957, are related by having the same or similar purposes of manipulating cryptocurrency markets, generating illicit income, and concealing illegal activities from authorities, results, Defendants – participants, victims, methods of commission or are otherwise interrelated by distinguishing characteristics.

312.     Plaintiff Dolgov is informed and believes and thereon alleges that predicate acts alleged herein, namely engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957, are continuous as they constitute an open-ended scheme, which poses a threat of continuity through the long duration of the alleged misconduct, namely two years, and the threat of continuing criminal conduct, as the alleged criminal conduct perpetrated by Defendants, and each of them, is still ongoing.

313.     Plaintiff Dolgov is informed and believes and thereon alleges that Defendants', and each of them, alleged price manipulation schemes, including, without limitation, pumps and dumps, Barts, stop loss hunts and liquidation cascades perpetrated by Defendants, and each of them, to transfer funds derived from specified unlawful activity between different exchange accounts controlled by Defendants or third persons in violation of 18 U.S.C. § 1957, directly and proximately resulted in substantial monetary cryptocurrency trading losses to Plaintiff Dolgov as alleged hereinbelow.

314.     Plaintiff Dolgov is informed and believes and thereon alleges that Defendants, and each of them, used at least a portion of the proceeds from their transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957 to manipulate spot and

derivative markets of cryptocurrencies, as alleged herein, which directly and proximately resulted in the substantial monetary cryptocurrency trading losses to Plaintiff Dolgov as alleged herein.

## DEFENDANTS ENGAGED IN WIRE FRAUD
## IN VIOLATION OF 18 U.S.C. § 1343

315.    Plaintiff Dolgov incorporates the allegations set forth in Paragraphs 1-314 above as if fully set forth herein.

316.    18 U.S.C. § 1343 provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both..."

317.    Plaintiff Dolgov is informed and believes and thereon alleges that during the Relevant Period, Defendants, and each of them, devised a scheme or artifice to defraud, namely a manipulative, fraudulent and deceptive scheme to manipulate the prices of certain cryptocurrency derivatives, including, without limitation, bitcoin Perpetual Swap contracts, bitcoin swaps, as well as the cash prices of cryptocurrencies, including, without limitation, cash bitcoin and to obtain money of other traders by way of injecting false information into markets in order to induce other traders to open highly leveraged positions on BitMEX and then cause their artificial liquidation in violation of 7 U.S.C. §§ 9(1), (3) and 13(a)(2).  This scheme was devised and intended to fraudulently benefit Defendants at the expense of retail traders by inducing artificial market price moves and using such price moves to force liquidations of traders' positions on the BitMEX platform, while simultaneously deliberately freezing BitMEX's platform to impede retail traders' efforts to salvage their funds.  The funds forcibly confiscated from traders as the result of the liquidations were deposited into the Insurance Fund maintained by Defendants.

318.    Plaintiff Dolgov is informed and believes and thereon alleges that, during the Relevant Period, Defendants, and each of them, used wire signals to transmit various electronic orders to multiple cryptocurrency exchanges for the specific purpose of misleading traders and

investors as to the cryptocurrency market's natural forces of supply and demand and for manipulating prices of spot cryptocurrencies and cryptocurrency derivatives.  Those actions further constitute wire fraud in violation of 18 U.S.C. § 1343.

319.    Plaintiff Dolgov is informed and believes and thereon alleges that the alleged fraudulent electronic wire transmissions were performed by Defendants on a daily basis, including during each of the specific Manipulation Times alleged in Paragraph 353 below, during the Relevant Period and were carried out from Defendants' offices located in San Francisco, California and Milwaukee, Wisconsin, and to respective computer servers of Amazon EKS as well as computer serves of multiple other United States based cryptocurrency exchanges that Defendants used to perpetrate their manipulative and fraudulent scheme alleged hereinabove. Plaintiff Dolgov is informed and believes and thereon alleges that each of Defendants HDR, ABS, Hayes, Delo and Reed issued the alleged fraudulent electronic wire transmissions on a daily basis during the Relevant Period, including during each of the specific Manipulation Times alleged in Paragraph 353 below.

320.    Plaintiff Dolgov is informed and believes and thereon alleges that the alleged wire transmissions contained, without limitation, electronic orders designed to inject false and misleading information about genuine supply and demand for bitcoin or bitcoin derivatives into the markets and to deceive other participants in the market into believing something untrue, namely that the visible order book accurately reflected market-based forces of supply and demand.  These alleged wire transmissions were an illegitimate part of the supply-demand equation, prevented true price discovery, and caused artificial pricing in the cryptocurrency market.  The false and misleading information injected by Defendants into the markets was intended to trick other market participants into reacting to an apparent change and imbalance of supply and demand by buying and selling bitcoin Perpetual Swap or spot bitcoin at times, prices and quantities that they otherwise would likely not have traded.  Moreover, the alleged wire transmissions further contained, without limitation, electronic orders designed to induce artificial price moves in the cryptocurrency markets in order to force liquidations of traders' positions on

the BitMEX exchange for the benefit of Defendants' Insurance Fund.  In addition, the electronic wire transmissions included Defendants' electronic commands to deliberately freeze servers of the BitMEX platform and Defendants' electronic commands to generate the fraudulent system overload messages alleged hereinabove.  Finally, the electronic wire transmissions included Defendants' fraudulent transmissions regarding the fake hardware failure in BitMEX's servers as well as the fake distributed denial-of-service attack (DDoS attack), which took place on or about March 13, 2020.

321.    Plaintiff Dolgov is informed and believes and thereon alleges that pumps and dumps, Barts, liquidation cascades and spoofing alleged hereinabove are specific examples of the conduct that was specifically designed by Defendants, and each of them, to mislead Plaintiff Dolgov as well as other traders on the cryptocurrencies market.

322.    Plaintiff Dolgov as well as other traders were in fact mislead by Defendants', and each of them, manipulative and fraudulent acts intended to mislead and defraud, including, without limitation, by pumps and dumps, Barts and spoofing perpetrated by Defendants, and each of them, and placed orders that they would not have otherwise placed.

323.    Plaintiff Dolgov, at the time of the alleged manipulative and fraudulent acts intended to mislead and defraud, which were perpetrated by Defendants, and each of them, and at the time Plaintiff Dolgov took the trades herein alleged, was ignorant of the manipulative and fraudulent nature of conduct of the Defendants, and each of them, and believed that the apparent market conditions were in fact dictated by market forces of supply and demand and not the result of false information being injected into the markets by Defendants.

324.    Plaintiff Dolgov, at the time the alleged manipulative and fraudulent acts intended to mislead and defraud were made by Defendants, and each of them, and at the time Plaintiff Dolgov took the actions herein alleged, was ignorant of secret intentions of Defendants, and each of them, to mislead and defraud Plaintiff Dolgov and other traders and Plaintiff Dolgov could not, in the exercise of reasonable diligence, have discovered the secret intentions of Defendants, and each of them.

325.    Had Plaintiff Dolgov known the actual facts, Plaintiff Dolgov would not have taken such alleged actions.

326.    If Plaintiff Dolgov had known of the actual intention of Defendants, and each of them, Plaintiff Dolgov would not have taken the alleged trades.  Plaintiff Dolgov's reliance on fraudulent and manipulative conduct of Defendants, and each of them, was justified because Plaintiff Dolgov rightfully assumed that the market conditions of spot bitcoin and bitcoin derivatives markets were due to the actual market forces of supply and demand.

327.    Plaintiff Dolgov is informed and believes and thereon alleges that predicate acts alleged herein, namely engaging in wire fraud in violation of 18 U.S.C. § 1343, are related by having the same or similar purposes of manipulating cryptocurrency markets, generating illicit income, and concealing illegal activities from authorities, results, Defendants – participants, victims, methods of commission or are otherwise interrelated by distinguishing characteristics.

328.    Plaintiff Dolgov is informed and believes and thereon alleges that predicate acts alleged herein, namely engaging in wire fraud in violation of 18 U.S.C. § 1343, are continuous as they constitute an open-ended scheme, which poses a threat of continuity through the long duration of the alleged misconduct, namely two years, and the threat of continuing criminal conduct, as the alleged criminal conduct perpetrated by Defendants is still ongoing.

329.    Plaintiff Dolgov is informed and believes and thereon alleges that Defendants' hereinabove alleged use of the electronic wire signals to defraud Plaintiff Dolgov as well as other market participants in violation of 18 U.S.C. § 1343 directly and proximately resulted in the substantial monetary cryptocurrency trading losses to Plaintiff Dolgov as alleged hereinbelow.

330.    Plaintiff Dolgov is informed and believes and thereon alleges that Defendants, and each of them, used at least a portion of the proceeds derived from wire fraud in violation of 18 U.S.C. § 1343 to manipulate spot and derivative markets of cryptocurrencies, as alleged herein, which directly and proximately resulted in the substantial monetary cryptocurrency trading losses to Plaintiff Dolgov as alleged herein.

**DEFENDANTS ENGAGED IN INTERSTATE TRANSPORTATION OF STOLEN FUNDS IN VIOLATION OF THE NATIONAL STOLEN PROPERTY ACT 18 U.S.C. § 2314**

331.    Plaintiff Dolgov incorporates the allegations set forth in Paragraphs 1-330 above as if fully set forth herein.

332.    18 U.S.C. § 2314 provides that "[w]hoever transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud … [s]hall be fined under this title or imprisoned not more than ten years, or both."

333.    Plaintiff Dolgov is informed and believes and thereon alleges that, during the Relevant Period, Defendants, and each of them, willfully and knowingly transmitted and transferred in interstate or foreign commerce cryptocurrency, including, without limitation, bitcoin and stablecoins, knowing that the transferred cryptocurrency was converted or taken by fraud from Plaintiff Dolgov as well as other cryptocurrency traders as the result of fraudulent market manipulation as alleged hereinabove.

334.    Plaintiff Dolgov is informed and believes and thereon alleges that Defendants, and each of them, knowingly transferred and transmitted, in interstate or foreign commerce, during the Relevant Period, on a daily basis, including during each of the specific Manipulation Times alleged in Paragraph 353 below, proceeds of the alleged illegal bitcoin Perpetual Swap contracts price manipulation from manipulation winner accounts as well as other accounts on BitMEX cryptocurrency exchange to accounts on other cryptocurrency exchanges, including, without limitation, Coinbase Pro, BitStamp and Kraken, as well as cryptocurrency off-ramp exchanges and OTC trading desks for subsequent conversion of the ill-gotten bitcoins into fiat currencies, including United States dollars and Hong Kong dollars.  Moreover, Defendants, and each of them, knowingly transferred and transmitted, in interstate or foreign commerce, on or about July 9, 2019, at least $900,000 of the fiat currency converted proceeds of the alleged illegal bitcoin Perpetual Swap contracts price manipulation from Defendant Unknown Exchange to Vilas Title Service Inc., 133 E Division St, Eagle River, WI 54521, United States.  Furthermore, Defendants,

and each of them, transferred and transmitted, in interstate or foreign commerce, on or about August 16, 2019, at least $1,425,000 of the fiat currency converted proceeds of the alleged illegal bitcoin Perpetual Swap contracts price manipulation from Defendant Unknown Exchange to Ligris + Associates, 399 Boylston St f7, Boston, MA 02116, United States.  The specific purpose of the transfers of funds alleged herein was to launder those funds through a real estate investment scheme and conceal their true illegal origin as well as ownership and control.

335.    Coinbase Pro and Kraken are located in California, while BitStamp is located in New York City, New York.  The transferred proceeds were converted or taken by fraud by Defendants from Plaintiff Dolgov as well as other cryptocurrency traders as the result of the fraudulent market manipulation as alleged hereinabove.  The Defendants were fully aware of the true nature of the transferred proceeds.

336.    For example, the effective transmissions of the winnings from market manipulation from the first helper account to the second winner account perpetrated by Defendants as described herein constitutes a violation of 18 U.S.C. § 2314. The Defendants were fully aware of the nature of the transferred funds and that such funds were taken by fraud from Plaintiff Dolgov as well as other cryptocurrency traders.

337.    Therefore, Defendants, and each of them, while being employed in or associated with the continuing Enterprise as alleged above, committed multiple acts that violated 18 U.S.C. § 2314, which further constitute the predicate acts of the Defendants', and each of them, racketeering activity.

338.    Plaintiff Dolgov is informed and believes and thereon alleges that predicate acts alleged herein, namely engaging in interstate transportation of stolen funds in violation of 18 U.S.C. § 2314, are related by having the same or similar purposes of manipulating cryptocurrency markets, generating illicit income and concealing illegal activities from authorities, results, Defendants – participants, victims, methods of commission or are otherwise interrelated by distinguishing characteristics.

339.    Plaintiff Dolgov is informed and believes and thereon alleges that predicate acts

alleged herein, namely engaging in interstate transportation of stolen funds in violation of 18

U.S.C. § 2314, are continuous as they constitute an open-ended scheme, which poses a threat of

continuity through the long duration of the alleged misconduct, namely two years, and the threat

of continuing criminal conduct, as the alleged criminal conduct perpetrated by Defendants is still

ongoing.

340.   Plaintiff Dolgov is informed and believes and thereon alleges that Defendants',

and each of them, alleged transfer of proceeds of the alleged illegal bitcoin Perpetual Swap

contracts price manipulation from BitMEX cryptocurrency exchange to other cryptocurrency

exchanges, including, without limitation, Coinbase Pro, BitStamp and Kraken, in violation of 18

U.S.C. § 2314, enabling Defendants, and each of them, to engage in further market manipulation,

directly and proximately resulted in substantial monetary cryptocurrency trading losses to

Plaintiff Dolgov as alleged hereinbelow.

341.   Plaintiff Dolgov is informed and believes and thereon alleges that Defendants, and

each of them, used at least a portion of the proceeds derived from the interstate transportation of

stolen funds in violation of 18 U.S.C. § 2314 to manipulate spot and derivative markets of

cryptocurrencies, as alleged herein, which directly and proximately resulted in the substantial

monetary cryptocurrency trading losses to Plaintiff Dolgov as alleged herein.

**DEFENDANTS ENGAGED IN INTERSTATE AND FOREIGN TRAVEL OR**
**TRANSPORTATION IN AID OF RACKETEERING ENTERPRISE IN**
**VIOLATION OF 18 U.S.C. § 1952**

342.   Plaintiff Dolgov incorporates the allegations set forth in Paragraphs 1-341 above

as if fully set forth herein.

343.   18 U.S.C. § 1952 provides that "[w]hoever travels in interstate or foreign

commerce or uses the mail or any facility in interstate or foreign commerce, with intent to (1)

distribute the proceeds of any unlawful activity; … or (3) otherwise promote, manage, establish,

carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful

activity, and thereafter performs or attempts to perform—(A) an act described in paragraph (1) or

(3) shall be fined under this title, imprisoned not more than 5 years, or both."

344.    Plaintiff Dolgov is informed and believes and thereon alleges that, during the Relevant Period, Defendants Hayes, Delo and Reed, and each of them, willfully and knowingly traveled between Hong Kong, United States and Seychelles with intent to distribute the proceeds of an unlawful activity, namely market manipulation in violation of CEA, money laundering, operating unlicensed money transmitting business as well as numerous other nefarious acts that took place on the BitMEX platform as alleged in this Complaint.  Therefore, Defendants Hayes, Delo and Reed violated 18 U.S.C. § 1952.

345.    Plaintiff Dolgov is informed and believes and thereon alleges that, during the Relevant Period, Defendants Hayes, Delo and Reed, and each of them, willfully and knowingly traveled between Hong Kong, United States and Seychelles with intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of unlawful activity namely market manipulation in violation of CEA, money laundering, operating unlicensed money transmitting business as well as numerous other nefarious acts that took place on the BitMEX platform as alleged in this Complaint. Therefore, Defendants Hayes, Delo and Reed violated 18 U.S.C. § 1952.

346.    Plaintiff Dolgov is informed and believes and thereon alleges that, during the Relevant Period, Defendants Reed and Agata Reed, and each of them, willfully and knowingly traveled between Wisconsin and Massachusetts with intent to distribute and reinvest in United States real estate property situated in Norwell, MA 02061 at least $1,425,000 of the proceeds of an unlawful activity, namely market manipulation in violation of CEA, money laundering, operating unlicensed money transmitting business as well as numerous other nefarious acts that took place on the BitMEX platform as alleged in this Complaint.  Therefore, Defendants Reed and Agata Reed violated 18 U.S.C. § 1952.

347.    Plaintiff Dolgov is informed and believes and thereon alleges that, during the Relevant Period, Defendants Reed and Agata Reed, and each of them, willfully and knowingly traveled between Wisconsin and Massachusetts with intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of unlawful activity

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

namely market manipulation in violation of CEA, money laundering, operating unlicensed money transmitting business as well as numerous other nefarious acts that took place on the BitMEX platform as alleged in this Complaint.  Therefore, Defendants Reed and Agata Reed violated 18 U.S.C. § 1952.

348.    Therefore, Defendants Hayes, Delo, Reed and Agata Reed, and each of them, while being employed in or associated with the continuing Enterprise as alleged above, committed multiple acts that violated 18 U.S.C. § 1952, which further constitute the predicate acts of the Defendants Hayes, Delo, Reed and Agata Reed, and each of them, racketeering activity.

349.    Plaintiff Dolgov is informed and believes and thereon alleges that predicate acts alleged herein, namely engaging in interstate and foreign travel or transportation in aid of racketeering enterprise in violation of 18 U.S.C. § 1952, are related by having the same or similar purposes of manipulating cryptocurrency markets, generating illicit income and concealing illegal activities from authorities, results, Defendants – participants, victims, methods of commission or are otherwise interrelated by distinguishing characteristics.

350.    Plaintiff Dolgov is informed and believes and thereon alleges that predicate acts alleged herein, namely engaging in interstate and foreign travel or transportation in aid of racketeering enterprise in violation of 18 U.S.C. § 1952, are continuous as they constitute an open-ended scheme, which poses a threat of continuity through the long duration of the alleged misconduct, namely two years, and the threat of continuing criminal conduct, as the alleged criminal conduct perpetrated by Defendants is still ongoing.

351.    Plaintiff Dolgov is informed and believes and thereon alleges that Defendants', and each of them, alleged interstate and foreign travel or transportation in aid of racketeering enterprise in violation of 18 U.S.C. § 1952, enabling Defendants, and each of them, to benefit from and continue the market manipulation in violation of CEA, money laundering, operating unlicensed money transmitting business as well as numerous other nefarious acts that took place on the BitMEX platform as alleged in this Complaint, directly and proximately resulted in substantial monetary cryptocurrency trading losses to Plaintiff Dolgov as alleged hereinbelow.

**SPECIFIC TIMES OF MARKET MANIPULATION BY DEFENDANTS**

352.    Plaintiff Dolgov incorporates the allegations set forth in Paragraphs 1-351 above as if fully set forth herein.

353.    Plaintiff Dolgov is informed and believes and thereon alleges that Defendants themselves manipulated cryptocurrency prices by using their own helper accounts on United States based cryptocurrency exchanges Kraken, Coinbase and BitStamp to place large market orders on those exchanges with maximum slippage to cause large artificial moves in the .BXBT and index price and .BETH index price on a daily basis, including, without limitation, the following specific manipulation times ("Manipulation Times"):

|     | From | To |
| --- | --- | --- |
| 1.  | 7AM UTC on November 14, 2018 | 12AM UTC on November 15, 2018 |
| 2.  | 12AM UTC on November 19, 2018 | 9AM UTC on November 20, 2018 |
| 3.  | 4PM UTC on November 24, 2018 | 11PM UTC on November 25, 2018 |
| 4   | 6AM UTC on December 24, 2018 | 12AM UTC on December 25, 2018 |
| 5.  | 4AM UTC on January 10, 2019 | 8PM UTC on January 10, 2020 |
| 6.  | 12AM UTC on April 2, 2019 | 12PM UTC on April 2, 2019 |
| 7.  | 2AM UTC on May 17, 2019 | 4AM UTC on May 17, 2019 |
| 8.  | 7PM UTC on June 26, 2019 | 12AM UTC on June 27, 2019 |
| 9.  | 4AM UTC on July 14, 2019 | 12AM UTC on July 15, 2019 |
| 10. | 4AM UTC on September 22, 2019 | 4PM UTC on September 26, 2019 |
| 11. | 12AM UTC on November 18, 2019 | 12AM UTC on November 20, 2019 |
| 12. | 4AM UTC on March 12, 2020 | 4AM UTC on March 13, 2020 |
| 13. | 9PM UTC on July 27, 2020 | 2AM UTC on July 28, 2020 |
| 14. | 12AM UTC on August 2, 2020 | 6AM UTC on August 2, 2020 |

354.    Additional and other facts regarding Defendants' market manipulation activities are hidden from Plaintiff at this time.  Such information is uniquely within Defendants'

possession, custody and control.  To date, Defendants provided absolutely no discovery to Plaintiff what so ever, despite being served with multiple discovery requests, which Defendants stonewalled.  Plaintiff reserves the right to amend or supplement the above list of Manipulation Times after he receives discovery from Defendants.

**SPECIFIC LOCATIONS AND TIMES OF RICO OVERT ACTS OF DEFENDANTS**

355.   Plaintiff Dolgov incorporates the allegations set forth in Paragraphs 1-354 above as if fully set forth herein.

356.   RICO overt acts perpetrated by Defendants are described in the table below.  All of those overt acts take place either on United States based cryptocurrency exchanges BitStamp, Coinbase Pro and Kraken or on BitMEX itself, which has the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations in this District.  The below table has been prepared based on information and belief of Plaintiff Dolgov:

| RICO Overt Act | RICO Conduct Involved | Place of Conduct |
|---|---|---|
| 1 | Defendants transmitting electronic wire signals to inject false information as to market forces of supply and demand into cryptocurrency markets and mislead traders to open unfavorable trading positions to be subsequently liquidated (e.g. first leg of a Bart, see paragraphs 142-144, 153, 317-330) | This District (BitMEX, having the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations in this District); BitStamp, Coinbase Pro and Kraken, all located in the United States |
| | Plaintiff entered into unfavorable trading positions being mislead by false market forces information injected by Defendants | This District (BitMEX, having the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations in this District) and Kraken, also located in this District |
| 2 | Defendants electronically transferring (depositing) funds to be used for manipulation into helper account(s) | BitStamp, Coinbase Pro and Kraken, all located in the United States |
| 3 | Defendants transmitting electronic wire signals to deliberately move BitMEX's .BXBT index price by | BitStamp, Coinbase Pro and Kraken, all located in the United States |

| | placing large market orders with maximum slippage from the helper accounts on three illiquid exchanges used by BitMEX to calculate its .BXBT index | |
|---|---|---|
| | Liquidation cascade that resulted in some of Plaintiff's damages due to liquidation of Plaintiff's XBTUSD Swap positions takes place, directly and proximately caused by the deliberate .BXBT index price move orchestrated by Defendants | This District (BitMEX, having the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations in this District) and Kraken, also located in this District |
| 4 | Defendants transmitting electronic wire signals to capture multiplied (due to disparity in liquidity) manipulation profits caused by the deliberate index price move using winner account(s) on BitMEX | This District (BitMEX, having the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations in this District) |
| 5 | Defendants transmitting electronic wire signals to freeze BitMEX servers and accepting orders on only one side of the market to exacerbate the price moves during manipulation times | This District, where all three site reliability engineers of BitMEX, who were responsible for the BitMEX trading platform uptime and who personally perpetrated the server freezes, were located |
| 6 | Defendants electronically transferring (withdrawing) funds from winner account(s) into bitcoin wallet | This District (BitMEX, having the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations in this District) |
| 7 | Defendants transmitting electronic wire signals to convert proceeds of market manipulation into fiat (legal tender) currencies | BitStamp, Coinbase Pro and Kraken, all located in the United States |
| 8. | Defendant Reed reinvesting converted proceeds of market manipulation and money laundering into United States real estate. | Wisconsin and Massachusetts |

357.    A summary of alleged RICO predicates perpetrated by Defendants is provided in the table below, which was prepared in accordance with information and belief of Plaintiff.  All of those predicates also took place either on United States based cryptocurrency exchanges BitStamp, Coinbase Pro and Kraken and on BitMEX itself, which has the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations in this District:

| RICO Predicate | RICO Overt Acts | Place of Conduct |
|---|---|---|
| 18 U.S.C. § 1960 Unlicensed Money Transmissions | 2, 3, 4, 5, 6, 7 | This District (BitMEX, having the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations in this District); BitStamp, Coinbase Pro and Kraken, all located in the United States |
| 18 U.S.C. § 1956 Money Laundering | 2, 3, 4, 5, 6, 7, 8 | This District (BitMEX, having the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations in this District); BitStamp, Coinbase Pro and Kraken, all located in the United States, Wisconsin and Massachusetts |
| 18 U.S.C. § 1957 Money Laundering | 2, 3, 4, 5, 6, 7, 8 | This District (BitMEX, having the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations in this District); BitStamp, Coinbase Pro and Kraken, all located in the United States, Wisconsin and Massachusetts |
| 18 U.S.C. § 1343 Wire Fraud | 1, 2, 3, 4, 5, 6, 7 | This District (BitMEX, having the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations in this District); BitStamp, Coinbase Pro and Kraken, all located in the United States |
| 18 U.S.C. § 2314 Transportation of Stolen Property | 2, 3, 4, 5, 6, 7 | This District (BitMEX, having the majority of cloud service providers, employees, engineering and software development team and the nerve center of operations in this District); BitStamp, Coinbase Pro and Kraken, all located in the United States |

358.   Additional and other facts regarding Defendants' RICO overt acts are hidden from Plaintiff at this time.  Such information is uniquely within Defendants' possession, custody and control.  To date, Defendants provided absolutely no discovery to Plaintiff what so ever, despite being served with multiple discovery requests, which Defendants stonewalled.  Plaintiff accordingly reserves the right to supplement and amend these allegations of RICO overt acts, if appropriate or necessary, following completion of relevant fact discovery.

359.   A summary of certain specific times of each of the alleged RICO predicates perpetrated by Defendants is provided in the table below.  The below table has been prepared based on information and belief of Plaintiff Dolgov:

| RICO Predicate | RICO | Defendants | Dates When Each RICO Predicate |
|---|---|---|---|

| | Overt Acts | Involved in RICO Predicate | Occurred |
|---|---|---|---|
| 18 U.S.C. § 1960 Unlicensed Money Transmissions | 2, 3, 4, 5, 6, 7 | HDR, ABS, Hayes, Delo, Reed | a. 7AM UTC on November 14, 2018 to 12AM UTC on November 15, 2018; b. 12AM UTC on November 19, 2018 to 9AM UTC on November 20, 2018; c. 4PM UTC on November 24, 2018 to 11PM UTC on November 25, 2018; d. 4AM UTC on December 24, 2018 to 12AM UTC on December 25, 2018; e. 4AM UTC on January 10, 2019 to 8PM UTC on January 10, 2020; f. 12AM UTC on April 2, 2019 to 12PM UTC on April 2, 2019; g. 2AM UTC on May 17, 2019 to 4AM UTC on May 17, 2019; h. 7PM UTC on June 26, 2019 to 12AM UTC on June 27, 2019; i. 4AM UTC on July 14, 2019 to 12AM UTC on July 15, 2019; j. 4AM UTC on September 22, 2019 to 4PM UTC on September 26, 2019 k. 12AM UTC on November 18, 2019 to 12AM UTC on November 20, 2019 l. 4AM UTC on March 12, 2020 to 4AM UTC on March 13, 2020; m. 9PM UTC on July 27, 2020 to 2AM UTC on July 28, 2020; and n. 12AM UTC on August 2, 2020 to 6AM UTC on August 2, 2020. |
| 18 U.S.C. § 1956 Money Laundering | 2, 3, 4, 5, 6, 7, 8 | HDR, ABS, Hayes, Delo, Reed, Grape Park, Mark Sweep | a. 7AM UTC on November 14, 2018 to 12AM UTC on November 15, 2018; b. 12AM UTC on November 19, 2018 to 9AM UTC on November 20, 2018; c. 4PM UTC on November 24, 2018 to 11PM UTC on November 25, 2018; d. 4AM UTC on December 24, 2018 to 12AM UTC on December 25, 2018; e. 4AM UTC on January 10, 2019 to 8PM UTC on January 10, 2020; f. 12AM UTC on April 2, 2019 to 12PM UTC on April 2, 2019; g. 2AM UTC on May 17, 2019 to 4AM UTC on May 17, 2019; h. 7PM UTC on June 26, 2019 to 12AM UTC on June 27, 2019; i. July 7, 2019; j. 4AM UTC on July 14, 2019 to 12AM UTC on July 15, 2019; k. 4AM UTC on September 22, 2019 to 4PM UTC on September 26, 2019 l. 12AM UTC on November 18, 2019 to 12AM UTC on November 20, 2019 m. 4AM UTC on March 12, 2020 to 4AM |

| | | | UTC on March 13, 2020;<br>n. 9PM UTC on July 27, 2020 to 2AM UTC on July 28, 2020; and<br>o. 12AM UTC on August 2, 2020 to 6AM UTC on August 2, 2020. |
|---|---|---|---|
| 18 U.S.C. § 1957 Money Laundering | 2, 3, 4, 5, 6, 7, 8 | HDR, ABS, Hayes, Delo, Reed, Grape Park, Mark Sweep | a. 7AM UTC on November 14, 2018 to 12AM UTC on November 15, 2018;<br>b. 12AM UTC on November 19, 2018 to 9AM UTC on November 20, 2018;<br>c. 4PM UTC on November 24, 2018 to 11PM UTC on November 25, 2018;<br>d. 4AM UTC on December 24, 2018 to 12AM UTC on December 25, 2018;<br>e. 4AM UTC on January 10, 2019 to 8PM UTC on January 10, 2020;<br>f. 12AM UTC on April 2, 2019 to 12PM UTC on April 2, 2019;<br>g. 2AM UTC on May 17, 2019 to 4AM UTC on May 17, 2019;<br>h. 7PM UTC on June 26, 2019 to 12AM UTC on June 27, 2019;<br>i. July 7, 2019;<br>j. 4AM UTC on July 14, 2019 to 12AM UTC on July 15, 2019;<br>k. 4AM UTC on September 22, 2019 to 4PM UTC on September 26, 2019<br>l. 12AM UTC on November 18, 2019 to 12AM UTC on November 20, 2019<br>m. 4AM UTC on March 12, 2020 to 4AM UTC on March 13, 2020;<br>n. 9PM UTC on July 27, 2020 to 2AM UTC on July 28, 2020; and<br>o. 12AM UTC on August 2, 2020 to 6AM UTC on August 2, 2020. |
| 18 U.S.C. § 1343 Wire Fraud | 1, 2, 3, 4, 5, 6, 7 | HDR, ABS, Hayes, Delo, Reed | a. 7AM UTC on November 14, 2018 to 12AM UTC on November 15, 2018;<br>b. 12AM UTC on November 19, 2018 to 9AM UTC on November 20, 2018;<br>c. 4PM UTC on November 24, 2018 to 11PM UTC on November 25, 2018;<br>d. 4AM UTC on December 24, 2018 to 12AM UTC on December 25, 2018;<br>e. 4AM UTC on January 10, 2019 to 8PM UTC on January 10, 2020;<br>f. 12AM UTC on April 2, 2019 to 12PM UTC on April 2, 2019;<br>g. 2AM UTC on May 17, 2019 to 4AM UTC on May 17, 2019;<br>h. 7PM UTC on June 26, 2019 to 12AM UTC on June 27, 2019;<br>i. 4AM UTC on July 14, 2019 to 12AM UTC on July 15, 2019;<br>j. 4AM UTC on September 22, 2019 to 4PM UTC on September 26, 2019<br>k. 12AM UTC on November 18, 2019 to |

| | | | 12AM UTC on November 20, 2019 l. 4AM UTC on March 12, 2020 to 4AM UTC on March 13, 2020; m. 9PM UTC on July 27, 2020 to 2AM UTC on July 28, 2020; and n. 12AM UTC on August 2, 2020 to 6AM UTC on August 2, 2020. |
|---|---|---|---|
| 18 U.S.C. § 2314 Transportation of Stolen Property | 2, 3, 4, 5, 6, 7 | HDR, ABS, Hayes, Delo, Reed | a. 7AM UTC on November 14, 2018 to 12AM UTC on November 15, 2018; b. 12AM UTC on November 19, 2018 to 9AM UTC on November 20, 2018; c. 4PM UTC on November 24, 2018 to 11PM UTC on November 25, 2018; d. 4AM UTC on December 24, 2018 to 12AM UTC on December 25, 2018; e. 4AM UTC on January 10, 2019 to 8PM UTC on January 10, 2020; f. 12AM UTC on April 2, 2019 to 12PM UTC on April 2, 2019; g. 2AM UTC on May 17, 2019 to 4AM UTC on May 17, 2019; h. 7PM UTC on June 26, 2019 to 12AM UTC on June 27, 2019; i. 4AM UTC on July 14, 2019 to 12AM UTC on July 15, 2019; j. 4AM UTC on September 22, 2019 to 4PM UTC on September 26, 2019 k. 12AM UTC on November 18, 2019 to 12AM UTC on November 20, 2019 l. 4AM UTC on March 12, 2020 to 4AM UTC on March 13, 2020; m. 9PM UTC on July 27, 2020 to 2AM UTC on July 28, 2020; and n. 12AM UTC on August 2, 2020 to 6AM UTC on August 2, 2020. |

360.    Additional and other facts regarding Defendants' RICO overt acts and their timing are hidden from Plaintiff at this time.  Such information is uniquely within Defendants' possession, custody and control.  To date, Defendants provided absolutely no discovery to Plaintiff what so ever, despite being served with multiple discovery requests, which Defendants stonewalled.  Plaintiff accordingly reserves the right to supplement and amend these allegations of RICO overt acts and their timing, if appropriate or necessary, following completion of relevant fact discovery.

361.    The individual roles of all Defendants with respect to RICO predicates are summarized in the below table, prepared according to information and belief of Plaintiff Dolgov:

| Defendant | Role of Defendant |
|---|---|
| HDR | Defendant HDR is a holding company.  Despite being incorporated in the Seychelles, Defendant HDR does not have, and never has had, any operations or employees in the Seychelles. Defendant HDR operates, or has operated during the Relevant Period, primarily from San Francisco office of Defendant ABS and Milwaukee office of Defendant Reed.  Defendant HDR was responsible for, among other things, the planning of the operation of the BitMEX platform to effectuate the market manipulation, including, without limitation deliberate server freezes and fraudulent system overloads alleged herein as well as effective transfers of market manipulation winnings from helper accounts to winner accounts and performance of other illegal acts conducted by the Enterprise. |
| ABS | Defendant ABS designs, develops, implements, operates and supports the online derivatives trading platform BitMEX from within this District. Defendant ABS was responsible for, among other things, day to day operations of the BitMEX platform and effectuating the market manipulation, including, without limitation deliberate server freezes and fraudulent system overloads alleged herein as well as effective transfers of market manipulation winnings from helper accounts to winner accounts and performance of other illegal acts conducted by the Enterprise, as well as creating custom software programs and scripts for performing market manipulation and implementing server freezes. |
| Grape Park | Defendants Grape Park and Mark Sweep were used by the Enterprise to conceal or disguise the true source of funds used for acquiring the real estate properties and their true ownership and control.  Defendant Reed dominates and controls every aspect of business of Defendant Grape Park and funds its operations. Defendant Grape Park is an alter ego of Defendant Reed. |

| | |
|---|---|
| Mark Sweep | Defendants Grape Park and Mark Sweep were used by the Enterprise to conceal or disguise the true source of funds used for acquiring the real estate properties and their true ownership and control.  Defendant Reed dominates and controls every aspect of business of Defendant Mark Sweep and funds its operations.  Defendant Mark Sweep is an alter ego of Defendant Reed. |
| Unknown Exchange | Defendant Unknown Exchange was responsible for knowingly, willfully and deliberately laundering a substantial portion of the bitcoin-denominated proceeds of market manipulation, money laundering, operating unlicensed money transmitting business and multitude of various other nefarious acts taking place on the BitMEX platform, by means of converting bitcoins into various traditional ("fiat") currencies, including United States dollars and Hong Kong dollars. |
| Hayes | Defendant Hayes was responsible for, among other things, conducting overall planning, oversight and supervision of the affairs of the Enterprise and coordination between the remaining co-conspirators, as well as controlling bank accounts and financial flows within the Enterprise.  In addition, Defendant Hayes gave directions to other members of the Enterprise, occupied the top position in the "chain of command" of the Enterprise through which the affairs of the Enterprise are conducted and was indispensable to the achievement of the Enterprise's goals of maximizing profits and minimizing trading losses for the Defendants, and each of them, and their co-conspirators, through unlawful trading practices, including market manipulation, concealing trading gains obtained through unlawful practices from regulatory and tax authorities using, without limitation, money laundering, generating illicit income from unlicensed money transmissions, promoting and enhancing the racketeering conspiracy and the activities of the Defendants, and each of them, and their co-conspirators and concealing the unlawful activities of the Defendants, and each of them, and |

| | |
|---|---|
| | their co-conspirators from scrutiny by cryptocurrency exchanges and law enforcement. |
| Delo | Defendant Delo was responsible for performing liquidations of user positions to rip the benefits of the market manipulation and other illegal acts conducted by the Enterprise and depositing the liquidation proceeds into Insurance Fund.  In addition, Defendant Delo gave directions to other members and took directions from Defendant Hayes, occupied a second position in the "chain of command" through which the affairs of the Enterprise are conducted, knowingly and eagerly implemented decisions of Defendant Hayes and was indispensable to the achievement of the Enterprise's goals of maximizing profits and minimizing trading losses for the Defendants, and each of them, and their co-conspirators, through unlawful trading practices, including market manipulation, concealing trading gains obtained through unlawful practices from regulatory and tax authorities using, without limitation, money laundering, generating illicit income from unlicensed money transmissions, promoting and enhancing the racketeering conspiracy and the activities of the Defendants, and each of them, and their co-conspirators and concealing the unlawful activities of the Defendants, and each of them, and their co-conspirators from scrutiny by cryptocurrency exchanges and law enforcement. |
| Reed | Defendant Reed was responsible for, among other things, planning and initiating the deliberate server freezes and fraudulent system overloads on BitMEX as alleged herein as well as effective transfers of market manipulation winnings from helper accounts on United States based exchanges Kraken, Coinbase and BitStamp to winner accounts on BitMEX, by placing large market orders on those exchanges with maximum slippage to cause large artificial moves in the .BXBT and index price and .BETH index price on a daily basis and performance of other illegal acts conducted by the Enterprise, by |

| | issuing electronic wire transmissions containing trading orders and other computer system commands and writing, deploying and remotely executing software scripts from his office located in Milwaukee, WI 53202. Defendant Reed was further responsible for laundering a substantial portion of the tainted proceeds of the illegal activities on the BitMEX platform from Defendants' general account (bitcoin wallet) through a real estate investment scheme involving multiple real estate properties in Wisconsin and Massachusetts, by concealing the nature of the funds used in acquisition of said properties and the true state of ownership and control thereof.   In addition, Defendant Reed gave directions to other members and took directions from Defendant Hayes, occupied a third position in the "chain of command" through which the affairs of the Enterprise are conducted, knowingly and eagerly implemented decisions of Defendants Hayes and Delo and was indispensable to the achievement of the Enterprise's goals of maximizing profits and minimizing trading losses for the Defendants, and each of them, and their co-conspirators, through unlawful trading practices, including market manipulation, concealing trading gains obtained through unlawful practices from regulatory and tax authorities using, without limitation, money laundering, generating illicit income from unlicensed money transmissions, promoting and enhancing the racketeering conspiracy and the activities of the Defendants, and each of them, and their co-conspirators and concealing the unlawful activities of the Defendants, and each of them, and their co-conspirators from scrutiny by cryptocurrency exchanges and law enforcement. |
|---|---|
| Agata Reed | Defendant Agata Reed was responsible for laundering a substantial portion of the tainted proceeds of the illegal activities on the BitMEX platform from Defendants' general account (bitcoin wallet) through a real estate investment scheme involving real estate properties in Massachusetts, by concealing the |

| | |
|---|---|
| | nature of the funds used in acquisition of said properties and the true state of ownership and control thereof.   In addition, Defendant Agata Reed gave directions to other members and took directions from Defendant Reed, occupied a fourth position in the "chain of command" through which the affairs of the Enterprise are conducted, knowingly and eagerly implemented decisions of Defendants Hayes, Delo and Reed and was indispensable to the achievement of the Enterprise's goals of maximizing profits and minimizing trading losses for the Defendants, and each of them, and their co-conspirators, through unlawful trading practices, including market manipulation, concealing trading gains obtained through unlawful practices from regulatory and tax authorities using, without limitation, money laundering, generating illicit income from unlicensed money transmissions, promoting and enhancing the racketeering conspiracy and the activities of the Defendants, and each of them, and their co-conspirators and concealing the unlawful activities of the Defendants, and each of them, and their co-conspirators from scrutiny by cryptocurrency exchanges and law enforcement. |
| Barbara Reed | Defendant Barbara Reed was responsible for laundering a substantial portion of the tainted proceeds of the illegal activities on the BitMEX platform from Defendants' general account (bitcoin wallet) through a real estate investment scheme involving real estate properties in Wisconsin, by concealing the nature of the funds used in acquisition of said properties and the true state of ownership and control thereof.    In addition, Defendant Barbara Reed gave directions to other members and took directions from Defendant Reed, occupied a fifth position in the "chain of command" through which the affairs of the Enterprise are conducted, knowingly and eagerly implemented decisions of Defendants Hayes, Delo and Reed and was indispensable to the achievement of the Enterprise's goals of maximizing profits and minimizing trading losses |

| | |
|---|---|
| | for the Defendants, and each of them, and their co-conspirators, through unlawful trading practices, including market manipulation, concealing trading gains obtained through unlawful practices from regulatory and tax authorities using, without limitation, money laundering, generating illicit income from unlicensed money transmissions, promoting and enhancing the racketeering conspiracy and the activities of the Defendants, and each of them, and their co-conspirators and concealing the unlawful activities of the Defendants, and each of them, and their co-conspirators from scrutiny by cryptocurrency exchanges and law enforcement. |
| Trace Reed | Defendant Trace Reed was responsible for laundering a substantial portion of the tainted proceeds of the illegal activities on the BitMEX platform from Defendants' general account (bitcoin wallet) through a real estate investment scheme involving real estate properties in Wisconsin, by concealing the nature of the funds used in acquisition of said properties and the true state of ownership and control thereof.   In addition, Defendant Trace Reed gave directions to other members and took directions from Defendant Reed, occupied a sixth position in the "chain of command" through which the affairs of the Enterprise are conducted, knowingly and eagerly implemented decisions of Defendants Hayes, Delo and Reed and was indispensable to the achievement of the Enterprise's goals of maximizing profits and minimizing trading losses for the Defendants, and each of them, and their co-conspirators, through unlawful trading practices, including market manipulation, concealing trading gains obtained through unlawful practices from regulatory and tax authorities using, without limitation, money laundering, generating illicit income from unlicensed money transmissions, promoting and enhancing the racketeering conspiracy and the activities of the Defendants, and each of them, and their co-conspirators and concealing the unlawful activities of the Defendants, and each |

|  | of them, and their co-conspirators from scrutiny by cryptocurrency exchanges and law enforcement. |
|---|---|

362.   Additional and other facts regarding Defendants' roles in the Enterprise are hidden from Plaintiff at this time.  Such information is uniquely within Defendants' possession, custody and control.  To date, Defendants provided absolutely no discovery to Plaintiff what so ever, despite being served with multiple discovery requests, which Defendants stonewalled.  Plaintiff accordingly reserves the right to supplement and amend these allegations of Defendants' roles in the Enterprise, if appropriate or necessary, following completion of relevant fact discovery.

363.   Certain specific electronic wire communications alleged herein are summarized in the following table, prepared based on Plaintiff Dolgov's information and belief:

| Type of Comm. | Date | From | To | Content or Purpose of Communication |
|---|---|---|---|---|
| Wire | 11/14/2018 | Hayes (New York) | Delo (Hong Kong) | Directions and specific instructions on which specific orders to place, software scripts to execute and computer commands to issue and how to otherwise manipulate bitcoin market for the benefit of Defendants. |
| Wire | 11/14/2018 | Hayes (New York) | Reed (Wisconsin) | Directions and specific instructions on which specific orders to place, software scripts to execute and computer commands to issue and how to otherwise manipulate bitcoin market for the benefit of Defendants. |
| Wire | 11/14/2018 | Reed (Wisconsin) | BitMEX/ABS (San Francisco) | Trading orders to inject false information as to market forces of supply and demand into cryptocurrency markets and mislead traders to open unfavorable trading positions to be subsequently liquidated, see |

| | | | | |
|---|---|---|---|---|
| | | | | paragraphs 142-144, 153, 317-330. |
| Wire | 11/14/2018 | Reed (Wisconsin) | Kraken (San Francisco) | Trading orders to inject false information as to market forces of supply and demand into cryptocurrency markets and mislead traders to open unfavorable trading positions to be subsequently liquidated. |
| Wire | 11/14/2018 | Reed (Wisconsin) | Bitcoin Network (Cloud) | Instruction for electronically transferring (depositing) bitcoin funds to be used for manipulation into a helper account on Kraken, see paragraphs 142-144, 153, 317-330. |
| Wire | 11/14/2018 | Reed (Wisconsin) | Kraken (San Francisco) | Electronic computer instruction to execute large market trading order o BTC/USD order book from helper account with maximum slippage to deliberately move BitMEX's .BXBT index price. |
| Wire | 11/14/2018 | Reed (Wisconsin) | BitMEX/ABS (San Francisco) | Computer instruction to execute server freeze application to freeze BitMEX servers and to initiate accepting orders on only one side of the market to exacerbate the price move. |
| Wire | 11/14/2018 | Delo (Hong Kong) | BitMEX/ABS (San Francisco) | Computer instruction to test and prepare liquidation engine for deployment and deploy liquidation engine to liquidate trader accounts. |
| Wire | 11/14/2018 | Reed (Wisconsin) | BitMEX/ABS (San Francisco) | Computer instruction to execute orders to capture multiplied (due to disparity in liquidity) manipulation profits caused by the deliberate .BXBT index price move using winner account(s) on BitMEX. |
| Wire | 11/14/2018 | Delo (Hong | BitMEX/ABS | Computer instruction to transfer |

| | | | Kong) | (San Francisco) | trader liquidation proceeds from trader wallets into Insurance Fund bitcoin wallet. |
|---|---|---|---|---|---|
| Wire | 11/14/2018 | Reed (Wisconsin) | BitMEX/ABS (San Francisco) | Computer instruction to electronically transfer (withdraw) funds from winner account(s) into bitcoin wallet. |
| Wire | 11/14/2018 | Hayes (New York) | Bitcoin Network (Cloud) | Instruction for electronically transferring (depositing) bitcoin funds from bitcoin wallet to account on Coinbase exchange. |
| Wire | 11/14/2018 | Hayes (New York) | Coinbase (San Francisco) | Trading orders to convert bitcoin proceeds of market manipulation into United States dollars. |
| Wire | 11/14/2018 | Hayes (New York) | Coinbase (San Francisco) | Instruction for electronically transferring converted U.S. dollar proceeds of market manipulation to bank accounts of HDR Global Trading Limited, ABS Global Trading Limited, Hayes, Delo and Reed. |
| Wire | 11/24/2018 | Hayes (New York) | Delo (Hong Kong) | Directions and specific instructions on which specific orders to place, software scripts to execute and computer commands to issue and how to otherwise manipulate bitcoin market for the benefit of Defendants. |
| Wire | 11/24/2018 | Hayes (New York) | Reed (Wisconsin) | Directions and specific instructions on which specific orders to place, software scripts to execute and computer commands to issue and how to otherwise manipulate bitcoin market for the benefit of Defendants. |
| Wire | 11/24/2018 | Reed (Wisconsin) | BitMEX/ABS (San Francisco) | Trading orders to inject false information as to market forces of supply and demand into cryptocurrency markets and |

Consensus Law
CryptoCurrency
Attorneys

Compl. for Violation of RICO (Demand for Jury Trial)   - 143 -   Dolgov v. HDR et al.   Case No. 3:20-cv-7140

| | | | | |
|---|---|---|---|---|
| | | | | mislead traders to open unfavorable trading positions to be subsequently liquidated, see paragraphs 142-144, 153, 317-330. |
| Wire | 11/24/2018 | Reed (Wisconsin) | Kraken (San Francisco) | Trading orders to inject false information as to market forces of supply and demand into cryptocurrency markets and mislead traders to open unfavorable trading positions to be subsequently liquidated, see paragraphs 142-144, 153, 317-330. |
| Wire | 11/24/2018 | Reed (Wisconsin) | Bitcoin Network (Cloud) | Instruction for electronically transferring (depositing) bitcoin funds to be used for manipulation into a helper account on Kraken. |
| Wire | 11/24/2018 | Reed (Wisconsin) | Kraken (San Francisco) | Electronic computer instruction to execute large market trading order o BTC/USD order book from helper account with maximum slippage to deliberately move BitMEX's .BXBT index price. |
| Wire | 11/25/2018 | Reed (Wisconsin) | BitMEX/ABS (San Francisco) | Computer instruction to execute server freeze application to freeze BitMEX servers and to initiate accepting orders on only one side of the market to exacerbate the price move. |
| Wire | 11/25/2018 | Delo (Hong Kong) | BitMEX/ABS (San Francisco) | Computer instruction to test and prepare liquidation engine for deployment and deploy liquidation engine to liquidate trader accounts. |
| Wire | 11/25/2018 | Reed (Wisconsin) | BitMEX/ABS (San Francisco) | Computer instruction to execute orders to capture multiplied (due to disparity in liquidity) manipulation profits caused by the deliberate .BXBT index price move using winner account(s) on |

| | | | | BitMEX. |
|---|---|---|---|---|
| Wire | 11/25/2018 | Delo (Hong Kong) | BitMEX/ABS (San Francisco) | Computer instruction to transfer trader liquidation proceeds from trader wallets into Insurance Fund bitcoin wallet. |
| Wire | 11/25/2018 | Reed (Wisconsin) | BitMEX/ABS (San Francisco) | Computer instruction to electronically transfer (withdraw) funds from winner account(s) into bitcoin wallet. |
| Wire | 11/25/2018 | Hayes (New York) | Bitcoin Network (Cloud) | Instruction for electronically transferring (depositing) bitcoin funds from bitcoin wallet to account on Coinbase exchange. |
| Wire | 11/25/2018 | Hayes (New York) | Coinbase (San Francisco) | Trading orders to convert bitcoin proceeds of market manipulation into United States dollars. |
| Wire | 11/25/2018 | Hayes (New York) | Coinbase (San Francisco) | Instruction for electronically transferring converted U.S. dollar proceeds of market manipulation to bank accounts of HDR Global Trading Limited, ABS Global Trading Limited, Hayes, Delo and Reed. |
| Wire | 5/16/2019 | Reed (Wisconsin) | BitMEX/ABS (San Francisco) | Trading orders to inject false information as to market forces of supply and demand into cryptocurrency markets and mislead traders to open unfavorable trading positions to be subsequently liquidated, see paragraphs 142-144, 153, 317-330. |
| Wire | 5/16/2019 | Reed (Wisconsin) | BitStamp (Denver) | Trading orders to inject false information as to market forces of supply and demand into cryptocurrency markets and mislead traders to open unfavorable trading positions to be subsequently liquidated, see paragraphs 142-144, 153, 317-330. |

| Wire | 5/16/2019 | Reed (Wisconsin) | Bitcoin Network (Cloud) | Instruction for electronically transferring (depositing) bitcoin funds to be used for manipulation into a helper account on BitStamp. |
|------|-----------|------------------|-------------------------|--------------------------------|
| Wire | 5/17/2019 | Reed (Wisconsin) | BitStamp (Denver) | Electronic computer instruction to execute large market trading order on BTC/USD order book from helper account with maximum slippage to deliberately move BitMEX .BXBT index price. |
| Wire | 5/17/2019 | Reed (Wisconsin) | BitMEX/ABS (San Francisco) | Computer instruction to execute server freeze application to freeze BitMEX servers and to initiate accepting orders on only one side of the market to exacerbate the price move. |
| Wire | 5/17/2019 | Delo (Hong Kong) | BitMEX/ABS (San Francisco) | Computer instruction to test and prepare liquidation engine for deployment and deploy liquidation engine to liquidate trader accounts. |
| Wire | 5/17/2019 | Reed (Wisconsin) | BitMEX/ABS (San Francisco) | Computer instruction to executed orders to capture multiplied (due to disparity in liquidity) manipulation profits caused by the deliberate .BXBT index price move using winner account(s) on BitMEX. |
| Wire | 5/17/2019 | Reed (Wisconsin) | BitMEX/ABS (San Francisco) | Computer instruction to electronically transfer (withdraw) funds from winner account(s) into bitcoin wallet. |
| Wire | 5/17/2019 | Delo (Hong Kong) | BitMEX/ABS (San Francisco) | Computer instruction to transfer trader liquidation proceeds from trader wallets into Insurance Fund bitcoin wallet. |
| Wire | 5/17/2019 | Hayes (New York) | Bitcoin Network (Cloud) | Instruction for electronically transferring (depositing) bitcoin funds from bitcoin wallet to |

| | | | | account on Coinbase exchange. |
|---|---|---|---|---|
| Wire | 5/17/2019 | Hayes (New York) | Coinbase (San Francisco) | Trading orders to convert bitcoin proceeds of market manipulation into United States dollars. |
| Wire | 5/17/2019 | Hayes (New York) | Coinbase (San Francisco) | Instruction for electronically transferring converted U.S. dollar proceeds of market manipulation to bank accounts of HDR Global Trading Limited, ABS Global Trading Limited, Hayes, Delo and Reed. |
| Wire | 7/3/2019 | Reed (Wisconsin) | Coinbase (San Francisco) | Electronic wire transfer instructions for transferring $900,000 of converted proceeds of money laundering to Vilas Title Service Inc., 133 E Division St, Eagle River, WI 54521, United States. |
| Wire | 7/3/2019 | Reed (Wisconsin) | Vilas Title Service Inc., 133 E Division St, Eagle River, WI 54521, United States | Electronic escrow instructions for reinvesting $900,000 of converted proceeds of money laundering into Real Estate Property 1. |
| Wire | 7/3/2019 | Barbara Reed (Wisconsin) | Reed (Wisconsin) | Instructions how to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of unlawful activity taking place on BitMEX platform using real estate investments in Wisconsin. |
| Wire | 7/3/2019 | Trace L.Reed (Wisconsin) | Reed (Wisconsin) | Instructions how to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of unlawful activity taking place on BitMEX platform using real estate investments in Wisconsin. |
| Wire | 7/14/2019 | Reed (Wisconsin) | BitMEX/ABS (San Francisco) | Trading orders to inject false information as to market forces of supply and demand into |

| | | | | |
|---|---|---|---|---|
| | | | | cryptocurrency markets and mislead traders to open unfavorable trading positions to be subsequently liquidated, see paragraphs 142-144, 153, 317-330. |
| Wire | 7/14/2019 | Reed (Wisconsin) | BitStamp (Denver) | Trading orders to inject false information as to market forces of supply and demand into cryptocurrency markets and mislead traders to open unfavorable trading positions to be subsequently liquidated, see paragraphs 142-144, 153, 317-330. |
| Wire | 7/14/2019 | Reed (Wisconsin) | Bitcoin Network (Cloud) | Instruction for electronically transferring (depositing) ether funds to be used for manipulation into a helper account on BitStamp. |
| Wire | 7/14/2019 | Reed (Wisconsin) | BitStamp (Denver) | Electronic computer instruction to execute large market trading order on ETH/USD order book from helper account with maximum slippage to deliberately move BitMEX .BETH index price. |
| Wire | 7/14/2019 | Reed (Wisconsin) | BitMEX/ABS (San Francisco) | Computer instruction to execute server freeze application to freeze BitMEX servers and to initiate accepting orders on only one side of the market to exacerbate the price move. |
| Wire | 7/14/2019 | Delo (Hong Kong) | BitMEX/ABS (San Francisco) | Computer instruction to test and prepare liquidation engine for deployment and deploy liquidation engine to liquidate trader accounts. |
| Wire | 7/14/2019 | Reed (Wisconsin) | BitMEX/ABS (San Francisco) | Computer instruction to executed orders to capture multiplied (due to disparity in liquidity) manipulation profits caused by |

| | | | | |
|---|---|---|---|---|
| | | | | the deliberate index price move using winner account(s) on BitMEX. |
| Wire | 7/14/2019 | Delo (Hong Kong) | BitMEX/ABS (San Francisco) | Computer instruction to transfer trader liquidation proceeds from trader wallets into Insurance Fund bitcoin wallet. |
| Wire | 7/14/2019 | Reed (Wisconsin) | BitMEX/ABS (San Francisco) | Computer instruction to electronically transfer (withdraw) funds from winner account(s) into bitcoin wallet. |
| Wire | 7/14/2019 | Hayes (New York) | Bitcoin Network (Cloud) | Instruction for electronically transferring (depositing) bitcoin funds from bitcoin wallet to account on Coinbase exchange. |
| Wire | 7/14/2019 | Hayes (New York) | Coinbase (San Francisco) | Trading orders to convert bitcoin proceeds of market manipulation into United States dollars. |
| Wire | 7/14/2019 | Hayes (New York) | Coinbase (San Francisco) | Instruction for electronically transferring converted U.S. dollar proceeds of market manipulation to bank accounts of HDR Global Trading Limited, ABS Global Trading Limited, Hayes, Delo and Reed. |
| Wire | 8/16/2019 | Reed (Wisconsin) | Coinbase (San Francisco) | Electronic wire transfer instructions for transferring $1,425,000 of converted proceeds of market manipulation to Ligris + Associates, 399 Boylston St f7, Boston, MA 02116, United States. |
| Wire | 8/16/2019 | Reed (Wisconsin) | Ligris + Associates, 399 Boylston St f7, Boston, MA 02116, United States | Electronic escrow instructions for reinvesting $1,425,000 of converted proceeds of money laundering into Real Estate Property 2. |
| Wire | 08/29/2019 | Agata Reed (Massachusetts) | Secretary of the State of | Order to form Grape Park LLC and to add an officer Agata Maria |

| | | | Delaware | Reed with the purpose to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of unlawful activity taking place on BitMEX platform using real estate investments in Massachusetts. |
|---|---|---|---|---|
| Wire | 11/20/2019 | Reed (Wisconsin) | Agata Reed (Massachusetts) | Instructions to form Grape Park LLC in Massachusetts, a branch of Defendant Grape Park LLC, with the purpose to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of unlawful activity taking place on BitMEX platform using real estate investments in Massachusetts. |
| Wire | 11/20/2019 | Agata Reed (Massachusetts) | Secretary of the Commonwealth of Massachusetts | Order to form Grape Park LLC and to add an officer Agata Maria Reed with the purpose to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of unlawful activity taking place on BitMEX platform using real estate investments in Massachusetts. |
| Wire | 3/12/2020 | Hayes (New York) | Reed (Wisconsin) | Direction to take BitMEX platform offline to liquidate traders while avoiding tapping into Insurance Fund. |
| Wire | 3/12/2020 | Reed (Wisconsin) | Site Reliability Engineers Jerry Aldrich, Scott H. and Armando Cerna (San Francisco) | Instruction to take BitMEX platform offline to liquidate traders while avoiding tapping into Insurance Fund. |

364.   Plaintiff Dolgov is informed and believes and thereon alleges that the electronic

wire transmission alleged in the previous Paragraph were repeated by Defendants, almost exactly,

during other Manipulation Times.

365.    Additional and other facts regarding Defendants' fraudulent wire communications are hidden from Plaintiff at this time.  Such information is uniquely within Defendants' possession, custody and control.  To date, Defendants provided absolutely no discovery to Plaintiff what so ever, despite being served with multiple discovery requests, which Defendants stonewalled.  Plaintiff accordingly reserves the right to supplement and amend these allegations of Defendants' fraudulent wire communications, if appropriate or necessary, following completion of relevant fact discovery.

## MARKET MANIPULATION EVENT ON AUGUST 2, 2020 AND DELETION OF EVIDENCE THEREOF BY DEFENDANTS

366.    Bitcoin suffered a price drop of $1,500 within few minutes on Sunday, August 2, 2020. The sudden slide caught many traders off guard, liquidating nearly $1.4 billion worth of positions across major exchanges.  The price drop triggered $144 million worth of sell liquidations or forced closure of long positions on BitMEX.

367.    Shortly after the crash, on August 2, 2020, at 8:44PM EDT, a brand new account suddenly popped up on the number one spot on the BitMEX Leaderboard showing nearly $120,000,000 in profit.  Plaintiff Dolgov is informed and believes and thereon alleges that the aforesaid Leaderboard account was the winner account of Defendants Hayes, Delo and Reed, which was used by said Defendants to capture the manipulation winnings induced by said Defendants placing large market orders with maximum slippage from helper accounts on United States based exchanges Kraken, Coinbase Pro and Kraken to deliberately move the .BXBT index price, which resulted in the aforesaid August 2, 2020, $1,500 bitcoin price crash and the $144 million worth of sell liquidations of BitMEX Perpetual Swap contracts, which are priced based on the aforesaid .BXBT index price manipulated by Defendants.

368.    The aforesaid evidence of the winner manipulation account on BitMEX was deleted by Defendants just one hour later, at 9:45PM EDT.  Plaintiff Dolgov is informed and believes and thereon alleges that the aforesaid Leaderboard account was accidentally listed on the

BitMEX Leaderboard and then, upon discovery, immediately deleted by Defendants, who tried to cover up their market manipulation acts and destroy relevant evidence.  Plaintiff Dolgov is



**Bitcoin Market Manipulation Event On August 2, 2020.  Perpetrators Crashed Bitcoin Price By $1,500 In Minutes Resulting in $150,000,000 Liquidations Of Trader Positions on BitMEX**

*Bitcoin prices, August 2, 2020.*

## Leaderboard

The following shows some of the most profitable traders on BitMEX.
These lists are anonymous. Each name always represents the same user, but is not personally identifiable.

### Top 25 Traders by Notional

**Winner Account With $120,000,000 Manipulation Profit Popped up at 8:44PM EDT**

| Rank | Name | Profit | Is Real Name |
|---|---|---|---|
| 1 | Rainbow-Narrow-Rider | 11,246.8487 XBT | ✖ |
| 2 | Mercury-Wood-Sprite | 8,179.7823 XBT | ✖ |
| 3 | Quick-Grove-Mind | 8,047.8158 XBT | ✖ |
| 4 | Heavy-Autumn-Wolf | 7,574.4154 XBT | ✖ |
| 5 | Alameda Research | 5,244.5830 XBT | ✔ |
| 6 | Hot-Relic-Fancier | 4,216.5159 XBT | ✖ |
| 7 | coincidentcapitalltd | 2,610.2783 XBT | ✔ |
| 8 | Skitter-Peridot-Raven | 2,345.7226 XBT | ✖ |
| 9 | Honeysuckle-South-Rib | 2,110.4027 XBT | ✖ |
| 10 | CSW is a fraud | 2,086.7229 XBT | ✔ |

$120,000,000

**Evidence of the Winner Account With Manipulation Profit Was Deleted 1hr Later at 9:45PM EDT**

## Leaderboard

The following shows some of the most profitable traders on BitMEX.
These lists are anonymous. Each name always represents the same user, but is not personally identifiable.

### Top 25 Traders by Notional

| Rank | Name | Profit | Is Real Name |
|---|---|---|---|
| 1 | Mercury-Wood-Sprite | 8,179.7823 XBT | ✖ |
| 2 | Quick-Grove-Mind | 8,047.8158 XBT | ✖ |
| 3 | Heavy-Autumn-Wolf | 7,574.4154 XBT | ✖ |
| 4 | Alameda Research | 5,244.5830 XBT | ✔ |
| 5 | Hot-Relic-Fancier | 4,216.5159 XBT | ✖ |

informed and believes and thereon alleges that the aforesaid amount of $120,000,000 in the winner account was Defendants' profit from perpetrating the aforesaid bitcoin market manipulation event of August 2, 2020.

369.    Plaintiff Dolgov is informed and believes and thereon alleges that the second highest ranked BitMEX Leaderboard account Quick-Grove-Mind with almost $100,000,000 profit is also a manipulation winner account of the Defendants that was used to capture market manipulation profits.  The multimillion-dollar profit gains in that account exactly match the



known bitcoin market manipulation events that took place on or about September 24, 2019, November 18-19, 2019 and March 11-12, 2020, when the .BXBT index price of bitcoin was manipulated by Defendants by placing large sell market orders on United States based Kraken,

Coinbase Pro and BitStamp exchanges, the pricing data from which is used in the .BXBT index calculation, based on which the BitMEX Perpetual Swap contract traded by Plaintiff is priced, in order to intentionally liquidate BitMEX retail traders, including Plaintiff.  Notably, this account also miraculously avoided any and all trading losses, posting only multimillion-dollar gains.

### COUNT I
**(Conduct Of Or Participation In The Conduct Of Enterprise's Affairs Through A Pattern Of Racketeering Activity In Violation Of 18 U.S.C. § 1962(c))**

370.    Plaintiff Dolgov incorporates the allegations set forth in Paragraphs 1-369 above as if fully set forth herein.

371.    This Count is against Defendants HDR, ABS, Grape Park, Mark Sweep, Unknown Exchange, Hayes, Delo, Reed, Agata Reed, Barbara Reed and Trace Reed (the "Count I Defendants").

372.    During Relevant Period, Enterprise engaged in activities that affect interstate commerce. The Count I Defendants are employed by or associated with the Enterprise.

373.    The Count I Defendants agreed to and did conduct and participate in the conduct of the Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff Dolgov as well as other cryptocurrency traders and misappropriating their cryptocurrency holdings as well as the Purposes alleged above. Specifically, Count I Defendants engaged in continuous pattern of racketeering activity involving, among other unlawful acts, operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), money laundering in violation of 18 U.S.C. § 1956(a), monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957(a), wire fraud in violation 18 U.S.C. § 1343, interstate transportation of stolen property in violation 18 U.S.C. § 2314 and interstate and foreign travel or transportation in aid of racketeering enterprise in violation of 18 U.S.C. § 1952.  The alleged acts were perpetrated by Count I Defendants during Relevant Period on a daily basis, including during each of the Manipulation Times alleged in Paragraph 353, and continue to take place.

374.    Pursuant to and in furtherance of their fraudulent scheme, Count I Defendants

committed multiple related acts of operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), money laundering in violation of 18 U.S.C. § 1956(a), engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957(a), wire fraud in violation 18 U.S.C. § 1343, interstate transportation of stolen property in violation 18 U.S.C. § 2314 and interstate and foreign travel or transportation in aid of racketeering enterprise in violation of 18 U.S.C. § 1952.

375.    The acts of operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), money laundering in violation of 18 U.S.C. § 1956(a), engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957(a), wire fraud in violation 18 U.S.C. § 1343, interstate transportation of stolen property in violation 18 U.S.C. § 2314 and interstate and foreign travel or transportation in aid of racketeering enterprise in violation of 18 U.S.C. § 1952 set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

376.    Plaintiff Dolgov is informed and believes and thereon alleges that Defendants, and each of them, took part in directing the affairs of the alleged Enterprise by engaging in a continuing pattern of racketeering activity involving, among other unlawful acts, operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), money laundering in violation of 18 U.S.C. § 1956(a), engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957(a), wire fraud in violation 18 U.S.C. § 1343, interstate transportation of stolen property in violation 18 U.S.C. § 2314 and interstate and foreign travel or transportation in aid of racketeering enterprise in violation of 18 U.S.C. § 1952.

377.    The Count I Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

378.    Plaintiff Dolgov is informed and believes and thereon alleges that Count I Defendants, and each of them, (1) gave or took directions; (2) occupied a position in the "chain of

command" through which the affairs of the Enterprise are conducted; (3) knowingly implemented decisions of upper management; and (4) were indispensable to the achievement of the alleged Enterprise's goals.

379.    Plaintiff Dolgov is informed and believes and thereon alleges that Count I Defendants, and each of them, conducted or participated in the conduct of the affairs of the alleged Enterprise engaging in a continuing pattern of racketeering activity involving, among other unlawful acts, operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), money laundering in violation of 18 U.S.C. § 1956(a), engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957(a), wire fraud in violation 18 U.S.C. § 1343, interstate transportation of stolen property in violation 18 U.S.C. § 2314 and interstate and foreign travel or transportation in aid of racketeering enterprise in violation of 18 U.S.C. § 1952.

380.    Plaintiff Dolgov is informed and believes and thereon alleges that Defendants, and each of them, participated in a pattern of racketeering activity, which included at least two acts of racketeering activity including, without limitation, at least two acts of operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), at least two acts of money laundering in violation of 18 U.S.C. § 1956, at least two acts of engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957, at least two acts of wire fraud in violation of 18 U.S.C. § 1343, at least two acts of interstate transportation of stolen property in violation 18 U.S.C. § 2314 and at least two acts of interstate and foreign travel or transportation in aid of racketeering enterprise in violation of 18 U.S.C. § 1952.   Count I Defendants, and each of them, committed the alleged predicate offenses as a part of conducting or participating in the Enterprise, and, therefore, is liable for the violation of the RICO, 18 U.S.C. § 1964(c).

381.    As a direct and proximate result of the Count I Defendants', and each of them, conduct of or participation in the long-running Enterprise, within the meaning of 18 U.S.C. § 1961(4), engaging in the continuing pattern of racketeering activity involving, among other

unlawful acts, operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), money laundering in violation of 18 U.S.C. § 1956(a), engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957(a), wire fraud in violation 18 U.S.C. § 1343, interstate transportation of stolen property in violation 18 U.S.C. § 2314 and interstate and foreign travel or transportation in aid of racketeering enterprise in violation of 18 U.S.C. § 1952, Plaintiff Dolgov have been domestically injured in its business and property in the amount to be proven at trial.

382.   As an example, Plaintiff Dolgov sustained a domestic loss of at least 3.93 bitcoins, on a domestic United States based cryptocurrency exchange BitMEX, on or about November 25, 2018, due to a liquidation cascade, when XBTUSD Swap position that Plaintiff Dolgov directly and personally purchased and owned was liquidated.  Plaintiff Dolgov is informed and believes and thereon alleges that this liquidation cascade and this loss was directly and proximately caused by an act of money laundering in violation of 18 U.S.C. §§ 1956 and 1957 perpetrated by Defendants themselves, who acted in accordance with their individual roles alleged in Paragraph 359, according to a general scheme alleged in Paragraphs 5-11, 356, 363 and involving helper account(s) and winner account(s), which further constituted an act of unlicensed effective transmissions of funds, representing market manipulation winnings, from helper account(s) to winner account(s), which Count I Defendants willfully and deliberately caused with full knowledge of the nature and purpose of the funds involved in the transfer, in violation 18 U.S.C. § 1960(a), 18 U.S.C. § 1957(a), 18 U.S.C. § 1952 and 18 U.S.C. § 1956(a) and 18 U.S.C. § 2314, in a manner alleged hereinabove.

383.   As another example, Plaintiff Dolgov sustained a domestic loss of at least 0.27 bitcoins, on a domestic United States based cryptocurrency exchange BitMEX, on or about November 15, 2018, due to a liquidation cascade, when XBTUSD Swap position that Plaintiff Dolgov directly and personally purchased and owned was liquidated or closed.  Plaintiff Dolgov is informed and believes and thereon alleges that this liquidation cascade and this loss was directly and proximately caused by an act of money laundering in violation of 18 U.S.C. §§ 1956

and 1957 perpetrated by Defendants themselves, who acted in accordance with their individual roles alleged in Paragraph 359, according to a general scheme alleged in Paragraphs 5-11, 356, 363 and involving helper account(s) and winner account(s), which further constituted an act of unlicensed effective transmissions of funds, representing market manipulation winnings, from helper account(s) to winner account(s), which Count I Defendants willfully and deliberately caused with full knowledge of the nature and purpose of the funds involved in the transfer, in violation 18 U.S.C. § 1960(a), 18 U.S.C. § 1957(a), 18 U.S.C. § 1952 and 18 U.S.C. § 1956(a) and 18 U.S.C. § 2314, in a manner alleged hereinabove.

384.    The aforesaid amounts constitute concrete financial losses of Plaintiff Dolgov. Absent Defendants' effective transmissions of funds alleged above, these losses would not have taken place.

385.    Count I Defendants' effective transmissions of funds, alleged above, were conducted by Count I Defendants through the same commercial website BitMEX.com, which was and is being extensively used by residents of the United States and this District.  Therefore, Count I Defendants' effective transmissions of funds, which injured Plaintiff, were directly related to the Count I Defendants' contacts with the United States and this District.

386.    Because the vast majority of BitMEX personnel, as alleged in Paragraph 100, almost the entire engineering team (all but six) as well as all three Site Reliability Engineers, as alleged in Paragraph 101, and almost all vital external service providers to BitMEX, as alleged in Paragraph 83, are located in this District, and because Defendant ABS, which formally employs this personnel is an alter ego of Defendant HDR, this District is the home base of the largest operation of Defendant DHR, the nerve center of the operation of the BitMEX platform, and it is the location where the illegal acts and the resulting injuries as alleged herein took place. Specifically, Plaintiff Dolgov is informed and believes and thereon alleges that three Site Reliability Engineers Jerry Aldrich, Scott H. and Armando Cerna personally caused, from within this District, BitMEX servers to freeze during manipulation times, on the direction received from Defendant Reed, who was located in Wisconsin.

387.    In addition, Defendant HDR as well its California alter ego Defendant ABS is a single enterprise with extensive presence in this District (over 80 employees).  Moreover, the alleged illegal acts were all performed on servers and other IT infrastructure owned and operated by United States based Amazon EKS with offices in this District. Furthermore, the helper accounts that were vital for Defendants and other perpetrators to manipulate the prices of cryptocurrencies and cryptocurrency derivatives in violation of CEA and to launder funds in violation of 18 U.S.C. § 1956(a), as alleged in this Complaint, were all maintained on United States based cryptocurrency spot exchanges BitStamp, Kraken and Coinbase Pro, two of which are located in the District.  Defendants transferred funds to and from those vital United States based accounts in order to conduct the affairs of the Enterprise.

388.    Therefore, Count I Defendants, and each of them, are liable, jointly and severally, to Plaintiff Dolgov under 18 U.S.C. §1964(c) for the violation of the RICO, 18 U.S.C. §1962(c) in the amount of triple of Plaintiff Dolgov's losses to be proven at trial.

## COUNT II
### (Conspiracy To Conduct Or Participate In The Conduct Of Enterprise's Affairs Through A Pattern Of Racketeering Activity In Violation Of 18 U.S.C. § 1962(d))

389.    Plaintiff Dolgov incorporates the allegations set forth in Paragraphs 1-388 above as if fully set forth herein.

390.    This Count is against Defendants HDR, ABS, Grape Park, Mark Sweep, Unknown Exchange, Hayes, Delo, Reed, Agata Reed, Barbara Reed and Trace Reed (the "Count II Defendants").

391.    As set forth above, the Count II Defendants agreed and conspired to violate 18 U.S.C. § 1962(a) (b) and (c).  Specifically, Count II Defendants conspired to: (1) use or invest income that is derived from a pattern of racketeering activity alleged hereinabove in the interstate Enterprise (18 U.S.C. § 1962(a)); (2) acquire or maintain interests in the Enterprise through a pattern of racketeering activity alleged hereinabove (18 U.S.C. § 1962(b)); and (3) conduct and participate in the conduct of the affairs of the Enterprise through a pattern of racketeering activity alleged hereinabove (18 U.S.C. § 1962(c)).

392.     The Count II Defendants have intentionally conspired and agreed to directly and indirectly use or invest income that is derived from a pattern of racketeering activity in an interstate enterprise, acquire or maintain interests in the enterprise through a pattern of racketeering activity alleged hereinabove, and conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity alleged hereinabove. The Count II Defendants knew that their predicate acts were part of a pattern of racketeering activity alleged hereinabove and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C.A. § 1962(a), (b) and (c), in violation of 18 U.S.C. § 1962(d).

393.     Plaintiff Dolgov is informed and believes and thereon alleges that Count II Defendants, and each of them, intended to further the operation of an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a).

394.     Plaintiff Dolgov is informed and believes and thereon alleges that Count II Defendants, and each of them, intended to further the money laundering endeavor in violation of 18 U.S.C. § 1956.

395.     Plaintiff Dolgov is informed and believes and thereon alleges that Count II Defendants, and each of them, intended to further the transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957.

396.     Plaintiff Dolgov is informed and believes and thereon alleges that Count II Defendants, and each of them, intended to further the wire fraud in violation of 18 U.S.C. § 1343.

397.     Plaintiff Dolgov is informed and believes and thereon alleges that Count II Defendants, and each of them, intended to further the interstate transportation of stolen property in violation of 18 U.S.C. § 2314.

398.     Plaintiff Dolgov is informed and believes and thereon alleges that Count II Defendants, and each of them, intended to further the interstate and foreign travel or transportation in aid of racketeering enterprise in violation of 18 U.S.C. § 1952.

399.     Plaintiff Dolgov is informed and believes and thereon alleges that Count II

Consensus Law
CryptoCurrency
Attorneys

Compl. for Violation of RICO (Demand for Jury Trial)   - 160 -   Dolgov v. HDR et al.   Case No. 3:20-cv-7140

Defendants, and each of them, have been aware of the essential nature and scope of the alleged Enterprise and intended to participate in it.

400. Plaintiff Dolgov is informed and believes and thereon alleges that Count II Defendants, and each of them, agreed to commit, or participate in, the violation of two predicate offenses, namely at least two acts of operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), at least two acts of money laundering in violation of 18 U.S.C. § 1956, at least two acts of engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957, at least two acts of wire fraud in violation of 18 U.S.C. § 1343, at least two acts of interstate transportation of stolen property in violation 18 U.S.C. § 2314 and at least two acts of interstate and foreign travel or transportation in aid of racketeering enterprise in violation of 18 U.S.C. § 1952.

401. In addition, in furtherance of the alleged conspiracy, and to achieve its purposes, the Defendants committed and caused to be committed the following acts, among others, alleged in this Complaint, in this District and elsewhere: 1) providing traders with extremely high trading leverage (up to 100x); 2) deliberately using .BXBT index price for highly liquid derivatives calculated based on prices of two or three illiquid spot exchanges; 3) enabling manipulators and money launderers to avoid detection by providing them with the ability to open unlimited number of anonymous document check-free trading accounts without any trading and withdrawal limits; 4) weaponizing deliberate server freezes, using fraudulent "system overload" events to accept some trading orders and reject others during large market moves to exacerbate price fluctuations and cause the most liquidations; and 5) regularly manipulating price of cryptocurrencies including, without limitation, bitcoin, by executing large market orders on illiquid spot exchanges in order to cause massive liquidations in traders' derivatives positions on BitMEX.

402. As direct and proximate result of the Count II Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiff Dolgov have been injured in his business and property in the amount to be proven at trial.

403. As a proximate result of the Count II Defendants', and each of them, conspiracy to

conduct or participate in the long-running Enterprise, within the meaning of 18 U.S.C. § 1961(4), engaging in the continuing pattern of racketeering activity involving, among other unlawful acts, at least two acts of operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), at least two acts of money laundering in violation of 18 U.S.C. § 1956, at least two acts of engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957, at least two acts of wire fraud in violation of 18 U.S.C. § 1343, at least two acts of interstate and foreign travel or transportation in aid of racketeering enterprise in violation of 18 U.S.C. § 1952, at least two acts of interstate transportation of stolen property in violation 18 U.S.C. § 2314 and at least two acts as alleged in Paragraphs 317-326 and 353-365, Plaintiff Dolgov sustained concrete and certain monetary cryptocurrency trading losses in the amount to be proven at trial.

404.    As an example, Plaintiff Dolgov sustained a domestic loss of at least 3.93 bitcoins, on a domestic United States based cryptocurrency exchange BitMEX, on or about November 25, 2018, due to a liquidation cascade, when XBTUSD Bitcoin Perpetual Swaps position that Plaintiff Dolgov directly and personally purchased and owned was liquidated.  Plaintiff Dolgov is informed and believes and thereon alleges that this liquidation cascade and this loss was directly and proximately caused by an act of money laundering in violation of 18 U.S.C. §§ 1956 and 1957 perpetrated by Defendants themselves, who acted in accordance with their individual roles alleged in Paragraph 361 and according to a general scheme alleged in Paragraphs 5-11, 356, 363 and involving helper account(s) and winner account(s), which further constituted an act of unlicensed effective transmissions of funds, representing market manipulation winnings, from helper account(s) to winner account(s), which Count II Defendants willfully and deliberately caused with full knowledge of the nature and purpose of the funds involved in the transfer, in violation 18 U.S.C. § 1960(a), 18 U.S.C. § 1957(a) and 18 U.S.C. § 1956(a), 18 U.S.C. § 1952 and 18 U.S.C. § 2314, in a manner alleged hereinabove.

405.    As another example, Plaintiff Dolgov sustained a domestic loss of at least 0.27 bitcoins, on a domestic United States based cryptocurrency exchange BitMEX, on or about

November 15, 2018, due to a liquidation cascade, when XBTUSD Bitcoin Perpetual Swaps position that Plaintiff Dolgov directly and personally purchased and owned was liquidated. Plaintiff Dolgov is informed and believes and thereon alleges that this liquidation cascade and this loss was directly and proximately caused by an act of money laundering in violation of 18 U.S.C. §§ 1956 and 1957 perpetrated by Defendants themselves, who acted in accordance with their individual roles alleged in Paragraph 361 and according to a general scheme alleged in Paragraphs 5-11, 356, 363 and involving helper account(s) and winner account(s), which further constituted an act of unlicensed effective transmissions of funds, representing market manipulation winnings, from helper account(s) to winner account(s), which Count II Defendants willfully and deliberately caused with full knowledge of the nature and purpose of the funds involved in the transfer, in violation 18 U.S.C. § 1960(a), 18 U.S.C. § 1957(a) and 18 U.S.C. § 1956(a), 18 U.S.C. § 1952 and 18 U.S.C. § 2314, in a manner alleged hereinabove.

406.    The aforesaid amounts constitute concrete financial losses of Plaintiff Dolgov. Absent Defendants' effective transmissions of funds alleged above, these losses would not have taken place.

407.    Count II Defendants' effective transmissions of funds, alleged above, were conducted by Count II Defendants through the same commercial website BitMEX.com, which was and is being extensively used by residents of the United States and this District.  Therefore, Count II Defendants' effective transmissions of funds, which injured Plaintiff, were directly related to the Count II Defendants' contacts with the United States and this District.

408.    Because the vast majority of BitMEX personnel, as alleged in Paragraph 100, almost the entire engineering team (all but six) as well as all three Site Reliability Engineers, as alleged in Paragraph 101, and almost all vital external service providers to BitMEX, as alleged in Paragraph 83, are located in this District, and because Defendant ABS, which formally employs this personnel is an alter ego of Defendant HDR, this District is the home base of the largest operation of Defendant DHR, the nerve center of the operation of the BitMEX platform, and it is the location where the illegal acts and the resulting injuries as alleged herein took place.  In

addition, Defendant HDR as well its California alter ego Defendant ABS is a single enterprise with extensive presence in this District (over 74 employees).  Specifically, Plaintiff Dolgov is informed and believes and thereon alleges that three Site Reliability Engineers Jerry Aldrich, Scott H. and Armando Cerna personally caused, from within this District, BitMEX servers to freeze during manipulation times, on the direction received from Defendant Reed, who was located in Wisconsin.  Moreover, the alleged illegal acts were all performed on servers and other IT infrastructure owned and operated by United States based Amazon EKS with offices in this District.  Furthermore, the helper accounts that were vital for Defendants and other perpetrators to manipulate the prices of cryptocurrencies and cryptocurrency derivatives in violation of CEA and to launder funds in violation of 18 U.S.C. § 1956(a), as alleged in this Complaint, were all maintained on United States based cryptocurrency spot exchanges BitStamp, Kraken and Coinbase Pro, two of which are located in the District.  Defendants transferred funds to and from those vital United States based accounts in order to conduct the affairs of the Enterprise.

409.    Therefore, Count II Defendants, and each of them, are liable, jointly and severally, to Plaintiff Dolgov under 18 U.S.C. §1964(c) for the violation of the RICO, 18 U.S.C. §1962(d) in the amount of triple of Plaintiff Dolgov's losses to be proven at trial.

### COUNT III
### (Use Of A Manipulative Or Deceptive Device Or Contrivance In Violation Of 7 U.S.C. § 9(1))

410.    Plaintiff Dolgov incorporates the allegations set forth in Paragraphs 1-409 above as if fully set forth herein.

411.    This Count is against Defendants HDR, ABS, Hayes, Delo and Reed (the "Count III Defendants").

412.    Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1), makes it unlawful for "any person, directly or indirectly, to use or employ or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, … any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate." Regulation 180.1 makes it unlawful for "any person, directly or indirectly, in

connections with any swap, or contract of sale of any commodity in interstate commerce, … to intentionally or recklessly: (1) use or employ or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;... (3) engage, or attempt to engage, in any act practice or course of business, which operates or would operate as a fraud or deceit upon any person...."

413.    Count III Defendants, and each of them, intended to affect or acted recklessly with regards to affecting the prices of the bitcoin Perpetual Swap contracts and cash bitcoin and engaged in overt acts in furtherance of their intent.

414.    By the foregoing conduct, Count III Defendants, and each of them, intentionally or recklessly used or employed or attempted to use or employ a manipulative device or artifice to defraud and engaged in or attempted to engage in any act, practice or course of business which operated or would operate as a fraud or deceit upon any person, in violation of Section 6(c)(1) of the CEA and Regulation 180.1.  Allegations of specific acts constituting fraud set forth in Paragraphs 317-326 above are incorporated as if fully set forth herein.

415.    Because the actions of Count III Defendants, and each of them, occurred within the scope of their employment, office, or agency with Defendant HDR, this Defendant is liable as a principal for their violations of Section 6(c)(1) and Regulation 180.1 pursuant to Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2018).

416.    Each and every overt action in furtherance of the attempt to manipulate prices, and each act of manipulation is alleged herein as a separate and distinct violation of Section 6(c)(1) of the CEA and Regulation 180.1.

417.    As direct and proximate result of the Count III Defendants, and each of them, use of a manipulative device or artifice to defraud as alleged herein, in violation of Section 6(c)(1) of the CEA and Regulation 180.1, including, without limitation, pumps and dumps, Barts, liquidation cascades and spoofing perpetrated by Count III Defendants, Plaintiff Dolgov has been domestically injured in its business and property in the amount to be proven at trial.  These acts were an illegitimate part of the supply-demand equation, prevented true price discovery, and caused artificial pricing in the cryptocurrency market.

418.   Plaintiff Dolgov directly traded XBTUSD Swap contracts at the at the time the alleged artificial price existed due to the wrongful conduct of Count III Defendants and each of them.

419.   As an example, Plaintiff Dolgov sustained a domestic loss of at least 3.93 bitcoins, on a domestic United States based cryptocurrency exchange BitMEX, on or about November 25, 2018, when XBTUSD Bitcoin Perpetual Swaps position that Plaintiff Dolgov directly and personally purchased and owned was liquidated by reason of an artificially low price that existed due to a liquidation cascade, which, on information and belief of Plaintiff Dolgov, was directly and proximately caused by Count III Defendants' and each of them use of manipulative or deceptive device or contrivance on that day as alleged in Paragraphs above.  If Defendants did not use the manipulative or deceptive device or contrivance on that day, the artificially low price would not have existed and the liquidation cascade would not have taken place.  In connection with the use of manipulative or deceptive device or contrivance, Defendants acted in accordance with their individual roles alleged in Paragraph 361.

420.   As an example, Plaintiff Dolgov sustained a domestic loss of at least 0.27 bitcoins, on a domestic United States based cryptocurrency exchange BitMEX, on or about November 15, 2018, when XBTUSD Bitcoin Perpetual Swaps position that Plaintiff Dolgov directly and personally purchased and owned was liquidated by reason of an artificially low price that existed due to a liquidation cascade, which, on information and belief of Plaintiff Dolgov, was directly and proximately caused by Count III Defendants' and each of them use of manipulative or deceptive device or contrivance on that day as alleged in Paragraphs above.  If Defendants did not use the manipulative or deceptive device or contrivance on that day, the artificially low price would not have existed and the liquidation cascade would not have taken place.  In connection with the use of manipulative or deceptive device or contrivance, Defendants acted in accordance with their individual roles alleged in Paragraph 361.

421.   The aforesaid amounts constitute concrete financial losses of Plaintiff Dolgov. Absent Defendants' use of manipulative or deceptive device or contrivance alleged above, these

losses would not have taken place.

422.   Count III Defendants' uses of manipulative or deceptive device or contrivance, alleged above, were conducted by Count III Defendants through the same commercial website BitMEX.com, which was and is being extensively used by residents of the United States and this District.  Therefore, Count III Defendants' uses of manipulative or deceptive device or contrivance, which injured Plaintiff, were directly related to the Count III Defendants' contacts with the United States and this District.

423.   Because the vast majority of BitMEX personnel, as alleged in Paragraph 100, almost the entire engineering team (all but six) as well as all three Site Reliability Engineers, as alleged in Paragraph 101, and almost all vital external service providers to BitMEX, as alleged in Paragraph 83, are located in this District, and because Defendant ABS, which formally employs this personnel is an alter ego of Defendant HDR, this District is the home base of the largest operation of Defendant DHR, the nerve center of the operation of the BitMEX platform, and it is the location where the illegal acts and the resulting injuries as alleged herein took place. Specifically, Plaintiff Dolgov is informed and believes and thereon alleges that three Site Reliability Engineers Jerry Aldrich, Scott H. and Armando Cerna personally caused, from within this District, BitMEX servers to freeze during manipulation times, on the direction received from Defendant Reed, who was located in Wisconsin.  Moreover, the alleged illegal acts were all performed on servers and other IT infrastructure owned and operated by United States based Amazon EKS with offices in this District. Specifically, Plaintiff Dolgov is informed and believes and thereon alleges that three Site Reliability Engineers Jerry Aldrich, Scott H. and Armando Cerna personally caused, from within this District, BitMEX servers to freeze during manipulation times, on the direction received from Defendant Reed, who was located in Wisconsin. Furthermore, the helper accounts that were vital for Defendants and other perpetrators to manipulate the prices of cryptocurrencies and cryptocurrency derivatives in violation of CEA and to launder funds in violation of 18 U.S.C. § 1956(a), as alleged in this Complaint, were all maintained on United States based cryptocurrency spot exchanges BitStamp, Kraken and

Coinbase Pro, two of which are located in the District.  Defendants transferred funds to and from those vital United States based accounts in order to conduct the affairs of the Enterprise.

424.    Therefore, Count III Defendants, and each of them, are liable, jointly and severally, to Plaintiff Dolgov under 7 U.S.C. § 25(a) in the amount to be proven at trial.

### COUNT IV
**(Manipulation And Attempted Manipulation Of Bitcoin Swaps And Cash Bitcoin In Violation Of 7 U.S.C. § 9(3) and 7 U.S.C. § 13(a)(2))**

425.    Plaintiff Dolgov incorporates the allegations set forth in Paragraphs 1-424 above as if fully set forth herein.

426.    This Count is against Defendants HDR, ABS, Hayes, Delo and Reed (the "Count IV Defendants").

427.    Section 6(c)(3) of the CEA, 7 U.S.C. § 9(3), makes it unlawful for "any person, directly or indirectly, to manipulate or attempt to manipulate the price of any swap or of any commodity in interstate commerce...."

428.    Section 9(a)(2) of the CEA, 7 U.S.C. § 13(a)(2), makes it unlawful for "[a]ny person to manipulate or attempt to manipulate the price of any commodity in interstate commerce, … or of any swap."

429.    Regulation 180.2 makes it "unlawful for any person, directly or indirectly, to manipulate or attempt to manipulate the price of any swap, or of any commodity in interstate commerce,.."

430.    Count IV Defendants, and each of them, possessed an ability to influence market prices of spot bitcoin and bitcoin derivatives, including Perpetual Swaps.  Specifically, as Count IV Defendants, and each of them, accumulated hundreds of millions of dollars in bitcoin.  With such a large amount of bitcoin available for trading, Count IV Defendants have had and continue to have the ability to move bitcoin market price and the price of Perpetual Swaps very substantially.

431.    Plaintiff Dolgov is informed and believes and thereon alleges that Count IV Defendants, and each of them, acting in furtherance of the manipulative, fraudulent and deceptive

scheme to manipulate the prices of certain cryptocurrency derivatives, including, without limitation, bitcoin future contracts, bitcoin Perpetual Swaps, as well as the cash prices of cryptocurrencies, including, without limitation, cash bitcoin caused an artificial price of spot bitcoin and bitcoin derivatives.  The artificial price was further caused by diminished investor confidence resulting from the abusive market conduct of Count IV Defendants.

432.   Allegations of specific acts constituting fraud set forth in Paragraphs 317-326 above are incorporated as if fully set forth herein.  These acts were an illegitimate part of the supply-demand equation, prevented true price discovery, and caused artificial pricing in the cryptocurrency market.

433.   Plaintiff Dolgov is informed and believes and thereon alleges that Count IV Defendants, and each of them, caused an artificial price of spot bitcoin and bitcoin derivatives in order to trigger a specific price-based market event, such as a liquidation cascade or execution of stop loss orders of other traders.

434.   Plaintiff Dolgov is informed and believes and thereon alleges that Count IV Defendants, and each of them, specifically intended to cause the alleged artificial price of spot bitcoin and bitcoin derivatives in order to trigger a specific price-based market event, such as a liquidation cascade or execution of stop loss orders of other traders.

435.   By the foregoing conduct, Count IV Defendants, and each of them, manipulated or attempted to manipulate the price of a swap and a price of the commodity in interstate commerce underlying such swap, in violation of Sections 6(c)(3) and 9(a)(2) of the CEA and Regulation 180.2.

436.   Because the actions of Count IV Defendants, and each of them, occurred within the scope of their employment, office, or agency with Defendant HDR, and Defendants HDR is liable as a principal for their violations of Sections 6(c)(3) and 9(a)(2) of the CEA and Regulation 180.2 pursuant to Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2018).

437.   Each and every overt action in furtherance of the attempt to manipulate prices, and

each act of manipulation is alleged herein as a separate and distinct violation of Section 6(c)(3) and 9(a)(2) of the CEA and Regulation 180.2.

438.    Plaintiff Dolgov traded (directly or indirectly) the spot bitcoin and/or bitcoin derivatives at the time the alleged artificial price existed due to the wrongful conduct of Count IV Defendants and each of them.

439.    As an example, Plaintiff Dolgov sustained a domestic loss of at least 3.93 bitcoins, on a domestic United States based cryptocurrency exchange BitMEX, on or about November 25, 2018, when XBTUSD Perpetual Swap position that Plaintiff Dolgov directly and personally purchased and owned was liquidated by reason of an artificially low price that existed due to a liquidation cascade, which, on information and belief of Plaintiff Dolgov, was directly and proximately caused by Count IV Defendants' and each of them market manipulation on that day as alleged in Paragraphs above.  If Defendants did not manipulate the market, the artificially low price would not have existed and the liquidation cascade would not have taken place.  In connection with the market manipulation, Defendants acted in accordance with their individual roles alleged in Paragraph 361.

440.    As another example, Plaintiff Dolgov sustained a domestic loss of at least 0.27 bitcoins, on a domestic United States based cryptocurrency exchange BitMEX, on or about November 15, 2018, when XBTUSD Perpetual Swap position that Plaintiff Dolgov directly and personally purchased and owned was liquidated by reason of an artificially low price that existed due to a liquidation cascade, which, on information and belief of Plaintiff Dolgov, was directly and proximately caused by Count IV Defendants' and each of them market manipulation on that day as alleged in Paragraphs above.  If Defendants did not manipulate the market, the artificially low price would not have existed and the liquidation cascade would not have taken place.  In connection with the market manipulation, Defendants acted in accordance with their individual roles alleged in Paragraph 361.

441.    As a proximate result of the Count IV Defendants', and each of them, manipulation or attempted to manipulation of the price of certain cryptocurrency derivatives,

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

including, without limitation, bitcoin swaps, as well as the cash prices of cryptocurrencies, including, without limitation, cash bitcoin, which caused an artificial price of spot bitcoin and bitcoin derivatives, Plaintiff sustained concrete monetary cryptocurrency Domestic Injury in the amount to be proven at trial..

442.    The aforesaid amounts constitute concrete financial losses of Plaintiff Dolgov. Absent Defendants' market manipulation alleged above, these losses would not have taken place.

443.    Count IV Defendants' market manipulation, alleged above, was conducted by Count IV Defendants through the same commercial website BitMEX.com, which was and is being extensively used by residents of the United States and this District.  Therefore, Count IV Defendants' market manipulation, which injured Plaintiff, was directly related to the Count IV Defendants' contacts with the United States and this District.

444.    Because the vast majority of BitMEX personnel, as alleged in Paragraph 100, almost the entire engineering team (all but six) as well as all three Site Reliability Engineers, as alleged in Paragraph 101, and almost all vital external service providers to BitMEX, as alleged in Paragraph 83, are located in this District, and because Defendant ABS, which formally employs this personnel is an alter ego of Defendant HDR, this District is the home base of the largest operation of Defendant DHR, the nerve center of the operation of the BitMEX platform, and it is the location where the illegal acts and the resulting injuries as alleged herein took place. Moreover, the alleged illegal acts were all performed on servers and other IT infrastructure owned and operated by United States based Amazon EKS with offices in this District.  Furthermore, the helper accounts that were vital for Defendants and other perpetrators to manipulate the prices of cryptocurrencies and cryptocurrency derivatives in violation of CEA and to launder funds in violation of 18 U.S.C. § 1956(a), as alleged in this Complaint, were all maintained on United States based cryptocurrency spot exchanges BitStamp, Kraken and Coinbase Pro and Defendants transferred funds to and from those vital United States based accounts in order to conduct the affairs of the Enterprise.

445.    Therefore, Count IV Defendants, and each of them, are liable, jointly and

1  severally, to Plaintiff Dolgov under 7 U.S.C. § 25(a) in the amount to be proven at trial.

2

3  **COUNT V**
**(Principal Agent Liability Under CEA)**

4  446.    Plaintiff Dolgov incorporates the allegations set forth in Paragraphs 1-445 above

5  as if fully set forth herein.

6  447.    This Count is against Defendants HDR, ABS, Hayes, Delo and Reed (the "Count

7  V Defendants").

8  448.    Each Count V Defendant is liable under Section 2(a)(1)(B) of the CEA, 7 U.S.C. §

9  2(a)(1)(B), for the manipulative acts of their agents, representatives, and/or other persons acting

10  for them in the scope of their employment.

11  449.    Plaintiff Dolgov sustained and is entitled to actual damages for the violations of

12  the CEA alleged herein.

13  **COUNT VI**

14  **(Aiding and Abetting Manipulation Of Bitcoin Swaps And Cash Bitcoin In Violation Of 7
U.S.C. § 25(a)(1))**

15  450.    Plaintiff Dolgov incorporates the allegations set forth in Paragraphs 1-449 above

16  as if fully set forth herein.

17  451.    This Count is against Defendants HDR, ABS, Hayes, Delo and Reed (the "Count

18  VI Defendants").

19  452.    Count VI Defendants, and each of them, knowingly aided, abetted, counseled,

20  induced and/or procured the violations of the CEA by Andrianov and unknown third persons as

21  alleged herein.  In addition, Defendant ABS knowingly aided, abetted, counseled, induced and/or

22  procured the violations of the CEA by Defendants HDR, Hayes, Delo and Reed.  Each Count VI

23  Defendant did so with knowledge of other Defendants' and unknown third persons' manipulation

24  of cryptocurrency prices through manipulative trades, and substantially and willfully intended to

25  assist these manipulations to cause artificial prices, during the Relevant Period, in violation of

26  Sections 13 and 22(a)(1) of the CEA, 7 U.S.C. §§ 13c(a) and 25(a)(1).  For example, Defendant

27  HDR knowingly aided and abetted Andrianov and unknown third persons in violation of the CEA

28

by enabling the price manipulators to open unlimited number of anonymous trading accounts on HDR exchange and thereby hindering detection of said manipulation.  Each of the Count VI Defendants HDR, Hayes, Delo, Reed was responsible for implementing this policy on the BitMEX exchange.  Moreover, Defendant HDR knowingly aided and abetted Andrianov and unknown third persons in violation of the CEA by providing high leverage, by deliberately designing BitMEX indexes based on price data for cryptocurrencies from just three exchanges – BitStamp, Kraken and Coinbase Pro, all three of which have way lower liquidity than BitMEX and by using deliberate server freezes and fraudulent "system overloads" events to accept some trading orders and reject others during large market moves in order to exacerbate the artificial prices and increase the number of liquidations to benefit Defendants.  Moreover, Defendant ABS knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA by Defendants HDR, Hayes, Delo and Reed by furnishing to said Defendants software tools designed to cause deliberate server freezes alleged hereinabove using services of at least three Site Reliability Engineers: Jerry Aldrich, Scott H. and Armando Cerna, who created those tools and who all reside in and operate from this District.

453.     As a proximate result of the Count VI Defendants' actions as alleged herein, Plaintiff Dolgov sustained concrete monetary cryptocurrency Domestic Injury in the amount to be proven at trial.

454.     Therefore, Count VI Defendants, and each of them, are liable, jointly and severally, to Plaintiff Dolgov under 7 U.S.C. § 25(a) in the amount to be proven at trial.

### COUNT VII
**(Negligence)**

455.     Plaintiff Dolgov incorporates the allegations set forth in Paragraphs 1-454 above as if fully set forth herein.

456.     This Count is against Defendants HDR, ABS, Hayes, Delo and Reed (the "Count VII Defendants").

457.     California law imposes a duty to prevent purely economic loss to third parties in

financial transactions.  The foundational case on this subject outlines six factors for establishing a duty to protect against economic loss: "[1] the extent to which the transaction was intended to affect the plaintiff, [2] the foreseeability of harm to him, [3] the degree of certainty that the plaintiff suffered injury, [4] the closeness of the connection between the defendant's conduct and the injury suffered, [5] the moral blame attached to the defendant's conduct, and [6] the policy of preventing future harm." *Biakanja v. Irving*, 49 Cal. 2d 647, 650 (1958).

458.     Plaintiff Dolgov traded on BitMEX platform XBTUSD Bitcoin Perpetual Swaps. Plaintiff Dolgov was enticed to trade on BitMEX due to Defendants' own predatory advertising tactics.  Therefore, Count VII Defendants owed a duty to Plaintiff Dolgov to maintain a functional cryptocurrency derivatives marketplace.  *In re Facebook, Inc., IPO Securities and Derivative Litigation*, 986 F. Supp. 2d 428 (S.D.N.Y. 2013) (NASDAQ owed investors a duty to properly process orders).  *Berk v. Coinbase*, Case No. 18-cv-01364-VC, Dkt. 75 (Judge Chhabria held that Coinbase owed duty to its traders to maintain a functional cryptocurrency trading marketplace).

459.     Moreover, Plaintiff Dolgov is informed and believes and thereon alleges that Count VII Defendants, and each of them, specifically intended to affect the prices of the bitcoin Perpetual Swap contracts and cash bitcoin in order to trigger specific market events as alleged above.  For example, Count VII Defendants, and each of them, intended to cause the price of bitcoin Perpetual Swap contracts or cash bitcoin to reach levels that would trigger liquidation cascades and execution of other traders' stop loss orders, as specifically alleged above.  Thus, Count VII Defendants, and each of them, specifically intended to affect traders like Plaintiff Dolgov, by causing their financial ruin by triggering liquidation of their positions or by causing triggering of execution of their stop loss orders.  Moreover, Count VII Defendants, and each of them, specifically intended to financially benefit from the financial ruin of other traders by buying spot bitcoin and bitcoin derivatives at artificially below market prices or by selling spot bitcoin and bitcoin derivatives at artificially above market prices.  In addition, Count VII Defendants, and each of them, specifically intended to financially benefit from the financial ruin of other traders

by liquidating trading positions of such trades by way of inducing artificial price moves and forcibly confiscating their collateral for the benefit of the Insurance Fund.

460. Because of Count VII Defendants', and each of them, specific intent to trigger the alleged market events, financial harm and even ruin to traders like Plaintiff Dolgov was completely and entirely foreseeable to Defendants, and each of them. In fact, it was Defendants', and each of them, specific intent to become unjustly enriched by reason of financially harming or ruining traders like Plaintiff Dolgov.

461. By reason of Count VII Defendants', and each of them, breach of the legal duty to prevent economic harm to traders like Plaintiff Dolgov, imposed by California law, Plaintiff Dolgov sustained ascertainable, concrete and certain monetary trading losses in the amount to be proven at trial.

462. Count VII Defendants', and each of them, conduct, namely unlawful market manipulation alleged above, was specifically intended to cause injury to traders like Plaintiff Dolgov.

463. Count VII Defendants', and each of them, conduct was clearly fraudulent, unlawful and was motivated purely by personal greed. Thus, a high degree of moral blame is attached to the Count VII Defendants', and each of them, intentional spot bitcoin as well as bitcoin derivatives market manipulation activities.

464. The State of California has a strong policy of preventing future harm to traders like Plaintiff Dolgov from unlawful and fraudulent conduct by Count VII Defendants, and each of them.

465. Accordingly, under California law, Count VII Defendants, and each of them, owed a legal duty to prevent economic harm to Plaintiff Dolgov.

466. Count VII Defendants, and each of them, breached the alleged legal duty to prevent economic harm to Plaintiff Dolgov by recklessly or negligently taking offline the BitMEX platform on or about March 13, 2020 and by recklessly or negligently manipulating the prices of spot bitcoin and bitcoin derivatives and thereby causing an economic injury to Plaintiff

Dolgov.

467.    As a factual (but for) and proximate (legal) result of the Count VII Defendants', and each of them, negligent market manipulation activities, Plaintiff Dolgov sustained certain and concrete monetary cryptocurrency trading losses in the amount to be proven at trial.

468.    In addition, Count VII Defendants, and each of them, breached the legal duty to maintain a functional cryptocurrency marketplace by recklessly or negligently taking offline the BitMEX platform on or about March 13, 2020.

469.    As a factual (but for) and proximate (legal) result of the Count VII Defendants', and each of them, breach of the legal duty to maintain a functional cryptocurrency marketplace, Plaintiff Dolgov sustained certain and concrete monetary cryptocurrency trading losses in the amount to be proven at trial.

470.    The aforesaid amount constitutes a certain and concrete financial loss of the Plaintiff Dolgov factually (directly) and legally (proximately) caused by Count VII Defendants', and each of them, unlawful conduct.

## COUNT VIII
### (Fraud)

471.    Plaintiff Dolgov incorporates the allegations set forth in Paragraphs 1-470 above as if fully set forth herein.

472.    This Count is against Defendants HDR, ABS, Hayes, Delo, Reed, Agata Reed, Barbara Reed and Trace Reed (the "Count VIII Defendants").

473.    Pursuant to California law, "fraud may arise from conduct that is designed to mislead, and not only from verbal or written statements." *Tenet Healthsystem Desert, Inc. v. Blue Cross of California* (2016) 245 Cal.App.4th 821, 839 [199 Cal.Rptr.3d 901].

474.    Allegations of specific acts constituting fraud set forth in Paragraphs 317-326 above are incorporated as if fully set forth herein.

475.    Count VIII Defendants', and each of them, market manipulation including, without limitation, pumps and dumps, Barts and spoofing, were the conduct that was specifically designed

to mislead traders like Plaintiff Dolgov.  For example, as alleged hereinabove, pumps and dumps, Barts and spoofing were perpetrated by Count VIII Defendants, and each of them, with the specific purpose of deceiving other market participants as to market-based forces of supply and demand for an asset and enticing unsuspecting traders, or other trading algorithms, to follow the trade and place orders that they would not have otherwise placed.  Moreover, pumps and dumps, Barts and spoofing were intended by Count VIII Defendants, and each of them, to trick other market participants into reacting to an apparent change and imbalance of supply and demand by buying and selling bitcoin Perpetual Swaps at times, prices and quantities that they otherwise would likely not have traded.

476.    Thus, pumps and dumps, Barts and spoofing were examples of the conduct that was specifically designed by Count VIII Defendants, and each of them, to mislead Plaintiff Dolgov as well as other traders.

477.    Plaintiff Dolgov as well as other traders were in fact mislead by Count VIII Defendants', and each of them, manipulative and fraudulent acts intended to mislead and defraud, including, without limitation, by pumps and dumps, Barts and spoofing perpetrated by Count VIII Defendants, and each of them, and placed orders that they would not have otherwise placed.

478.    Plaintiff Dolgov, at the time of the alleged manipulative and fraudulent acts intended to mislead and defraud, which were perpetrated by Count VIII Defendants, and each of them, and at the time Plaintiff Dolgov took the trades herein alleged, was ignorant of the manipulative and fraudulent nature of conduct of the Count VIII Defendants, and each of them, and believed that the market conditions were in fact dictated by market forces of supply and demand.

479.    Plaintiff Dolgov, at the time the alleged manipulative and fraudulent acts intended to mislead and defraud were made by Count VIII Defendants, and each of them, and at the time Plaintiff Dolgov took the actions herein alleged, was ignorant of secret intentions of Count VIII Defendants, and each of them, to mislead and defraud Plaintiff Dolgov and other traders and Plaintiff Dolgov could not, in the exercise of reasonable diligence, have discovered the secret

1   intentions of Count VIII Defendants, and each of them.

2       480.    Had Plaintiff Dolgov known the actual facts, Plaintiff Dolgov would not have
3   taken such alleged actions.

4       481.    If Plaintiff Dolgov had known of the actual intention of Count VIII Defendants,
5   and each of them, Plaintiff Dolgov would not have taken the alleged trades.  Plaintiff Dolgov's
6   reliance on fraudulent and manipulative conduct of Count VIII Defendants, and each of them,
7   was justified because Plaintiff Dolgov rightfully assumed that the market conditions of spot
8   bitcoin and bitcoin derivatives markets were due to the actual market forces of supply and
9   demand.

10      482.    As a proximate result of fraud and deceit perpetrated by Count VIII Defendants,
11  and each of them, and based on the facts herein alleged, Plaintiff Dolgov have been damaged in
12  the amount to be proven at trial.

13      483.    In doing the wrongful acts herein alleged, Count VIII Defendants, and each of
14  them, acted with oppression, fraud, and malice, and Plaintiff Dolgov is entitled to punitive
15  damages in the amount of $50,000,000 pursuant to Cal. Civ. Code § 3294.

## COUNT IX
### (Civil Conspiracy)

18      484.    Plaintiff Dolgov incorporates the allegations set forth in Paragraphs 1-483 above
19  as if fully set forth herein.

20      485.    This Count is against Defendants HDR, ABS, Hayes, Delo, Reed, Agata Reed,
21  Barbara Reed and Trace Reed (the "Count IX Defendants").

22      486.    At some time point during the Relevant Period, Count IX Defendants, and each of
23  them, knowingly and willfully conspired and agreed among themselves to defraud traders by
24  perpetrating a manipulative, fraudulent and deceptive scheme to manipulate the prices of certain
25  cryptocurrency derivatives, including, without limitation, bitcoin swaps, as well as the cash prices
26  of cryptocurrencies, including, without limitation, cash bitcoin.

27      487.    Count IX Defendants, and each of them, did the acts and things hereinabove

28

alleged pursuant to, and in furtherance of, the conspiracy and hereinabove alleged agreement.

488.    Count IX Defendants, and each of them, furthered the alleged conspiracy by cooperation with, or by lending aid and encouragement to, or ratification and adoption of the acts of other Count IX Defendants, and each of them.

489.    Count IX Defendants, and each of them, were fully aware that the other Defendants, and each of them, planned to perpetrate fraud and deceit upon Plaintiff Dolgov as well as other traders.

490.    Count IX Defendants, and each of them, agreed with the other Count IX Defendants, and each of them, and intended that the alleged fraud and deceit be committed upon Plaintiff Dolgov and other traders.

491.    As a proximate result of the fraud and deceit perpetrated by Count IX Defendants, and each of them, and according to the facts herein alleged, Plaintiff Dolgov have been damaged in the amount to be proven at trial.

492.    In doing the wrongful acts herein alleged, Count IX Defendants, and each of them, acted with oppression, fraud, and malice, and Plaintiff Dolgov is entitled to punitive damages in the amount of $50,000,000 pursuant to Cal. Civ. Code § 3294.

## COUNT X
**(Unfair Business Practices In Violation Of Cal. Bus. & Prof. Code §§ 17200 et seq.)**

493.    Plaintiff Dolgov incorporates the allegations set forth in Paragraphs 1-492 above as if fully set forth herein.

494.    This Count is against Defendants HDR, ABS, Grape Park, Mark Sweep, Unknown Exchange, Hayes, Delo, Reed, Agata Reed, Barbara Reed and Trace Reed (the "Count X Defendants").

495.    By reason of Count X Defendants', and each of them, fraudulent, deceptive, unfair, and other wrongful conduct as herein alleged, said Count X Defendants, and each of them, have violated Cal. Bus. & Prof. Code §§ 17200 et seq. by consummating an unlawful, unfair, and fraudulent business practice, designed to deprive Plaintiff Dolgov of his bitcoin holdings.

496.    "The 'unlawful' practices prohibited by Cal. Bus. & Prof. Code §§ 17200 et seq. are any practices forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made. *Watson Labs., Inc. v. Rhone-Poulenc Rorer, Inc.*, (C.D. Cal 2001) 178 F.Supp.2d 1099, 1120; *People v. McKale*, (1979) 25 Cal.3d 626.

497.    Count X Defendants', and each of them, unlawful practices for purposes of Cal. Bus. & Prof. Code §§ 17200 et seq. include, without limitation, the hereinabove-alleged unlawful acts perpetrated by Defendants, and each of them, which violate the following criminal statutes:

a.      18 U.S.C. § 1343 (wire fraud);

b.      18 U.S.C. § 1952 (engaging in interstate and foreign travel or transportation in aid of racketeering enterprise);

c.      18 U.S.C. § 1956(a) (money laundering);

d.      18 U.S.C. § 1957(a) (engaging in monetary transactions in property derived from specified unlawful activity);

e.      18 U.S.C. § 1960(a) (conducting, controlling, managing, supervising, directing, or owning all or part of an unlicensed money transmitting business);

f.      18 U.S.C. § 2314 (interstate transportation of stolen property);

g.      18 U.S.C. § 1962(c) (conducting or participating, directly or indirectly, in the conduct of enterprise's affairs through a pattern of racketeering activity);

h.      18 U.S.C. § 1962(d) (conspiracy to conduct or participate, directly or indirectly, in the conduct of enterprise's affairs through a pattern of racketeering activity);

i.      Cal. Fin. Code § 2152(b) (engaging in unlicensed money transmitting business in California);

j.      31 U.S.C. § 5318(h)(1) (failing to establish an anti-money laundering program at a financial institution);

k.      31 U.S.C. § 5318(l) (failing to implement reasonable procedures to verify the identity of any person seeking to open an account, failing to maintain records of information used to verify a person's identify, and failing to consult lists of known or suspected terrorists or

terrorist organizations);

l.    31 U.S.C. § 5322(a) (criminal violation of Bank Secrecy Act);

m.    31 U.S.C. § 5322(c) (criminal violation of Bank Secrecy Act); and

n.    18 U.S.C. § 371 (conspiracy to commit offense or to defraud United States).

498.    Count X Defendants', and each of them, 'unlawful' practices for purposes of Cal. Bus. & Prof. Code §§ 17200 et seq. further include, without limitation, the hereinabove-alleged unlawful acts perpetrated by Count X Defendants, and each of them, that violate the following civil statutes:

o.    7 U.S.C. § 9(1) (using a manipulative or deceptive device or contrivance in connection with bitcoin Perpetual Swaps and cash bitcoin);

p.    7 U.S.C. § 9(3) (manipulation and attempted manipulation of bitcoin Perpetual Swaps and cash bitcoin);

q.    7 U.S.C. § 13(a)(2) (manipulation and attempted manipulation of bitcoin Perpetual Swaps and cash bitcoin).

r.    7 U.S.C. § 6(a) (2018), or, alternatively, 7 U.S.C. § 4(b) and 17 C.F.R. § 48.3 (2019) (offering, entering into, confirming the execution of, or otherwise dealing in, off-exchange commodity futures transactions);

s.    7 U.S.C. § 6c(b) (2018), and 17 C.F.R. § 32.2 (2019) (offering, entering into, confirming the execution of, or transacting in off- exchange transactions in commodity options);

t.    7 U.S.C. § 6d (2018) (acting as an unregistered FCM);

u.    7 U.S.C. § 7b-3(1) (2018), and 17 C.F.R. § 37.3(a)(1) (2019) (operating a facility for the trading or processing of swaps without being registered as a SEF or as a DCM);

v.    17 C.F.R. § 166.3 (2019) (failing to supervise); and

w.    17 C.F.R. § 42.2 (2019) (failing to comply with applicable provisions of the Bank Secrecy Act).

499.    Allegations of specific acts constituting fraud set forth in Paragraphs 317-326 above are incorporated as if fully set forth herein.  These acts constitute "fraudulent, deceptive,

unfair" acts for purposes of Cal. Bus. & Prof. Code §§ 17200 et seq.

500.     Thus, by reason of the foregoing, Count X Defendants have violated Bus. & Prof. Code §§ 17200 et seq. by consummating an unlawful, unfair, deceptive and fraudulent business practice, designed to deprive Plaintiff Dolgov of his bitcoin holdings.

501.     By reason of the foregoing and as a proximate result of Count X Defendants', and each of them, violation of Cal. Bus. & Prof. Code §§ 17200 et seq. as herein alleged, Plaintiff Dolgov has been damaged in the amount to be proven at trial.

502.     Therefore, Plaintiff Dolgov is entitled to restitution from Count X Defendants, and each of them, in the amount to be proven at trial.

## COUNT XI
### (Unjust Enrichment (Restitution))

503.     Plaintiff Dolgov incorporates the allegations set forth in Paragraphs 1-502 above as if fully set forth herein.

504.     This Count is against Defendants HDR, ABS, Grape Park, Mark Sweep, Unknown Exchange, Hayes, Delo, Reed, Agata Reed, Barbara Reed and Trace Reed (the "Count XI Defendants").

505.     As a result of the unlawful actions of c set forth hereinabove, Count XI Defendants, and each of them, have received a financial benefit at the expense of Plaintiff Dolgov.

506.     Count XI Defendants, and each of them, had knowledge of the alleged benefit.

507.     Count XI Defendants, and each of them, voluntarily accepted and retained the benefit obtained.

508.     For example, Defendants Agata Reed, Barbara Reed and Trace Reed are in possession of two real estate properties located in Lake Tomahawk, WI 54539 and Norwell, MA 02061, with the aggregate market value of over $2,500,000, acquired using funds misappropriated from Plaintiff through market manipulation and laundered by Defendants through the Defendant Unknown Exchange and thir real estate money laundering scheme.

509.     The circumstances render Count XI Defendants' retention of the benefit inequitable unless Count XI Defendants, and each of them, pay to Plaintiff Dolgov the value of the benefit.

510.     Count XI Defendants, and each of them, have been unjustly enriched at the expense of Plaintiff Dolgov.

511.     Plaintiff Dolgov is entitled to damages as a result of Count XI Defendants', and each of them, unjust enrichment, including the disgorgement of all benefits unlawfully obtained by Count XI Defendants, and each of them, from Plaintiff Dolgov.

512.     As a result of the actions of Count XI Defendants, and each of them, set forth hereinabove, Defendants, and each of them, became unjustly enriched, and as a result thereof, Plaintiff Dolgov is entitled to damages in the amount to be proven at trial, which constitutes a certain and concrete financial loss of the Plaintiff Dolgov factually (directly) and legally (proximately) caused by Count XI Defendants, and each of them, unlawful conduct.

## COUNT XII
### (Constructive Trust)

513.     Plaintiff Dolgov incorporates the allegations set forth in Paragraphs 1-512 above as if fully set forth herein.

514.     This Count is against Defendants HDR, ABS, Grape Park, Mark Sweep, Unknown Exchange, Hayes, Delo, Reed, Agata Reed, Barbara Reed and Trace Reed (the "Count XII Defendants").

515.     By reason of the fraudulent and otherwise wrongful manner in which the Count XII Defendants, or any of them, obtained their alleged right, claim or interest in and to the property of Plaintiff Dolgov, Count XII Defendants and each of them, have no legal or equitable right, claim or interest therein, but, instead, Count XII Defendants, and each of them are involuntary trustees holding said property and profits therefrom in constructive trust for Plaintiff Dolgov with the duty to convey the same to Plaintiff Dolgov forthwith.

**COUNT XIII**
**(Accounting)**

516.     Plaintiff Dolgov incorporates the allegations set forth in Paragraphs 1-515 above as if fully set forth herein.

517.     This Count is against Defendants HDR, ABS, Grape Park, Mark Sweep, Unknown Exchange, Hayes, Delo, Reed, Agata Reed, Barbara Reed and Trace Reed (the "Count XIII Defendants").

518.     As a result of the actions of Count XIII Defendants, and each of them, set forth hereinabove, Count XIII Defendants, and each of them, have received money, which is due to Plaintiff Dolgov from Count XIII Defendants, and each of them, as previously alleged.

519.     The amount of money due from Count XIII Defendants to Plaintiff Dolgov is unknown to Plaintiff Dolgov and cannot be ascertained without an accounting of the receipts and disbursements of Count XIII Defendants, and each of them, in connection with the alleged unlawful market manipulation by Count XIII Defendants.

520.     Plaintiff Dolgov has demanded an accounting of the aforementioned receipts and disbursements of Count XIII Defendants, and each of them, in connection with the alleged unlawful market manipulation and payment of the amount found due, but Count XIII Defendants, and each of them, have failed and refused, and continue to fail and refuse, to render such an accounting and to pay such sum.

**COUNT XIV**
**(Conversion)**

521.     Plaintiff Dolgov incorporates the allegations set forth in Paragraphs 1-520 above as if fully set forth herein

522.     This Count is against Defendants HDR, ABS, Grape Park, Mark Sweep, Hayes, Delo, Reed, Agata Reed, Barbara Reed and Trace Reed (the "Count XIV Defendants").

523.     During the Relevant Period, Plaintiff was and still is the owner and is entitled to the possession of the following property, namely his valuable bitcoin holdings deposited in Plaintiff's BitMEX trading account.

524.     At various times mentioned in this Complaint, Defendants took the above-

mentioned property, including Plaintiff's valuable bitcoin holdings deposited in Plaintiff's respective BitMEX and Kraken trading accounts from Plaintiff's possession and converted the same to their own use.

525.   For example, Defendants Agata Reed, Barbara Reed and Trace Reed are in possession of two real estate properties located in Lake Tomahawk, WI 54539 and Norwell, MA 02061, with the aggregate market value of over $2,500,000, acquired using funds misappropriated from Plaintiff through market manipulation and laundered by Defendants through the Defendant Unknown Exchange and their real estate money laundering scheme.

526.   As a proximate result of Defendants' conversion alleged herein, Plaintiff Dolgov is entitled to damages in the amount to be proven at trial, which constitutes a certain and concrete financial loss of Plaintiff Dolgov factually (directly) and legally (proximately) caused by Count XIV Defendants, and each of them, conversion.

## PRAYER

By reason of the foregoing, Plaintiff Dolgov respectfully request that this Court:

(a)   enter a judgment that Defendants, and each of them, conducted or participated in the conduct of enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c);

(b)   enter a judgment that Defendants, and each of them, conspired to conduct or participate in the conduct of enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d);

(c)   enter a judgment that Defendants, and each of them, have used deceptive or manipulative device in connection with cryptocurrencies Perpetual Swap contracts, cryptocurrencies swaps and cash cryptocurrencies in violation of 7 U.S.C. § 9(1);

(d)   enter a judgment that Defendants, and each of them, have manipulated prices of cryptocurrencies Perpetual Swap contracts, cryptocurrencies swaps and cash cryptocurrencies in violation of 7 U.S.C. §§ 9(3) and 13(a)(2);

(e)   enter a judgment that Defendants, and each of them, have aided and abetted

manipulation of prices of cryptocurrencies Perpetual Swap contracts, cryptocurrencies swaps and cash cryptocurrencies by the other Defendants and third persons;

(f)     enter a judgment that Defendants, and each of them, have acted negligently;

(g)     enter a judgment that Defendants, and each of them, have perpetrated fraud upon Plaintiff Dolgov;

(h)     enter a judgment that Defendants, and each of them, have conspired to perpetrate fraud upon Plaintiff Dolgov;

(i)     enter a judgment that Defendants, and each of them, have engaged in unfair business practices in violation of Cal. Bus. & Prof. Code §§ 17200 et seq.;

(j)     preliminarily and permanently enjoin Defendants, and each of them, their officers, subsidiaries, affiliates distributors, agents, servants, employees, attorneys, and all persons in active concert with them, from any further violation of Federal and California laws;

(k)     enter a judgment that Defendants, and each of them, because unjustly enriched at the expense of Plaintiff Dolgov;

(l)     impose a constructive trust over Defendants, and each of them, for the benefit of Plaintiff Dolgov;

(m)     order an accounting of the alleged receipts and disbursements of Defendants, and each of them, in connection with the alleged unlawful market manipulation and payment of the amount found due to Plaintiff Dolgov;

(n)     enter judgment that Defendants, and each of them, acted with malice, fraud and oppression;

(o)     award compensatory damages to Plaintiff Dolgov and against all Defendants, and each of them, jointly and severally, in the amount to be proven at trial.

(p)     award treble damages to Plaintiff Dolgov and against all Defendants, and each of them, jointly and severally, in the amount to be proven at trial pursuant to 18 U.S.C. § 1964(c);

(q)     award reasonable attorney fees, costs and prejudgment interest to Plaintiff Dolgov and against all Defendants, and each of them, jointly and severally;

1

2

(r)      award Plaintiff Dolgov exemplary and punitive damages, pursuant to Cal. Civ.

3

Code § 3294, against all Defendants, and each of them, jointly and severally, in the amount of

$50,000,000; and

4

(s)      award Plaintiff Dolgov such other relief as this Court deems just and proper.

5

6

Dated:  October 14, 2020                                      Respectfully submitted,

7

By: /s/ Pavel I. Pogodin

Pavel I. Pogodin

8

CONSENSUS LAW

9

Pavel I. Pogodin, Ph.D., Esq.

5245 Av. Isla Verde

10

Suite 302

Carolina, PR 00979

11

United States of America

12

Telephone: (650) 469-3750

Facsimile: (650) 472-8961

13

Email: pp@consensuslaw.io

Attorneys for Plaintiff Dmitry Dolgov

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **DEMAND FOR JURY TRIAL**

2

3   Pursuant to Fed. R. Civ. P. 38, Plaintiff Dolgov demands trial by jury of all issues triable to a

4   jury.

5

Dated:  October 14, 2020                        Respectfully submitted,

6

By: /s/ Pavel I. Pogodin

7                                                    Pavel I. Pogodin

8                                              CONSENSUS LAW
9                                              Pavel I. Pogodin, Ph.D., Esq.
                                               5245 Av. Isla Verde
10                                             Suite 302
                                               Carolina, PR 00979
11                                             United States of America
                                               Telephone: (650) 469-3750
12                                             Facsimile: (650) 472-8961
                                               Email: pp@consensuslaw.io
13                                             Attorneys for Plaintiff Dmitry Dolgov

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28